IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ROBERT W. JACKSON, III, | : |
| | : **Civil Action No.** |
| Plaintiff, | : |
| | : 0 6 - 3 0 0 |
| -against- | : |
| | : **Chief Judge Sue L. Robinson** |
| STANLEY W. TAYLOR, JR., | : |
| Commissioner, Delaware Department | : |
| of Correction; THOMAS L. | : |
| CARROLL, Warden, Delaware | : **Emergency Action** |
| Correctional Center; PAUL | : **Execution Scheduled for** |
| HOWARD, Bureau Chief, Delaware | : **Midnight on May 19, 2006** |
| Bureau of Prisons; and OTHER | : |
| UNKNOWN STATE ACTORS | : |
| RESPONSIBLE FOR AND | : |
| PARTICIPATING IN THE | : |
| CARRYING OUT OF PLAINTIFF'S | : |
| EXECUTION, All in their Individual | : |
| and Official Capacities, | : |
| | : |
| Defendants. | : |
| | : |

# CIVIL RIGHTS COMPLAINT PURSUANT TO 42 U.S.C. § 1983

## INTRODUCTION AND NATURE OF ACTION

1.     Absent this Court's intervention, Plaintiff will be subjected to an execution via an unconstitutionally administered lethal injection.    The current methods used by Defendants to carry out executions are all but certain to cause barbaric and unnecessary levels of pain and suffering, in violation of the Eighth and

Fourteenth Amendments to the United States Constitution. As alleged herein, the manner in which Defendants intend to execute Plaintiff would violate the standard of care used to insure the comfort of a dog being put down by a doctor of veterinarian medicine. Just last week, an execution in Ohio, which used the same combination of lethal injection drugs as is used in Delaware, demonstrated the type of unconstitutional pain and suffering that can occur during a botched execution by lethal injection:

> "It don't work. It don't work," Joseph Lewis Clark shouted five times, raising his head and body, drawing taught the restraints that kept him on the executioner's table. "They're not working."
>
> For the first time since Ohio reinstituted the death penalty in 1999, an execution by lethal injection of a convicted murderer went awry in many ways. In the end, however, the result was the same. Clark, 57, became the 21st inmate to die at the state's hands and the second in 2006.
>
> There was nothing routine, however, about what happened in the death chamber at the Southern Ohio Correctional Facility.
>
> * * *
>
> It was Clark's struggle against death that stood out. Even in his final moments, a good hour and a half after he was supposed to be dead, Clark raised his head more than a dozen times as the three-drug fatal cocktail was pumped into a vein.
>
> "This has never happened before," Andrea Dean, a department spokeswoman, told media witnesses during the execution while Clark's groans could be heard behind a drawn curtain.

2

Kostyu, Paul E., "Execution of Joseph Lewis Clark fails to go smoothly," Copley News Service, May 2, 2006 (emphasis added).[1]

2.     Plaintiff, Robert W. Jackson, III, is a death-sentenced prisoner scheduled to be executed by the State of Delaware on May 19, 2006. He brings this action through undersigned counsel pursuant to 42 U.S.C. § 1983. Plaintiff seeks preliminary and final injunctive relief and a declaratory judgment regarding Defendants' procedure for carrying out his execution through lethal injection. That procedure is wholly inadequate to ensure that Mr. Jackson's death will not be excruciatingly painful, torturous, and cruel, in violation of Mr. Jackson's rights under the Eighth and Fourteenth Amendments to the United States Constitution. The procedures by which Defendants intend to execute Plaintiff also violate various Delaware state laws, rules and regulations, and, accordingly, Plaintiff also moves for relief based on pendant state claims.

3.     On January 18th, 2006, the Superior Court of the State of Delaware, New Castle County, held an office conference regarding Plaintiff's case. At that time, Plaintiff's court-appointed counsel (Thomas Foley, Esq.) erroneously informed the Judge that there would be no further litigation related to Plaintiff's convictions, death sentence or execution. See Jackson v. Carroll, No. 04-9012 (3d Cir. May 2, 2006),

---

[1]The author was a media witness to the execution of Joseph Lewis Clark.

3

slip op. at 2 (explaining that after the setting of the May 19 execution date "the office of the Federal Community Defender has entered an appearance" and "Jackson explains that the only reason why the execution date was set as early as May 19, 2006 is that after we denied his request for a certificate of appealability, counsel – Thomas M. Foley, Esq. – erroneously represented in state court that Jackson would not pursue further litigation.").

4.     Undersigned counsel are new to Mr. Jackson's case. See id. Pursuant to authorization received from the Administrative Office of the United States Courts, the Federal Community Defender Office for the Eastern District of Pennsylvania ("Community Defender") has been asked to render assistance to capital defense counsel in Delaware federal habeas corpus proceedings. Undersigned counsel (Michael Wiseman) met with this Court on March 13, 2006, along with Penny Marshall, Federal Public Defender for the District of Delaware, Joseph Miller, First Assistant Federal Defender for the Community Defender, Kevin O'Connell, Assistant State Public Defender, and the Honorable Jan R. Jurden, Judge of the Superior Court of Delaware. At that time, this Court was advised of the Administrative Office's request that the Community Defender lend such assistance to the Delaware Bar, and the Community Defender sought the approval of this Court for this endeavor. Subsequently, the Community Defender was authorized to render such assistance, and

4

its staff began work on a number of Delaware capital post-conviction cases, including this one.

5. On March 31, 2006, Billy H. Nolas, an Assistant Federal Defender employed by the Community Defender, entered his appearance as counsel for Mr. Jackson in the United States Supreme Court. Prior to that day, no attorney from the Community Defender had worked on Mr. Jackson's case.

6. This Complaint is being filed within six weeks of the Community Defender's involvement with Plaintiff Jackson. Community Defender counsel have acted with dispatch in bringing this litigation to this Court. Plaintiff's ability to bring this Complaint even more quickly has been hampered by Defendants' refusal to provide Plaintiff with the information he has requested about the actual protocols the Delaware Department of Correction (hereinafter, "DOC") will follow to carry out Mr. Jackson's execution.

7. Delaware's execution statute, 11 Del. C. § 4209 (f), is notable for its vagueness. Speaking in the broadest terms, it says only that Plaintiff's death sentence shall "be inflicted by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such person sentenced to death is dead." The statute prescribes no specific drugs, substances, dosages, drug combinations, or the manner of intravenous line access to be used in the execution process. The statute

5

does not prescribe any certification, training, or licensure requirement for those participating in the execution process. It does not indicate the types of personnel necessary for the constitutional carrying out of the execution. Contrary to reality, it decrees that "the administration of the required lethal substance or substances . . . shall not be construed to be the practice of medicine. . ." id., even though to be done without unconstitutionally inflicting enormous pain and suffering, it requires a high degree of medical knowledge and expertise. The statute vests in Defendant Taylor plenary authority to establish and then change, at will, the methods, drugs, personnel and every other aspect of the execution: "such execution procedure shall be determined and supervised by the Commissioner of the Department of Correction" id., "Certain procedures are mandated by law while others are left to the discretion of the Department of Correction."[2]

8.     Defendants have refused all requests by Plaintiff and his counsel to secure information about the specific protocol to be used in executing him. Nevertheless, Plaintiff has been able to discover limited information about the lethal injection protocol by studying the procedure used in past executions, autopsy reports of prisoners who have been executed, and the DOC protocol that was in effect in

---

[2]http://www.state.de.us/correct/information/deathrow_history.shtml at page 3, last visited May 6, 2006.

6

1994.[3]

9.     Based on information available to date, defendants will execute Plaintiff
by poisoning him with a lethal combination of three chemical substances: sodium
pentothal, a short-acting barbiturate; pancuronium bromide, a paralytic agent; and
potassium chloride, an extremely painful chemical that causes cardiac arrest.

10.    In carrying out Plaintiff's execution by lethal injection, Defendants will
follow an execution protocol that has not been provided to Plaintiff, despite formal
request. The protocol the Defendants will follow in carrying out Plaintiff's execution
violates the Eighth Amendment's prohibition against cruel and unusual punishment
and Delaware statutes, rules, and regulations. The combination of the three particular
chemicals used in the lethal injection, as well as the manner of their administration,
create a grave and substantial risk that Plaintiff will be conscious throughout the
execution process and, as a result, will experience a constitutionally actionable level
of excruciating pain and an unnecessarily protracted death, but will be unable to

_____

[3]In State v. Deputy, 644 A.2d 411 (Sup. Ct. Del. 1994), two internal regulations
from the DOC were made public. The First was DOC Policies and Procedures
Number 750, titled, Execution Procedures. The second was a document titled
"Injection Team," which included sections on "Pre-Execution Inventory and
Equipment Check," "Obtaining Drugs," "IV Set-Up Procedure," "Injection
Procedure,""When the Signal to Commence Is Given by the Warden," and "Contents
of Syringes." The second document also contains a "Supply Check List," which sets
forth the drugs that are administered to accomplish death.

7

communicate his pain and suffering to his executioners.

11.    Sodium pentothal, in an ordinary clinical dose, is a very short-acting barbiturate that is usually administered only during the preliminary phase of anesthesia. There is a reasonable likelihood that sodium pentothal, if ineffectively delivered, will not provide a sedative effect for the duration of the execution process. Without adequate sedation, Plaintiff will experience excruciating pain as a result of the asphyxiation caused by pancuronium bromide and the painful internal burn and cardiac arrest caused by a potassium chloride overdose.

12.    Pancuronium bromide, the second chemical administered in the lethal injection process, paralyzes voluntary muscles, including the diaphragm, but it does not affect consciousness or the perception of pain.    Pancuronium bromide, administered by itself as a "lethal dose," would not result in a quick death. Rather, it would cause someone to suffocate to death slowly, while still conscious. However, because the DOC does not use pancuronium bromide to cause death, its use in the execution process is completely unnecessary. Because it will serve only to mask Plaintiff's pain and suffering, and prevent him from reporting that he is not properly anaesthetized, its use is the process violates the Eighth Amendment's proscription against cruel and unusual punishments.

13.    Pancuronium bromide serves no lawful or penological purpose. It

8

cannot lawfully be used alone as the fatal agent, because causing death by suffocation would violate the Eighth Amendment's prohibition against cruel and unusual punishment. The use of pancuronium bromide thus greatly increases the risk that Plaintiff will be conscious, but paralyzed throughout the process leading to his death, and that he will suffer extraordinary pain but be unable to report the same to his executioners.

14. Potassium chloride, the third chemical administered, causes cardiac arrest. Without proper anesthesia, potassium chloride causes great pain and suffering, as it burns its way through the condemned's veins.

## JURISDICTION AND VENUE

15. This action is brought pursuant to 42 U.S.C. § 1983 to protect Mr. Jackson's right not to be subjected to cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. To be clear, Plaintiff does not allege that lethal injection is *per se* unconstitutional, or that the Defendants may not execute Plaintiff by lethal injection. Rather, he challenges as unconstitutional and violative of state law the manner by which the Defendants will likely administer Plaintiff's lethal injection, absent this Court's intervention. Thus, this matter is properly before the Court pursuant to 42 U.S.C. § 1983 challenging the lethal injection process that Defendants will use to execute Plaintiff, because it is not

9

a challenge to his sentence of death, nor a challenge to lethal injection *per se*.

16.     This Court therefore has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1343 (civil rights violations), § 2201 (declaratory relief), and § 2202 (further relief). Plaintiff also invokes this Court's jurisdiction to hear and decide all pendant state law claims.

17.     Since Defendants are employees or contractors engaged by the State of Delaware who will act under color of state law, this Court has general personal jurisdiction in this matter.

18.     Venue is proper pursuant to 28 U.S.C. § 1391 (b), because Plaintiff is currently incarcerated at the Delaware Correctional Center ("DCC") in Smyrna, Delaware, located in this District. All executions conducted by Defendants, including Plaintiff's, occur at the DCC. The events giving rise to this Complaint have occurred, and/or will occur, in this District.

## PARTIES

19.     Plaintiff, Robert W. Jackson, III, is a United States citizen and a resident of the State of Delaware. He is currently a death-sentenced prisoner in the custody of the Delaware Department of Correction. He is held at DCC in Smyrna, Delaware.

20.     Defendant, Stanley W. Taylor, Jr., is the Commissioner of the Delaware Department of Correction. He is responsible for the day-to-day management of the

10

DOC and is charged by state statute with determining the specific execution protocol,

and carrying out and supervising Plaintiff's execution:

*Method and imposition of sentence of death....* Punishment of death shall, in all cases, be inflicted by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such person sentenced to death is dead, and such execution procedure shall be determined and supervised by the Commissioner of the Department of Correction.

11 Del. C. § 4209(f).

21. Defendant, Thomas L. Carroll is the Warden of the Delaware Correctional Center, where Plaintiff is incarcerated and where the execution is due to take place. He is Plaintiff's custodian. Additionally, he is responsible for the day-to-day management of the DCC and for the supervision of Plaintiff's execution.

22. Defendant, Paul Howard, is the Bureau Chief for the Bureau of Prisons, which provides overall administrative support for Delaware's five state prisons, including the Delaware Correctional Center. His predecessor was responsible for researching and drafting what Plaintiff believes to be the current execution protocol.

23. Defendants, Other Unknown State Actors Responsible for and Participating in the Carrying Out of Plaintiff's Execution, are agents, employees or contractors engaged by Defendants and their agents to participate in Plaintiff's execution.

11

24.    All Defendants are sued in both their individual and official capacities.

## PRISON LITIGATION REFORM ACT EXHAUSTION

25.    It is not at all clear that DOC's prison regulations actually provide, or require, any form of grievance of Plaintiff's complaints. Nonetheless, on May 1, 2006, Plaintiff filed an inmate Grievance Report, requesting that his lethal injection not be carried out in a manner that would likely cause him unconstitutional levels of pain and suffering. Plaintiff's grievance was denied on May 4, 2006. Plaintiff was then informed by DOC, for the first time, that there was some type of appeal process. Plaintiff filed an appeal on May 5, 2006. These filings were all done *pro se*, as the DOC authorities would not permit representation by counsel.

26.    Notwithstanding his filing of a grievance, Plaintiff is not required to exhaust administrative remedies before bringing this Complaint because modification of the lethal injection protocol is not possible through the grievance process, and exhaustion is futile. Thus, Plaintiff's grievance was filed in an abundance of caution, with due recognition that exhaustion is futile.    Indeed, in a number of public statements, Defendants have made clear that they do not intend to revise their lethal injection protocol to bring it within constitutional standards. On May 2, 2006, Department of Corrections spokeswoman Gail Minor told the press that "a pending court case in California challenging the legality of lethal injections would not affect

12

Jackson's scheduled execution." Joe Rogalsky, *Date set for execution; Ruling in California case won't have effect*, DELAWARE STATE NEWS, May 2, 2006. Ms. Minor further stated that Department policy forbade her from releasing the chemical makeup of Delaware's injection, but said discussions with DOC "legal counsel" indicated Mr. Jackson's execution could proceed as scheduled. Id.

   27.    Plaintiff's challenge to the lethal injection protocol that the DOC intends to use to execute him is ripe for adjudication.

## FACTS

28.    All prior allegations set forth above are realleged as if set forth entirely herein.

29.    The best available information about Delaware's current lethal injection protocol indicates that Defendants, acting under color of state law, will administer to Plaintiff a mix of chemicals that will cause unnecessary pain and suffering during the administration of his sentence of death, thereby depriving Plaintiff of his rights to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments, in violation of 42 U.S.C. § 1983, and various Delaware state laws, rules, and regulations.

30.    The manner by which Plaintiff's execution will occur violates Plaintiff's rights under the cruel and unusual punishment clause of the Eighth Amendment

because the method creates the unreasonable and unacceptable risk of unnecessary physical and psychological pain; does not comport with contemporary norms and standards of decency; and offends Plaintiff's and society's dignity.

31.    Defendants will carry out Plaintiff's execution by utilizing three dangerous chemicals, but the protocol Defendants will follow does not ensure that the personnel entrusted with the lethal injection procedure possess the proper and necessary training, experience, or expertise to prepare and administer those chemicals. Defendants' protocol for the administration of the drugs also fails to take account of any individualized factors about the condemned that might alter the amount of chemicals needed or the way the chemicals should be administered. Defendants' protocol fails to specify the timing of the administration of the three separate chemicals, which is an essential requirement for their proper administration.

32.    Sodium pentothal, also known as thiopental, is the first drug administered. Sodium pentothal is an ultra-short-acting barbiturate that produces only shallow anesthesia. Medical professionals use it as an initial anesthetic in preparation for surgery, during the time that they set up a breathing tube in the patient, and then use different drugs to bring the patient to a "surgical plane" of anesthesia, i.e., the deeper level of anesthesia that is maintained throughout a surgery. Thus, when used in a therapeutic medical procedure, sodium pentothal is intended

14

only as a preliminary anesthetic used for the patient's comfort prior to the inducing of full, surgical, anesthesia. It is used with specific recognition that **it can be overcome if the patient is feeling pain in this initial period,** so that the medical professionals involved in the surgery can be made aware of any errors made in setting up the breathing tube and initiating the deeper anesthesia for the duration of the surgery. Plaintiff too will wake up to the pain of his execution, but because of the use of the next drug administered, pancuronium bromide, he will not be able to alert his executioner that he is feeling pain.

33.    Under Defendants' current procedure, sodium pentothal is the only anesthetic that will be administered during Plaintiff's execution.

34.    Sodium pentothal is unstable in liquid form and must be mixed and applied in a way that requires the expertise associated with licensed medical professionals.

35.    The second chemical the Defendants use is pancuronium bromide, which is a paralytic agent, not an anesthetic. The pancuronium bromide will cause Plaintiff to be paralyzed but conscious. If the initial dose of sodium pentothal fails to properly anesthetize Plaintiff – whether the failure results from an error of administration, an insufficient dose, or some other problem -- Plaintiff will be paralyzed and unable to breathe or move, but he will be conscious to suffer pain and death from burning veins

15

and heart failure caused by the administration of potassium chloride. The risk of sodium pentothal failing to initiate or maintain adequate anesthesia is neither remote nor imaginary. When sodium pentothal is exposed to pancuronium bromide, it precipitates and becomes inactive as an anesthetic. Any one of a number of mistakes, or even simple bad luck, can cause this to happen. In the absence of assurance that the executioners have the same training and skills as those who participate in therapeutic medical procedures, there is a substantial likelihood that precipitation will happen.

36.   Moreover, because Defendants will administer the potassium chloride in a lethal dose, the use of pancuronium bromide serves no purpose in the execution process. It will neither bring on Plaintiffs' death (that will be accomplished by the third drug to be administered, potassium chloride), nor will it anesthetize him. Its only function is to prevent the witnesses, media, and the DCC staff from knowing whether the sodium pentothal has worn off and whether the condemned is suffering from suffocation or from the internal burn and cardiac arrest of the third chemical, potassium chloride. In short, pancuronium bromide unnecessarily increases the risk that Plaintiff will be conscious but paralyzed during the enormously painful injection. Because he will be paralyzed, he will be unable to communicate to the executioners that he is experiencing the cruel and unusual levels of pain.

16

37. Conversely, without the use of pancuronium bromide, Plaintiff would be able to indicate that he was still conscious prior to the administration of potassium chloride. That ability is particularly crucial because Plaintiff will not be in the same room as his executioner(s). Because the executioner(s) will be removed from Petitioner and the death chamber itself, it will be impossible for the executioner(s) to determine whether Plaintiff is conscious once he is paralyzed by the pancuronium bromide.[4] 38. The third and final chemical, potassium chloride, causes the death of the condemned. Potassium chloride burns intensely as it passes through the veins towards the heart. Because the veins return blood to the heart after the blood has reached the extremities, the blood runs more slowly in the veins than it does in the arteries, prolonging the pain suffered by the condemned.

39. When the potassium chloride reaches the heart, it causes a heart attack. If the sodium pentothal has worn off, the condemned experiences the severe pain of cardiac arrest, but he is unable to express the pain, because the pancuronium bromide has paralyzed his face, arms, and entire body so that he cannot speak or move.

40. The American Veterinary Medical Association ("AVMA") has concluded that it is acceptable to euthanize an animal using the combination of an

_____

[4]http://www.state.de.us/correct/information/deathrow_history.shtml at page 2, last visited May 6, 2006, states that the executioner(s) are not in the death chamber during the process.

17

anesthetic and potassium chloride if the animal is under general anesthesia when the

potassium chloride is administered. 2000 Report of the AVMA Panel of Euthenasia,

218 J. Am. Veterinary Med. Ass'n 669, 680 (March 1, 2001) ("AVMA Report"). The

use of potassium chloride is "unacceptable and condemned," however, "when used

in unanaesthetized animals." Id.

41.    The AVMA further states that when potassium chloride is used for

animal euthenasia, it is "of utmost importance" that the personnel performing the

euthenasia "are trained and knowledgeable in anesthetic techniques, and are

competent in assessing anesthetic depth appropriate for administration of potassium

chloride intravenously. Administration of potassium chloride intravenously requires

animals to be in a surgical plane of anesthesia characterized by loss of consciousness,

loss of reflex muscle response, and loss of response to noxious stimuli." AVMA

Report at 681.

42.    Under Delaware law, animals are euthanized by "administration of

sodium pentobarbital" or, under some limited circumstances, by administration of

chloroform.  3 Del. C. § 8001.[5]  Delaware law requires that administration of

pentobarbital "be by a licensed veterinarian or by a person certified as proficient in

---

[5]An animal may be subject to euthanasia "[w]ith chloroform by a means
approved in writing by a licensed veterinarian after inspecting the equipment and
method." 3 Del. C. § 8001.

18

the injection of sodium pentobarbital by a licensed veterinarian after passing both a

written and practical examination." 3 Del. C. § 8002 (b)(2).

43.     Defendants have no analogous requirement that those involved in the

execution process be similarly credentialed. In fact, Defendants do not require that

the personnel who administer the lethal chemicals have any specialized training, thus

greatly increasing the likelihood of Plaintiff suffering undue, unnecessary, and

horrific pain and suffering. The available information about Delaware's lethal

injection protocol indicates that it fails to comport with the minimum standards for

the humane euthanization of animals.

44.     According to the information made public by the DOC, a member of the

DOC staff acts as the executioner.[6] Prior to 1991, the DOC hired a non-staff person

to carry out the execution, but "primarily due to budgetary constraints," the policy

was altered in 1991 to the effect that a staff member acts as executioner.[7] Defendants

do not publish and have refused all requests for information with respect to the

training, credentials, certifications, experience, or proficiency required of any

personnel involved in the administration of the lethal injection procedure,

---

[6]The DOC's website states, "The job of the staff executioner is voluntary, and
the person's identity is kept confidential." http://www.state.de.us/correct/
information/deathrow_history.shtml.

[7]http://www.state.de.us/correct/information/deathrow_history.shtml.

19

notwithstanding the fact that anesthesia is a complex medical procedure requiring a great deal of expertise in order to be performed correctly.

45.    Autopsy reports from prisoners executed in Delaware in the past suggest that some likely remained conscious during the administration of lethal drugs, which could have occurred because of improper insertion of the intravenous line, an unrecognized blockage in the line, or various other reasons. Yet, Defendants have not published and have refused all requests for their internal regulations or practices regarding requirements for the presence at an execution of any personnel who possess sufficient expertise to insert an intravenous line properly, to determine if there is a blockage in the intravenous line, or to evaluate whether the condemned is properly sedated before proceeding with the painful parts of the execution process.

46.    The potential absence of medically trained personnel greatly increases the risk that Plaintiff would not receive the necessary amount of anesthetic prior to being paralyzed by the pancuronium bromide, and thus would experience the painful internal burn of the potassium chloride.

47.    Inducing unconsciousness by correctly administering sodium pentothal is indispensable to preventing the wanton infliction of pain when the potassium chloride is administered. Defendants, however, have made no provision for the preparation of backup syringes of sodium pentothal.

20

48.    Defendants have failed to address the individual prisoner's medical condition and history. Several regularly prescribed drugs, including valium, which is often given to inmates prior to an execution, interfere with the ability of sodium pentothal to act properly as an anesthetic.

49.    Defendants also have no provisions for addressing the many reasonably foreseeable complications with any appropriate medical responses.

50.    Although it is possible to constitutionally conduct executions by lethal injection, Defendants have chosen not to do so. Defendants could choose to use different chemicals that pose a low to non-existent risk of administration error but do not cause extraordinarily grave consequences to a condemned prisoner if not properly administered. Instead, Defendants have chosen to use chemicals that pose a high risk of administration error. Moreover, they have not taken precautions to ensure that the personnel who administer the lethal injection chemicals possess the training, experience, and expertise needed to administer those chemicals properly. Defendants could choose not to administer the utterly unnecessary drug, pancuronium bromide, the only purpose of which is to make the witnesses more comfortable, however they will nonetheless use it. Thus, while it is possible for Defendants to choose different lethal injection chemicals and/or to retain qualified personnel to administer its chosen chemicals in order to ensure the constitutionality of Plaintiff's execution, they have

21

not done so.

## CLAIMS

51.    All prior allegations are repeated as if set forth herein.

52.    Defendants' protocol for carrying out Plaintiff's execution violates his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

53.    Defendants' failure to have an established protocol setting forth the proper dosage and administration of chemicals violates the Eighth and Fourteenth Amendments to the United States Constitution.

54.    Defendants' use of pancuronimum bromide in the execution process serves no legitimate purpose and will cause Plaintiff unnecessary and unconstitutional levels of pain and suffering by preventing him from alerting the executioner(s) that he is feeling the excruciating pain of the execution, thereby violating the Eighth and Fourteenth Amendments to the United States Constitution.

55.    Defendants' failure to utilize credentialed and trained personnel in proximity to Plaintiff during the execution, to administer the lethal drugs and monitor the execution process will cause Plaintiff unnecessary and unconstitutional levels of pain and suffering and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution.

22

## REQUEST FOR RELIEF

Wherefore, Robert W. Jackson, III, requests the following relief:

A.    Temporary, preliminary, and permanent injunctive relief enjoining the Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from executing plaintiff by lethal injection using the DOC's lethal injection protocol.

B.    Temporary, preliminary, and permanent injunctive relief to enjoin the execution of Plaintiff and to maintain the status quo until the DOC's lethal injection protocol is brought into conformity with constitutional standards.[8]

---

[8]According to Delaware law, Mr. Jackson is not subject to execution by hanging, because that method of execution only becomes relevant if lethal injection is found unconstitutional *per se.* 11 Del. C. § 4209(f) ("If the execution of the sentence of death as provided above is held unconstitutional by a court of competent jurisdiction, then punishment of death shall, in all cases, be inflicted by hanging by the neck."). As stated above, Plaintiff does not challenge the constitutionality of lethal injection, but only the unconstitutional manner by which it will be accomplished unless this Court intervenes to require Defendants to perform the lethal injection in a constitutional manner.

In any event, even if this Court's ruling required that Plaintiff's execution default to death by hanging, hanging by the neck is itself an unconstitutional, cruel form of punishment that cannot be administered in accordance with the United States Constitution or the laws of the State of Delaware. The clearest indication that hanging is an unconstitutional form of execution is that pursuant to society's evolving standards or decency, virtually all jurisdictions have dispensed with it. See e.g. Furman v. Georgia, 408 U.S. 238 (1972) (Brennan, J. concurring) ("Since the development of the supposedly more humane methods of lethal gas and electrocution, hanging . . . ha[s] virtually ceased.") (internal quotation marks and citations omitted).

23

C.   In the event that the DOC's lethal injection protocol is not enjoined in its entirety as violating the Eighth and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin defendants, their officers, agents, servants, employees, and all persons acting in concert with them from administering pancuronium bromide during the execution process;

D.   In the event that the DOC's lethal injection protocol is not enjoined in its entirety as violating the Eighth and Fourteenth Amendments, temporary, preliminary, and permanent injunctive relief to enjoin defendants, their officers, agents, servants, employees, and all persons acting in concert with them from

_____

Review of even a single description of a hanging shows why society has all but eschewed it as a humane and constitutional method of execution:

> When the trap springs he dangles at the end of the rope. There are times when the neck has not been broken and the prisoner strangles to death. His eyes pop almost out of his head, his tongue swells and protrudes from his mouth, his neck may be broken, and the rope many times takes large portions of skin and flesh from the side of the face that the noose is on. He urinates, he defecates, and droppings fall to the floor while witnesses look on.

Gardner, *Executions and Indignities – An Eighth Amendment Assessment of Methods of Inflicting Capital Punishment*, 39 Ohio St. L.J. 96, 121 (1978).

Because Plaintiff is not challenging Defendants authority to execute Plaintiff by lethal injection, the instant Complaint does not challenge the constitutionality of hanging. However, Plaintiff reserves his right to amend this Complaint should any order entered by this Court cause Defendants to believe that they are authorized by law to hang Plaintiff, or should preparations for a hanging commence.

24

allowing personnel who lack sufficient training, credentials, certification, experience,

or proficiency to conduct the lethal injection procedure;

E.      That the Court conduct appropriate and necessary evidentiary hearings

and discovery to permit Plaintiff to prove his constitutional claims; and

F.      Any such other relief as the Court deems just and proper.

Respectfully Submitted,

Maureen Kearny Rowley
Chief Federal Defender
By: Billy H. Nolas
Michael Wiseman
Helen Marino
Megan McCracken
Assistant Federal Defenders
Federal Community Defender
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Plaintiff
Robert W. Jackson, III

Dated:      Wilmington, Delaware
            May 8, 2006

25

06-300

⊛JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Robert W. Jackson III, | Stanley W. Taylor, Thomas L. Carroll, Paul Howard, & Other Unknown Agents |

| (b)  County of Residence of First Listed Plaintiff _____ (EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant  Kent |
|---|---|
| | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED. |

| (c)  Attorney's (Firm Name, Address, and Telephone Number) Michael Wiseman, Federal Community Defender, Capital Habeas Unit, Phila, PA , 215-928-0520 | Attorneys (If Known)  302 - 577 - 8844 Loren C. Meyers, Department of Justice 829 N. French St, Wilmington, DE 19801 |
|---|---|

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☒ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from another district (specify)

☐ 6  Multidistrict Litigation

☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing  (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. section 1983
Brief description of cause:
Complaint for injunctive relief regarding lethal injection

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND:  ☐ Yes  ☐ No |
|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY | (See instructions): | JUDGE _____ | DOCKET NUMBER _____ |
|---|---|---|---|

DATE  MAY  8, 2006

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____