IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

|  |  |  |
|---|---|---|
| ROBERT W. JACKSON, III, | : | Civil Action No. |
|  | : | 06-cv-300 |
|  | : |  |
| Plaintiff, | : | Chief Judge Sue L. Robinson |
|  | : |  |
| vs. | : | **Emergency Action** |
|  | : |  |
| STANLEY W. TAYLOR, JR., Commissioner, | : | **Execution Scheduled for** |
| Delaware Department of Correction;  THOMAS | : | **Midnight** |
| L. CARROLL, Warden, Delaware Correctional | : | **May 19, 2006** |
| Center; PAUL HOWARD, Bureau Chief, Bureau | : |  |
| of Prisons;  and OTHER UNKNOWN STATE | : |  |
| ACTORS RESPONSIBLE FOR AND | : |  |
| PARTICIPATING IN THE CARRYING OUT OF | : |  |
| PLAINTIFF'S EXECUTION, All in their | : | Electronically Filed |
| Individual and Official Capacities, | : |  |
|  | : |  |
| Defendants. | : |  |

_____

**PLAINTIFF'S MOTION FOR PRELIMINARY**
**INJUNCTION AND CONSOLIDATED MEMORANDUM OF LAW**

_____          Maureen Kearny Rowley
                                         Chief Federal Defender
                                         By: Billy H. Nolas
                                         Michael Wiseman
                                         Helen Marino
                                         Megan McCracken
                                         Assistant Federal Defenders
                                         Federal Community Defender
                                         for the Eastern District of Pennsylvania
                                         Capital Habeas Corpus Unit
                                         Suite 545 West – The Curtis Center
                                         Philadelphia, PA 19106
                                         215-928-0520
                                         Counsel for Plaintiff
                                         Robert W. Jackson, III.

Dated:  Wilmington, Delaware
        May 8, 2006

_____**NOTICE OF MOTION FOR PRELIMINARY RELIEF**

Plaintiff Robert W. Jackson, III is currently under a sentence of death. His execution by lethal injection is scheduled to take place at midnight on May 19, 2006. Mr. Jackson has filed a civil rights Complaint alleging that the protocol to be used by the Defendants to carry out his execution by lethal injection constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments because it creates a substantial risk that Mr. Jackson will be fully conscious and in agonizing pain during the execution process.[1]

Because it is unlikely that his Complaint can be fully adjudicated prior to his execution, he moves for preliminary injunctive relief to prevent defendants from executing him in an unconstitutional manner.

This application for a preliminary injunction is made pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65. Mr. Jackson will sustain irreparable harm if injunctive relief is not granted to prevent defendants from conducting Mr. Jackson's execution in accordance with the DOC's current protocol for lethal injection. Mr. Jackson is likely to prevail on the merits of the underlying action, and the balance of hardships weighs decidedly in his favor. This application is based on the Complaint, the following memorandum and points of authorities, and exhibits, including the declaration of Plaintiff's primary expert, Dr. Mark Heath.

Pursuant to Federal Rule of Civil Procedure 65(b), the Complaint has been provided to opposing counsel. Mr. Jackson requests that the Court issue an order to show cause and establish

---

[1]As alleged in the Complaint, Defendants have refused to provide undersigned counsel with any information regarding the specific protocol that will be used in Plaintiff's execution. Accordingly, Plaintiff's allegations are based on past executions, past protocols and a smattering of public information.

a briefing schedule, so that a hearing on this motion for preliminary relief can be conducted prior to the scheduled execution.

## I.    INTRODUCTION.

Plaintiff, Robert W. Jackson III, a death row prisoner incarcerated at Delaware Correctional Center, will soon be executed by lethal injection.  A growing body of medical evidence, eyewitness observations, and veterinary studies, persuasively demonstrate that the manner in which the Defendants administer lethal injections creates a significant risk that the condemned person fails to receive adequate anaesthesia and will therefore be conscious for the bulk of the duration of the execution.  Without adequate anesthesia, the condemned first would experience slow suffocation and paralysis as a result of the administration of pancuronium bromide, then would experience the extraordinarily painful activation of the sensory nerve fibers in the walls of his veins as a result of the administration of potassium chloride.  Given the significant risk of horrific pain and suffering posed by the protocol that will likely be followed, Mr. Jackson seeks to prevent the Defendants from executing him in a manner that is likely to subject him to this excruciating pain.

In the 18 executions by lethal injection the DOC has conducted, it has used three drugs, presumably in succession: first, sodium pentothal, a fast-acting, short-lasting barbiturate that, under ideal circumstances, will cause a condemned prisoner to lose consciousness; pancuronium bromide, a neuromuscular blocking agent that paralyzes the muscles and has no apparent purpose other than to make the execution appear peaceful and humane to witnesses; and, finally, potassium chloride, which induces cardiac arrest.  The best available information about these executions indicates that the conditions under which executions are carried out have been consistent over the years.  These conditions – remote administration of the drugs, untrained and improperly credentialed personnel

2

involved in the procedure, and no monitoring of the prisoner's condition throughout the execution process – create a substantial risk that the drugs, particularly sodium pentothal, will not be administered properly. Such an error could result – and has resulted – in prisoners remaining conscious during the painful portions of their executions. However, the likely protocol does not contain any procedures for preventing or reacting to the obvious risks. The protocol does not explain how execution personnel should detect and react to problems with administration of the chemicals; how to insure proper levels of anesthesia or explain how to suspend the execution, should it become clear that the condemned is still conscious.

Mr. Jackson alleges that the significant risk of a botched execution is a foreseeable consequence of the conditions imposed by the DOC's internal protocol for carrying out executions by lethal injection. It is surely unconstitutional for the Defendants to institute an execution protocol that creates a significant risk of inflicting excruciating pain and then to consciously disregard that risk. Plaintiff therefore requests that the Court enjoin Defendants from executing him by means of lethal injection in a manner that all but insures he will suffer torturous and unnecessary pain and suffering.

## II.    FACTUAL BACKGROUND.

Robert W. Jackson, III, was arrested on April 9th, 1992, and subsequently indicted in the New Castle County Superior Court for two counts of First Degree Murder (intentional murder and felony murder), Burglary Second Degree, Conspiracy Second Degree, Robbery First Degree, and three counts of Possession of a Deadly Weapon During the Commission of a Felony. Following a jury trial, Jackson was convicted of all indicted counts on March 30th, 1993, and, following a penalty hearing, sentenced to death by lethal injection. Presiding over the Superior Court Trial was the

Honorable Vincent A. Bifferato.

Following his first direct appeal to the Delaware Supreme Court, Jackson's convictions were affirmed; however, the Delaware Supreme Court vacated his death sentence, remanding the matter for a new penalty hearing.  See Jackson v. Carroll, 643 A.2d 1360 (Del. 1994), cert. denied Delaware v. Jackson, 513 U.S. 1136 (1995).

The second penalty hearing was held in September 1995.  Although the jury was not unanimous in recommending a death sentence, Judge Bifferato again imposed a sentence of death on October 26, 1995.  Jackson's counsel at his second penalty hearing were Kevin J. O'Connell, Esquire, and Thomas A. Foley, Esquire.  Jackson's death sentence was affirmed on appeal to the Delaware Supreme Court.  See Jackson v. State, 684 A.2d 745 (Del. 1996).

Following a representation hearing on June 12, 1997, Judge Bifferato appointed Mr. Foley as post-conviction counsel for Jackson.  Jackson's State Petition for Post Conviction Relief was filed on August 21, 1997.  On August 25, 1999, the Court issued a Memorandum Opinion, denying Jackson's Motion for Postconviction Relief.  State v. Jackson, Del. Super., ID# 92003717DI, Bifferato, J. (Aug. 25, 1999). Subsequently, Jackson appealed to the Delaware Supreme Court, which affirmed the Trial Court's denial of his Rule 61 Motion for Postconviction Relief.  Jackson v. State, 770 A.2d 506 (Del. 2001).

In August 2001, Jackson filed a Petition for Writ of Habeas Corpus in the U. S. District Court, District of Delaware.  An Amended Petition was filed on August 14, 2002.  This Court denied Jackson's Petition for Writ of Habeas Corpus.  Jackson v. State, 2004 WL 1192650 (D. Del. May 20, 2004) (No. Civ. 01-552-SLR).

Jackson filed a timely appeal in the Third Circuit Court of Appeals, which denied relief on

Jackson's appeal on December 20th, 2005. That decision, and the earlier ruling of the District Court, will be the subject of Plaintiff's Petition for Writ of Certiorari, which is being filed in the United States Supreme Court on this date (May 8, 2006).

On January 18, 2006, the Superior Court of the state of Delaware, New Castle County, held an office conference regarding Plaintiff's case. At that time, Plaintiff's then-counsel (Thomas Foley, Esq.) believed that there would be no further litigation, and counsel so informed the court. Counsel erred. As a result of that conference and the erroneous information from Mr. Foley, the Superior Court, on January 23, 2006, issued an Order setting May 19, 2006 as Mr. Jackson's execution date. See Jackson v. Carroll, No. 04-9012 (3d Cir. May 2, 2006), slip op. at 2 (explaining that after the setting of the May 19 execution date "the office of the Federal Community Defender has entered an appearance" and "Jackson explains that the only reason why the execution date was set as early as May 19, 2006 is that after we denied his request for a certificate of appealability, counsel – Thomas M. Foley, Esq. – erroneously represented in state court that Jackson would not pursue further litigation.").

Undersigned counsel are new to Mr. Jackson's case. See id. Pursuant to authorization received from the Administrative Office of the United States Courts, the Federal Community Defender Office for the Eastern District of Pennsylvania ("Community Defender") has been asked to render assistance to capital defense counsel in Delaware federal habeas corpus proceedings. Undersigned counsel (Michael Wiseman) met with this Court on March 13, 2006, along with Penny Marshall, Federal Public Defender for the District of Delaware, Joseph Miller, First Assistant Federal Defender for the Community Defender, Kevin O'Connell, Assistant State Public Defender, and the Honorable Jan R. Jurden, Judge of the Superior Court of Delaware. At that time, this Court

was advised of the Administrative Office's request that the Community Defender lend such assistance to the Delaware Bar, and the Community Defender sought the approval of this Court for this endeavor. Subsequently, the Community Defender was authorized to render such assistance, and its staff began work on a number of Delaware capital post-conviction cases, including this one.

On March 31, 2006, Billy H. Nolas, an Assistant Federal Defender employed by the Community Defender, entered his appearance as counsel for Mr. Jackson in the United States Supreme Court. Prior to that day, no attorney from the Community Defender had worked on Mr. Jackson's case.

On May 1, 2006, Plaintiff filed an inmate Grievance Report, requesting that his lethal injection not be carried out in a manner that would likely cause him unconstitutional levels of pain and suffering. Plaintiff's grievance was denied on May 4, 2006. Plaintiff was then informed by DOC, for the first time, that there was some type of appeal process. Plaintiff filed an appeal on May 5, 2006. These filings were all done *pro se*, as the DOC authorities would not permit representation by counsel.

Notwithstanding his filing of a grievance, Plaintiff is not required to exhaust administrative remedies before bringing this Complaint because modification of the lethal injection protocol is not possible through the grievance process, and exhaustion is futile. Thus, Plaintiff's grievance was filed in an abundance of caution, with due recognition that exhaustion is futile. Indeed, in a number of public statements, Defendants have made clear that they do not intend to revise their lethal injection protocol to bring it within constitutional standards. On May 2, 2006, Department of Corrections spokeswoman Gail Minor told the press that "a pending court case in California challenging the legality of lethal injections would not affect Jackson's scheduled execution." Joe Rogalsky, *Date*

6

*set for execution; Ruling in California case won't have effect*, DELAWARE STATE NEWS, May 2, 2006.  Ms. Minor further stated that Department policy forbade her from releasing the chemical makeup of Delaware's injection, but said discussions with DOC "legal counsel" indicated Mr. Jackson's execution could proceed as scheduled.  Id. No administrative challenge to the lethal injection protocol is possible here.

## III.    ARGUMENT

Mr. Jackson's civil rights Complaint alleges that the protocol that is likely to be used in his execution will result in unneccessary pain and suffering in violation of his right to be free from cruel and unusual punishment. Mr. Jackson seeks a permanent injunction to prevent his execution by use of the unconstitutional protocol.  As described herein, Mr. Jackson is likely to succeed on the merits of his request for a permanent injunction.  As also described herein, absent the Court's granting of the instant motion for a preliminary injunction, he will likely suffer irreparable harm because his constitutional claims may not be fully adjudicated prior to his execution date.  It is also in the public interest to grant preliminary injunctive relief, because doing so will allow for the full adjudication of the important questions presented in the Complaint.

### A.    The Legal Standard Governing Preliminary Injunctive Relief.

Plaintiff easily meets the well-known and established standards governing motions for preliminary injunctive relief.  "The standard for evaluating a motion for preliminary injunction is a four-part inquiry, requiring the moving party to show: (1) a reasonable probability of success on the merits; (2) irreparable injury if preliminary relief is not granted; (3) granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) preliminary relief will be in the public interest." United States v. Bell, 414 F.3d 474, 478 n.4 (3d Cir.2005).

"The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." <u>P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore</u>, LLC, 428 F.3d 504, 508 (3d Cir.2005). However, the necessary showing of likelihood of success diminishes in proportion to the "relative hardship to the party seeking the preliminary injunction." <u>Beardslee v. Woodford</u>, 395 F.3d 1064, 1067-68 (9th Cir. 2005). Where the balance of hardships tips sharply in favor of the plaintiff, he need demonstrate only the existence of serious questions going to the merits. <u>Id.</u>

Plaintiff will not demonstrate that he meets each of the four criteria.

**B.    Plaintiff Is Likely To Succeed On The Merits**.

The Complaint filed in this case alleges significant and horrific facts relevant to the manner of execution that will be used against Plaintiff. Plaintiff submits that he will prevail on the merit.

**1.    Plaintiff's Claim Is Cognizable under Section 1983.**

First, Mr. Jackson's Complaint is properly brought as a civil rights action. Section 1983 provides statutory authorization for federal claims against individuals acting under color of state law. To bring this claim under Section 1983, Plaintiff must allege, first, a violation of a right protected by the Constitution or federal law, and, second, that this right will be or is being violated by an individual acting under color of state law. 42 U.S.C. § 1983.

He does not challenge the legality of his conviction or sentence, nor does he seek to prevent the State form executing him by lethal injection **in a constitutional manner**, <u>i.e.</u> in a manner that will prevent him from experiencing the unnecessary and wanton infliction of pain and suffering. Rather, Mr. Jackson's challenge is a "method of execution" claim that is cognizable under 42 U.S.C. § 1983. <u>See</u> <u>Nelson v. Campbell</u>, 541 U.S. 637, 647 (2004) (focusing on whether the petitioner's

8

challenge "would necessarily prevent" the State from carrying out the execution).

Here, Plaintiff seeks review of the method by which his execution by lethal injection will be carried out. Plaintiff asserts that Defendants, while acting under color of state law, will violate his Eighth Amendment rights while carrying out the DOC's lethal injection protocol, thereby subjecting him to pain and suffering that would not occur if the execution were carried out with due care.

### 2.    Delaware's Lethal Injection Protocol Violates the Eighth Amendment.

The Eighth Amendment, applicable to the states through the Fourteenth Amendment, prohibits the imposition of cruel and unusual punishments. U.S. Const. Amend. VIII. The prohibition includes the "infliction of unnecessary pain in the execution of the death sentence." Louisiana ex re. Francis v. Resweber, 329 U.S. 459, 463 (1947); see also Gregg v. Georgia, 428 U.S. 153, 173 (1976) (holding Eighth Amendment prohibits "unnecessary and wanton infliction of pain"). Because the question of "unnecessary pain" is inherently relativistic, the Eighth Amendment inquiry takes account of "evolving standards of decency" and "contemporary values concerning the infliction of a challenged sanction." Gregg, 428 U.S. at 173. For example, a method of execution that was initially regarded as more humane than its alternatives could, over time, come to offend contemporary values as a result of scientific advancements and experiences with the method that demonstrate that it is not as humane as initially believed. See Fierro v. Gomez, 77 F.3d 301, 303 n.1 (9th Cir. 1996) (noting that last previous challenge to execution by lethal gas had been considered by state supreme court in 1953 and that scientific knowledge had advanced in intervening years); Cf Atkins v. Virginia, 536 U.S. 304, 314-16 (2002) (tracing development of state laws forbidding execution of mentally retarded offenders since 1989 and concluding, "The practice, therefore, has become truly unusual, and it is fair to say that a national consensus has developed against it."); Roper

v. Simmons, 543 U.S. 551, 564-65 (2005) (tracing development of state laws forbidding execution of minors since 1989 and finding the change "significant").

In determining whether a particular method of execution offends contemporary standards of decency by inflicting unnecessary pain, courts examine the "objective evidence of the pain involved in the challenged method." Campbell v. Wood, 18 F.3d 662, 682 (9th Cir. 1994). Such evidence can include expert testimony regarding the effect of the method on both humans and animals; the execution records of prisoners executed using the same method; and scientific studies and other evidence analyzing the effects on humans and animals. See Fierro, 77 F.3d at 307 (listing types of evidence considered by district court in analyzing effects of exposure to cyanide gas); Campbell, 18 F.3d at 683-87 (discussing expert testimony, scientific literature, and experiments on death by hanging considered by district court). Furthermore, evidence that other prisoners have suffered unnecessary pain, evidence of other prisoner's voluntary and involuntary movement, expressions, and apparent consciousness during his execution, are all relevant to the determining whether Plaintiff will suffer. See Fierro, 77 F.3d at 307-08 (relying on eyewitness accounts of executions by lethal gas); Campbell, 18 F.3d at 685 (relying on physician's observations during an execution by hanging).

Of course it is impossible to determine with certainty before the fact whether a particular person will suffer unnecessary pain during his execution. "For any individual challenging a death sentence, evidence of botched executions can only be put in terms of probability." J.D. Mortenson, *Earning the Right to be Retributive: Execution Methods, Culpability Theory, and the Cruel and Unusual Punishment Clause*, 88 Iowa L. Rev. 1099, 1118-20 (2003). For this reason, the question of whether the particular administration of a method of execution will inflict unnecessary pain on an individual is an inquiry as to whether the method of execution subjects the person to an

**unacceptable risk** of unconstitutional pain or suffering.  Fierro, 77 F.3d at 307 ("Campbell also made clear that the method of execution must be considered in terms of the risk of pain.") (emphasis in original); Campbell, 18 F.3d at 687.

Because any medical procedure inherently carries a risk that a mistake or accident might cause unforeseeable pain, the Eighth Amendment does not require executioners to eliminate all possible risk of pain or accident from their execution protocols.  See Campbell, 18 F.3d at 687.  A risk of pain becomes unnecessary and constitutionally intolerable, however, when experience with an execution procedure demonstrates that there are foreseeable problems that could arise that would result in the condemned's suffering intense pain, and the procedure fails to minimize or at least account for those risks.  Conversely, when the risk of pain is significantly diminished by alterations to an execution procedure, the Eighth Amendment can be satisfied.  As set forth in the Complaint, Defendants have unnecessarily increased the likelihood of a mishap and the unconstitutional infliction of pain by the drugs they use, the drugs they do not use, and as a result of the lack of credentials of those carrying out the execution.

Considering the risk of Plaintiff suffering unconstitutional pain and suffering, the Delaware lethal injection protocol that will be used by Defendants to execute Plaintiff, is clearly unconstitutional because it creates a significant, substantial **and unnecessary** risk that the Plaintiff will experience a prolonged and agonizing death.  Although a properly carried out execution by lethal injection may not involve unnecessary pain and suffering, the Delaware protocol creates a procedure that is rife with potential problems and opportunities for untrained personnel to commit grave errors, all of which can lead to an excruciatingly painful death.  Because the protocol fails to account for these potential problems, which are inherent in allowing untrained personnel to perform

11

executions by remote control, executions performed in accordance with the protocol carry a significant and unconstitutional risk of unnecessary pain.

              a.       **The lethal injection protocol creates an actionable risk of unnecessary pain during executions by imposing conditions conducive to errors and by failing to compensate or prepare for these conditions.**

The best available evidence indicates that Delaware's lethal injection protocol provides that executions shall be carried out by remote control – that is by means of an IV line(s) inserted into a vein(s) and monitored and controlled from a room outside the execution chamber.[2]  The executioner(s) causes two grams of sodium pentothal, an ultrashort-acting barbiturate anesthetic, to be administered through the IV.  Next, a syringe of normal saline is administered through the IV.  Then, 100 milligrams of pancuronium bromide, which completely paralyzes both the prisoner's voluntary muscles and his diaphragm, is administered.  Again, a syringe of normal saline is administered through the IV.  Finally, the prisoner is given 100 milliequivalents of potassium chloride, which eventually causes cardiac arrest.  See Heath Decl. ¶ 11 (attached as an Exhibit to this Motion).[3]

---

[2]Plaintiff refers to the lethal injection protocol throughout this motion and brief, but Plaintiff points out that Defendants have not produced the current protocol for carrying out executions by lethal injection, despite Plaintiff's formal requests.  In referring to the procedure for lethal injection, Plaintiff relies of four sources: (1) the Delaware Department of Correction Policies and Procedures, Number 750, "Execution Procedures (Confidential)," made public record in the appendix in State v. Deputy, 644 A.2d 411 (Sup. Ct. Del. 1994); (2) an internal Department of Correction document entitled "Injection Team," also made public in the Deputy case; (3) public information made available at the website of the Delaware Department of Correction, http://www.state.de.us/correct/default.shtml, and pages within the site; and (4) media accounts of past executions.

[3]Mark Heath M.D. is a nationally recognized expert on lethal injection.  He is an anaesthesiologist, who has studied lethal injection methods and procedures around the country. He has consulted with various correctional systems and state legislatures to assist in bringing their

Although the doses of sodium pentothal and pancuronium bromide each would, if given alone, eventually cause death by stopping breathing, neither drug has sufficient time to cause death before the potassium chloride is administered. Id., at ¶ 13.   Thus, medical evidence suggests that Plaintiff will be alive at the time that the intended fatal chemical, potassium chloride, is injected. Id. at ¶¶ 13-16.   Potassium chloride, when given in doses sufficient to cause death, is known to be excruciatingly painful, because it activates the nerves in the prisoner's veins before it causes the heart to stop, thus burning its way to the prisoner's heart. Id. at ¶ 19.   It is therefore imperative – to avoid torturous levels of pain  – that prisoners be adequately anesthetized before the potassium chloride is administered. Id. ¶ 20.

Administering the lethal drugs in the manner dictated by the lethal injection protocol creates the risk that the sodium pentothal will not be administered properly and the prisoner will not be rendered fully unconscious by the time that the other two drugs are administered. Because the protocol fails to ensure the proper administration of sodium pentothal, the risk of consciousness cannot be mitigated by the fact that the dose of sodium pentothal may be excessive in comparison to the dose that would be used in a surgical setting.   Although the full dose of sodium pentothal, if it reached the condemned, should be sufficient to induce unconsciousness id., at ¶ 17, that fact is irrelevant in light of the substantial danger that the full dose of sodium pentothal simply will not reach the prisoner.  See id. at ¶¶ 35-48.

The risk that prisoners will be conscious during their executions is in part inherent in the use of sodium pentothal itself; the DOC has chosen to use an ultrashort-acting anesthetic that is

---

systems for lethal injection into Eighth Amendment compliance.  His *curriculum vitae* is attached to his Declaration.

extremely sensitive to errors in administration. In medical situations, sodium pentothal is used only for specific, expeditious tasks, and only by personnel who have considerable expertise in anesthesia. Heath Decl. ¶¶ 32, 49-52. Monitoring the effects of sodium pentothal, like those of other ultrashort-acting anesthetics, requires considerable expertise in anesthesia. Id. ¶¶ 32, 33. Moreover, because sodium pentothal is extremely unstable, it must be carefully and properly mixed so that it does not precipitate, a technical task that requires significant training in pharmaceutical calculations. Id. ¶¶ 36, 46. Thus, sodium pentothal's instability increases the likelihood of it being administered incorrectly, and its fast-acting properties heighten the risk that improper administration will result in ineffective anesthesia and consciousness, with resulting pain and suffering.

The danger of improper administration of sodium pentothal is exacerbated by the fact that the lethal injection protocol does not require medically trained personnel to supervise, or assist in the medical tasks necessary to prepare for the execution. These tasks include mixing the sodium pentothal solution, Heath Decl. ¶ 36; setting up the IV line and associated equipment, including the "Y" injection site, in order to ensure that fluids do not leak and are not misdirected, id. at ¶¶ 39-40; and finding a usable vein, properly inserting the IV line in the proper direction, and verifying that the drugs are flowing into the prisoner's vein rather than into surrounding tissue, id. at ¶¶ 41-45. All of these tasks require a high degree of specialized training. See id. at ¶ 65.

The risk of inadequate anesthesia is compounded by the fact that the protocol requires that no execution personnel be present in the execution chamber when any of the drugs are administered. The protocol thus prevents personnel from obtaining any visual or other verification that the drugs are actually being administered to the prisoner, or that the sodium pentothal anesthetic has taken and remains in effect. Proper monitoring of the flow of fluids into the vein requires a clear view of the

14

IV site, and also tactile examination of the skin surrounding the IV site to verify skin firmness and temperature. Id. at ¶¶ 39, 40, 54.

Proper monitoring of the prisoner would also necessitate that a person trained specifically in assessing anesthetic depth closely observe the prisoner at all times after the sodium pentothal is administered. Only persons trained in anesthesia are able to assess properly whether the prisoner has attained the degree of unconsciousness necessary to render him insensitive to pain. Id. at ¶¶ 18, 33, 55, 65. For this reason, even the American Veterinary Medical Association (AVMA) requires that persons euthanizing animals be "competent in assessing depth [of anesthesia] appropriate for administration of potassium chloride." 2000 Report of the AVMA Panel of Euthenasia, 218 J. Am. Veterinary Med. Ass'n 669, 681 (March 1, 2001) ("AVMA Report"). Similarly, Delaware law requires that administration of euthanasia for animals "be by a licensed veterinarian or by a person certified as proficient in the injection of sodium pentobarbital by a licensed veterinarian after passing both a written and practical examination." 3 Del. C. § 8002 (b)(2). See Heath Decl. At ¶¶ 56-57. No such certification or licensing requirement exists with regard to Delaware executions.

Thus, the lethal injection protocol, by requiring that non-medical personnel remotely inject an unstable drug into prisoners without proper monitoring, creates conditions that are highly conducive to serious errors that could cause the sodium pentothal to be administered improperly. In the face of this danger, the protocol fails to take even the most rudimentary steps towards minimizing the obvious potential problems. Indeed, the protocol is stunning in its complete failure to acknowledge any risk or potential problem other than tampering with the lethal drugs in the days leading up to the execution.

Examples of the protocol's failure to account for the very risks that it creates are numerous.

Despite the fact that the injection team personnel are not doctors or nurses who are capable of exercising competent medical judgment based on the situation at hand, the protocol contains no specific instructions for inserting the angiocath into the vein; what size should be used; what to do if there is trouble finding an adequate vein; or how to compensate if any equipment malfunctions. Similarly, the protocol does not attempt to account for the foreseeable issues that may arise when a prisoner requires special consideration for any reason.  There is no provision for individualized dosage calculation or medical care or prisoners on medications that may interfere with the anesthetic. Nor is there any indication of how personnel should go about exercising their discretion should these types of issues arise, or who bears responsibility for making medical decisions on the scene.  Indeed, the protocol does not specify whether the injection team is in any way prepared to handle the contingencies that might occur during the course of an execution, or provide that training should encompass foreseeable contingencies.

The protocol does not anticipate and provide for the problems that could arise as a result of having no personnel in the execution chamber with the condemned. There is no procedure for testing or verifying the efficacy of the extended IV tubing, or even any instruction on precisely how to set up the tubing. Nor is there a procedure for entering the chamber during the execution should any of the equipment malfunction or the prisoner somehow indicate that something has gone awry.

Finally, and most disturbingly, the protocol apparently does not require execution personnel to verify in any manner, even through the windows of the execution chamber, that the prisoner has been rendered unconscious by the sodium pentothal.  Thus, despite the foreseeable risks created by the protocol and described above, the protocol simply does not acknowledge, much less provide for, the possibility that the dose of sodium pentothal will fail to render the prisoner unconscious.

16

> **b.**   **The use of pancuronium bromide in combination with sodium pentothal creates a significant risk that the condemned will be conscious, but unable to communicate that he is conscious, during their executions.**

In light of the fact that sodium pentothal is an ultra-short-acting anesthetic, and that Delaware's lethal injection protocol creates the risk that the dose will not be properly administered, it is particularly important that the prisoner have the opportunity to alert execution personnel should he regain – or never lose – consciousness, and that the execution personnel have the ability to ascertain whether the prisoner is properly anesthetized. Yet the use of pancuronium bromide in combination with sodium pentothal effectively prevents any post-administration correction of problems with the sodium pentothal. It also serves no purpose within the lethal injection process, raising questions about its use.

Pancuronium bromide is a neuromuscular blocking agent that blocks nerve cells from interacting with muscle tissue, therefore paralyzing the prisoner's muscles, including those of the chest and diaphragm. Heath Decl. ¶ 13.  A patient given pancuronium bromide alone would slowly suffocate to death; thus, the unanesthetized experience of the effects of pancuronium bromide would in itself involve extraordinary suffering, as the condemned struggled to breathe.  Id. at ¶ 22. Because the drug does not affect the brain or nerves themselves, however, an unanesthetized prisoner would remain completely conscious, but due to the paralysis would be completely unable to communicate either verbally or by movement the fact that he is conscious.

Pancuronium bromide also prevents observers from determining whether the condemned is conscious.  Id. at ¶¶ 24, 25.  Thus, even if the lethal injection protocol provided some mechanism by which personnel could monitor the prisoner's consciousness, which it does not, the use of

pancuronium bromide all but ensures that it will be impossible to determine visually whether the prisoner is still feeling pain. Should a prisoner retain consciousness after the sodium pentothal is administered, the prisoner would suffer slow suffocation as well as the excruciating pain of the potassium chloride, all while being completely paralyzed and unable to communicate. Id. at ¶¶ 13, 22, 27. This period would last at least a minute, until the condemned loses consciousness from suffocation or is killed by the potassium chloride. Id. at ¶ 13.

It is precisely this risk of the combination of ineffective anesthesia and paralysis that has led at least nineteen states to prohibit the use of a sedative in conjunction with a neuromuscular blocking agent like pancuronium bromide to euthanize animals. See Beardslee, 395 F.3d at 1073 & n.9 (listing relevant state laws and noting the evidence is "somewhat significant"). The AVMA, moreover, prohibits the use of neuromuscular blocking agents alone, stating that because the drugs cause "respiratory arrest before loss of consciousness, . . . the animal may perceive pain and distress after it is immobilized." AVMA Report at 696 app. 4. The fact that so many states and the nation's leading veterinary association have condemned as inhumane the use of anesthetics and neuromuscular blocking agents in tandem in the euthanasia of animals is – to say the least – persuasive evidence that this combination of drugs is not consistent with evolving standards of decency when administered to humans. The Eighth Amendment must prohibit the infliction of the same unnecessary pain that the laws of 19 states seek to avoid visiting upon household pets – the veterinary avoidance of this method of euthanasia is compelling indeed.

Despite the evidence that employing pancuronium bromide is not consistent with basic standards of care for animals, and the fact that the use of pancuronium bromide increases the risk that a prisoner will suffer unnecessary pain, Defendants will use it to execute Mr. Jackson.

18

Pancuronium bromide serves no legitimate purpose in the execution procedure while greatly increasing the risk of an prisoner's suffering undetected agony.

> c.    **The deficiencies in Defendants' lethal injection protocol are the result of conscious choices.**

The multiple flaws in Defendants' lethal injection protocol exist as the result of choices made by Defendants.    Delaware's capital sentencing statute, 11 Del. C. § 4209,[4] gives Defendant Taylor almost total discretion over the means by which prisoners are executed: he is responsible for determining and supervising the execution procedure, including choosing the drugs used to accomplish the execution, developing the procedures by which the drugs are administered, and determining what training and qualifications, if any, are required for the execution team. Defendants have chosen to exercise this discretion in a manner that creates an unacceptable risk that prisoners will suffer excruciating pain before their deaths.

Defendants have chosen to use drugs that are extremely sensitive to error, in that sodium pentothal can wear off quickly if not administered correctly, and pancuronium bromide will mask the prisoner's resulting consciousness. For precisely this reason, the AVMA has chosen to use pentobarbital, a longer-acting anesthetic, in animal euthanasia.  AVMA Report at 680-81.  Thus, it is clear that other means of causing death by injecting lethal chemicals are available, and that considerations of good medical practice and preventing pain and consciousness are not incompatible with the aim of causing death.

> d.    **Conclusion.**

---

[4]"Punishment of death shall, in all cases, be inflicted by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such person sentenced to death is dead, and such execution procedure shall be determined and supervised by the Commissioner of the Department of Correction."  11 De. C. § 4209.

19

Delaware's lethal injection protocol creates a significant risk that a prisoner will experience excruciating pain for several minutes. This risk is inherent in the design of the protocol, with its insistence on remote administration and its choice of drugs, and is aggravated by the lethal injection protocol's failure to account for the problems that could arise as a result, and its failure to require adequate training, credentialing and licensing of those responsible for carrying it out.

The risk of unnecessary pain is clearly more substantial than the slight or negligible risk that may be characterized as an accident or anomaly. Available information from Delaware executions and those performed in other states with similar protocols, indicates the strong possibility that at least some of these prisoners were not properly anesthetized during their executions. While it is impossible to quantify precisely the risk of pain that an individual prisoner like Mr. Jackson faces when he enters the execution chamber, the nature of the risk renders it more substantial than might otherwise be the case. Because the potential problems are caused by the lethal injection protocol, every condemned prisoner faces the risk of unnecessary pain during his execution. The risk is not dependent on unforeseeable contingencies, such as an uncontrollable electrical problem, see Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 464 (1947), but simply increases if a prisoner's individual characteristics make him less receptive to anesthesia. Mr. Jackson deserves to have his challenge considered on a full record after discovery.

Balanced against these foreseeable risks is the plain fact that Defendants can remediate these problems with no adverse impact on any legitimate concerns, such as the efficacy of the execution, prison security or cost.

### C.     Mr. Jackson Will Suffer Irreparable Harm If Injunctive Relief Is Not Granted.

If the Defendants are not enjoined from executing Mr. Jackson in accordance with its lethal

injection protocol, Mr. Jackson will suffer irreparable harm.  The excruciating pain that Mr. Jackson will suffer during his execution clearly constitutes irreparable harm.  See Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996) (holding that continued pain and suffering resulting from deliberate medical indifference is irreparable harm).  Moreover, he will have no meaningful retrospective remedy or remedy at law, as he will no longer be alive.  Indeed, the Defendant's violation of Mr. Jackson's Eighth Amendment rights in itself warrants a presumption of irreparable harm, as federal courts have found that "an alleged constitutional infringement will often alone constitute irreparable harm." Association for Fairness in Business, Inc. v. New Jersey, 82 F.Supp.2d 353 (D. N.J. 2000) (internal quotation marks omitted).

        **D.**       **The Balance of Hardships Favor Mr. Jackson.**

The balance of hardships tips sharply in Mr. Jackson's favor.  In requesting preliminary injunctive relief, Mr. Jackson seeks simply to vindicate his right to be free from cruel and unusual punishment in the time left before his execution.  Without this preliminary relief, Mr. Jackson will be unable to vindicate these rights.   Defendants, in contrast, will suffer little to no harm if Mr. Jackson's execution is carried out in a humane manner.  See Gomez v. U.S. Dist. Ct. for Northern Dist. of Cal., 966 F.2d 460, 462 (9th Cir. 1992) (Noonan, J., dissenting from grant of writ of mandate) ("The state will get its man in the end. In contrast, if persons are put to death in a manner that is determined to be cruel, they suffer injury that can never be undone, and the Constitution suffers an injury that can never be repaired.").

**E.    Granting Injunctive Relief Is In The Public Interest.**

Mr. Jackson's claim that Delaware's lethal injection protocol causes unconstitutional wanton pain and suffering implicates the public interest.  Because Mr. Jackson alleges that the State of Delaware will violate his Eighth Amendment rights by executing him in accordance with its lethal injection protocol, it is paramount to the public interest that Mr. Jackson's claims be resolved on the merits.  The issues are significant enough that the United States Supreme Court has taken *certiorari* to consider them, see Nelson v. Campbell, 541 U.S. 637 (2004) (holding plaintiff's civil rights complaint pursuant to §1983 was appropriate vehicle for challenge to "cut-down" procedure, and plaintiff's request for preliminary injunction did not transform § 1983 claim into a challenge to validity of his death sentence sounding in habeas), and the Court continues to consider them on *certiorari* review this term, see Hill v. Crosby, 126 S.Ct. 1189 (2006) (granting *certiorari*).  Surely the issues are worthy of this Court's consideration.  Full and fair review is in the public interest.

Lethal injection has become the predominant method of execution because it is widely believed by officials to be, and is perceived by the general public as, the most humane form of execution. See Atul Gawande, *When Law and Ethics Collide – Why Physicians Participate in Executions*, 354 NEJM 1221-1229 (2006) ("Lethal injection now appears to be the sole method of execution accepted by courts as humane enough to satisfy Eighth Amendment requirements — largely because it medicalizes the process. . . .  Officials liked this method.  Because it borrowed from established anesthesia techniques, it made execution like familiar medical procedures rather than the grisly, backlash-inducing spectacle it had become."). In choosing lethal injection on the assumption that it is painless, the Delaware state legislature has concluded that employing the most humane method of execution possible is in the public interest. There is now compelling evidence,

22

as described herein and in the Complaint, that lethal injection protocols like the one used in Delaware create a significant and unacceptable risk of inflicting unnecessary pain. Definitively resolving the important and pressing question of the constitutionality of the lethal injection protocol is entirely in the public interest, and therefore granting temporary relief so that Mr. Jackson may remain alive while the parties conduct discovery into this issue also furthers the public interest.

There are no countervailing considerations suggesting that granting temporary relief would hurt the public interest. Mr. Jackson has not engaged in abusive delay, nor is this suit an attempt simply to put off his execution. Where an prisoner presents a meritorious claim of constitutional dimension, it cannot possibly be in the public interest to allow the State to execute him using the very method that he challenges.

## IV.    CONCLUSION

Mr. Jackson is not attempting to prevent the State from executing him. He simply is demanding the constitutional protection to which he is entitled, by requesting that this Court ensure that he is not executed in an unconstitutional manner. To avoid the risk that Mr. Jackson's execution will be performed in such a manner as to cause him to suffer minutes of torture immediately preceding his death, Mr. Jackson is entitled to relief under 42 U.S.C. § 1983.

Accordingly, Mr. Jackson requests that the Court grant to him a hearing on this motion for preliminary relief; discovery requested in the accompanying Motion; and a preliminary injunction preventing Defendants from executing him by means of lethal injection under the protocol currently in effect in the State of Delaware.

Respectfully Submitted,

/s/ Michael Wiseman

Maureen Kearny Rowley
Chief Federal Defender
By: Billy H. Nolas
Michael Wiseman
Helen Marino
Megan McCracken
Assistant Federal Defenders
Federal Community Defender
for the Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Plaintiff
Robert W. Jackson, III.

Dated:  Wilmington, Delaware
        May 8, 2006

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 8th day of May, 2006 I served the within upon the following person by United States Mail, postage prepaid, by electronic filing and by e-mail:

Loren C. Meyers
Delaware Department of Justice
820 North French Street, 7th Floor
Wilmington, DE 19801
Loren.Meyers@state.de.us

/s/ Michael Wiseman

_____
Michael Wiseman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____
                                                    :
ROBERT W. JACKSON, III,                 :         Civil Action No.
                                                    :         06-cv-300
                                                    :
                    Plaintiff,               :         Chief Judge Sue L. Robinson
                                                    :
            vs.                                 :         **Emergency Action**
                                                    :
STANLEY W. TAYLOR, JR., Commissioner,   :    **Execution Scheduled for**
Delaware Department of Correction; THOMAS   :    **Midnight**
L. CARROLL, Warden, Delaware Correctional   :    **May 19, 2006**
Center; PAUL HOWARD, Bureau Chief, Bureau   :
of Prisons; and OTHER UNKNOWN STATE   :
ACTORS RESPONSIBLE FOR AND   :
PARTICIPATING IN THE CARRYING OUT OF   :
PLAINTIFF'S EXECUTION, All in their   :         Electronically Filed
Individual and Official Capacities,   :
                                                    :
                    Defendants.            :
_____:

## ORDER

And Now, this ____ day of May, 2006 upon Plaintiff's Motion for Preliminary Injunction, Defendants' responsive pleadings, and the full record of this matter, it is hereby ORDERED,

1.     Plaintiff's Motion is granted.

2.     Defendants are hereby preliminarily enjoined from executing Plaintiff using procedures, drugs and protocols that would violate the Eighth Amendment of the United States Constitution.

3.     The Preliminary Injunction shall remain in effect until further order of the Court.

                                                    _____
                                                    Sue L. Robinson, Chief USDJ

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT W. JACKSON, III, | : | Civil Action No. |
| | : | 06-cv-300 |
| | : | |
| Plaintiff, | : | Chief Judge Sue L. Robinson |
| | : | |
| vs. | : | **Emergency Action** |
| | : | |
| STANLEY W. TAYLOR, JR., Commissioner, | : | **Execution Scheduled for** |
| Delaware Department of Correction; THOMAS | : | **Midnight** |
| L. CARROLL, Warden, Delaware Correctional | : | **May 19, 2006** |
| Center; PAUL HOWARD, Bureau Chief, Bureau | : | |
| of Prisons;  and OTHER UNKNOWN STATE | : | |
| ACTORS RESPONSIBLE FOR AND | : | |
| PARTICIPATING IN THE CARRYING OUT OF | : | |
| PLAINTIFF'S EXECUTION, All in their | : | Electronically Filed |
| Individual and Official Capacities, | : | |
| | : | |
| Defendants. | : | |

**EXHIBITS TO**
**PLAINTIFF'S MOTION FOR PRELIMINARY**
**INJUNCTION AND CONSOLIDATED MEMORANDUM OF LAW**

1.    Declaration of Mark J.S. Heath, M.D.
2.    Curriculum Vitae of Mark J.S. Heath, M.D.
3.    Delaware Department of Correction Policies and Procedure 750, "Execution Procedures"
4.    April 14, 1993 Affidavit of Henry Risley
5.    Department of Correction "Injection Team" Document and "Supply Check List"
6.    Grievance Report of Robert W. Jackson, III
7.    April 4, 2006 letter to Stanley W. Taylor, Commissioner of Correction from Thomas
      Foley, Esq.
8.    April 4, 2006 letter to Thomas L. Carroll, Warden, Delaware Correctional Center from
      Thomas Foley, Esq.

# EXHIBIT 1

DECLARATION OF MARK HEATH, M.D.,
PURSUANT TO 28 U.S.C.§ 1746  AND 11 Del. C. § 3103

I, Mark J. S. Heath, M.D., being first duly sworn do hereby depose and say:

**Qualifications and Training**

1.        I am an adult over age 18, have never been adjudged incompetent, suffer from no

mental or emotional illness and make this affidavit of my own free will.

2.        I am an Assistant Professor of Clinical Anesthesiology at Columbia University in

New York.  I obtained my Bachelor of Arts degree from Harvard University in 1983, magna cum

laude, and graduated with honors from the University of North Carolina Medical School in 1986.

I am Board Certified in Anesthesiology.  My current practice is devoted one-third to clinical

care, one-third to education of medical residents and fellows, and one-third to laboratory

research in the field of neuroscience.  As a result of my training and research, I am familiar and

proficient with the use and pharmacology of the chemicals used to perform lethal injection.  I am

qualified to do animal research at Columbia University and am familiar with the American

Veterinary Medical Association's guidelines.

3.        Over the past several years, I have performed many hundreds of hours of research

into the techniques that are used during this procedure.  I have testified as an expert medical

witness in the following actions concerning lethal injection:

Reid v. Johnson, No. Civil Action. 3:03cv1039 (E.D. Va.);

Abdur'Rahman v. Bredesen, No. 02-2236-III (Davidson County Chancery Ct.,
Tenn.);

State v. Michael Wayne Nance, 95-B-2461-4 (Ga. Superior Ct.);

Taylor v. Cawford, 05-4173-CV-C-FJG (W.D. Mo.);

Ralph Baze & Thomas Bowling v. Rees, 04-CI-01094, (Franklin County Circuit Ct., Kent.);

Evans v. Saar, No. 1:06-CV-00149-BEL, (D. Md.);

Baker v. Saar, No. 1:05-CV-03207-WDQ, (D.Md.);

State v. Nathanial Code, No.138860, (1st Judicial D. Ct. of LA for Caddo Parish 2003).

4.       I have also testified as a medical expert in Pennsylvania in an action that did not concern lethal injection.

5.       I have filed affidavits that have been reviewed by courts in the above states, as well as the United States Supreme Court and courts in New York, Alabama, North Carolina, South Carolina, Ohio, Oklahoma, Texas, California, and Connecticut. During court proceedings, I have heard testimony from prison wardens who are responsible for conducting executions by lethal injection. I have testified by invitation before the Nebraska Senate Judiciary Committee regarding proposed legislation to adopt lethal injection. I have testified by invitation before the Pennsylvania House Judiciary Committee regarding legislation proposing to prohibit the use of pancuronium bromide and other neuromuscular blockers during lethal injection procedures. My research regarding lethal injection has involved both extensive conversations with experts in fields including lethal injection, toxicology, and forensic pathology; conversations with individuals familiar with the provision of anesthesia in hospitals, and personal correspondence with the individuals responsible for introducing lethal injection as a method of execution in the United States. My qualifications are further detailed in my curriculum vitae, which I have attached to this declaration.

6.       I have been asked by counsel for Mr. Robert W. Jackson, III to review

2

information and documents related to lethal injection in Delaware to determine the likelihood that those lethal injection procedures create medically unacceptable risks of inflicting excruciating pain and suffering on inmates.

7.       I hold all opinions expressed in this Declaration to a reasonable degree of medical certainty, except as specifically noted otherwise.

**Opinions and Bases Therefore**

**Overview of the Delaware Lethal Injection Procedure**

8.       My education, training, research, and experience as a practicing anesthesiologist in a teaching hospital, as detailed above and in my curriculum vitae, inform all of my opinions.

9.       I have reviewed information concerning Delaware executions by lethal injection, including Delaware statutes pertaining to lethal injection, the Official Delaware website describing the execution process, reports on post-mortem medical examinations, reports of toxicology analyses, an affidavit by Henry Risley Bureau Chief, Bureau of Prisons, regarding the Delaware lethal injection procedures and his observations during two executions by lethal injection, regulations relating to the euthanasia of animals in Delaware, and Execution Procedures (Policies and Procedures No. 750).

10.      Counsel have informed me they have not been provided with the current regulations or procedures that govern and specify what will be done during Mr. Jackson's execution. The lethal injection protocol provided to me apparently dates from the early 1990's, and it is not clear whether this protocol currently applies. I note that Mr. Risley states that the protocol was revised during his tenure. Further, Mr. Risley states in his affidavit that the procedures can be further revised in the future if warranted or after consultation. I am therefore

3

unable to provide an opinion regarding the current Delaware lethal injection protocol, and the opinions in this Declaration are based upon my review of the older materials and Mr. Risley's affidavit.

11.        Based on my review of the provided materials, and based upon toxicology reports, Delaware uses a lethal injection protocol based on the administration of thiopental sodium (also known as thiopental and Pentothal), pancuronium bromide (also known as pancuronium), and potassium chloride (also called potassium and KCl).  A saline solution is administered as a "flush" solution before and after the administration of pancuronium.  All solutions are delivered into one IV, but a second IV is also in place and is to be used in the event of a problem with the primary IV.  While, as discussed above, I do not know the doses that are currently in use by Delaware, the older protocol describes the use of 2 grams of thiopental, 100 milligrams of pancuronium, and 100 milliequivalents of potassium chloride.

12.        Based upon my review of this material and my knowledge of and experience in the field of anesthesiology, I have formed several conclusions with respect to the protocol of the Delaware Department of Correction for carrying out lethal injections.  These conclusions arise both from the details disclosed in the materials I have reviewed and from medically relevant, logical inferences drawn from the omission of details in those materials (e.g., details regarding the training of the personnel involved; details of the medical equipment used; and details of the precise methods by which the personnel involved use the equipment to carry out an execution by lethal injection).

**Drugs Used in the Lethal Injection Process**

13.        Broadly speaking, the sodium pentothal is intended to serve as an anesthetic,

4

rendering the inmate unconscious for the duration of the execution. The pancuronium bromide paralyzes the inmate's voluntary muscles, including those of his chest and diaphragm. Pancuronium bromide is not an anesthetic or sedative drug, and it does not affect consciousness. Potassium chloride is a salt solution that, when rapidly administered in high concentration and quantity, induces cardiac arrest. Although the successful delivery into the circulation of 2 grams of sodium pentothal and 100 milligrams of pancuronium bromide into the circulation would be lethal, it is important to understand that the lethality of sodium pentothal and pancuronium is due to respiratory arrest, which takes several minutes to ensue and does not typically occur prior to the administration of potassium chloride. In the execution sequence, before death is caused by respiratory arrest from sodium pentothal and pancuronium bromide, death is caused by cardiac arrest induced by potassium chloride. I base this opinion, that the potassium chloride and not the pancuronium bromide or sodium pentothal is responsible for the death of inmates during lethal injection, on the information provided below in paragraphs 14, 15, and 16.

14.    Review of records from EKGs from lethal injection procedures conducted in other states. In the vast majority of cases, during lethal injection, cardiac activity consistent with generating perfusion persists through the administration of sodium pentothal and pancuronium bromide and only stops after potassium has been administered. The relatively sudden cessation of organized EKG activity is not consistent with a cessation of circulation due to administration of sodium pentothal and/or pancuronium bromide and is consistent with cessation of circulation after the administration of a large dose of potassium chloride.

15.    Statements by Dr. Mark Dershwitz. Dr. Dershwitz, who has often served as an expert for defendants in lethal injection challenges in various states, has in his affidavits made

5

statements such as, "during an execution by lethal injection, circulation is slowed immediately by the administration of sodium pentothal, and circulation is stopped completely by the administration of potassium chloride..." *See* Affidavit of Mark Dershwitz dated September 27, 2004, *Perkins v. Polk, et. al,* No. 5:04-CT-643-BO. While I agree with Dr. Dershwitz that the successful delivery into the circulation of large doses of sodium pentothal will slow the circulation, slowing of the circulation is a common consequence of the induction of general anesthesia and does not cause death. I also agree with Dr. Dershwitz that EKG and execution log evidence from executions by lethal injection suggests that circulation is completely stopped by the administration of potassium. For circulation to be completely stopped by potassium, some circulation must be present prior to the administration of potassium. Therefore it is logical and necessary to infer that some or possibly all inmates are alive until the potassium has been administered and has traveled via the circulation to the heart.

16.      Properties of Sodium Pentothal and Pancuronium Bromide. Sodium pentothal and pancuronium bromide exert their effects by interacting with molecular targets in the nervous system and on muscle cells in a manner that induces unconsciousness and stops breathing. Sodium pentothal and pancuronium bromide, unlike other chemicals such as cyanide, do not kill cells or tissues, and are useful to clinicians precisely because they do not kill or harm cells or tissues. The reason that sodium pentothal and pancuronium bromide can cause death is that they cause the inmate to stop breathing. Failure to breathe will result in brain damage, brain death, and cardiac arrest as the level of oxygen in the blood declines over time. These processes take a varying amount of time, depending on many factors. Physicians generally use four minutes of not breathing as the approximate benchmark time after which irreversible brain damage from

6

lack of oxygen occurs, and death typically occurs some number of minutes after the onset of

brain damage. It is worth noting, however, that this general figure of four minutes is often used

in the context of cardiac arrest, in which there is no circulation of blood through the brain. If

some level of blood circulation persists, it is very likely that brain damage and brain death would

take longer than four minutes. In the context of lethal injection, sodium pentothal and

pancuronium bromide, if successfully delivered into the circulation in large doses, would indeed

each be lethal, because they would stop the inmate's breathing, eventually causing cardiac arrest.

However, as described above, in execution by lethal injection as practiced by Delaware and other

states, the administration of potassium chloride and death precede any cardiac arrest that would

be caused by sodium pentothal and pancuronium bromide.

**Sodium Pentothal**

17.        The successful delivery of 2 grams of sodium pentothal into the circulation of an

inmate would induce an appropriate depth of anesthesia during an execution. However, the

attempted administration of 2 grams of sodium pentothal does not necessarily render an

execution humane.

18.        The plane of anesthesia needs to be monitored during an execution to ensure the

anesthesia has been properly administered and the appropriate plane of anesthesia has been

properly induced. The process of administering anesthesia intravenously is a complicated and

highly technical process that is rife with the possibility of error unless done properly and

precisely, therefore necessitating appropriate monitoring. Based on the limited material made

available to me, there is an apparent absence of any monitoring by a qualified physician or

Certified Registered Nurse Anesthetist (CRNA), who can ensure the maintenance of

7

unconsciousness, and who has the authority to intervene in the event that the proper plane of
unconsciousness has not been achieved.

**Potassium Chloride**

19.          Intravenous injection of concentrated potassium chloride solution causes
excruciating pain.  The vessel walls of veins are richly supplied with sensory nerve fibers that are
highly sensitive to potassium ions.  The intravenous administration of concentrated potassium in
doses intended to cause death therefore would be extraordinarily painful.  Defendants' selection
of potassium chloride to cause cardiac arrest needlessly increases the risk that an inmate will
experience excruciating pain prior to execution.  There exist, however, alternative chemicals that
do not activate the nerves in the vessel walls of the veins in the way that potassium chloride
does.  For example, drugs that can be given in sufficiently high doses to cause rapid cardiac
arrest are often used by veterinarians in combination with an anesthetic drug when providing
euthanasia for household pets such as dogs and cats.  The drugs most often used by veterinarians
to euthanize household pets do not cause pain or discomfort when injected intravenously
(although cardiac arrest per se may be distressing, hence the veterinary requirement for
concomitant anesthesia).

20.          The language of the legislation enacting lethal injection in Delaware does not
specify or require the use of potassium chloride.  Delaware has for unknown reasons exercised
its statutory discretion to select potassium chloride, rather than one of the many painless
alternatives, to cause cardiac arrest and death.  It is difficult to understand why Delaware would
continue to use potassium chloride to cause cardiac arrest, given that there are painless
alternatives that are just as easy to use, are not controlled substances, are inexpensive, cause

8

rapid cardiac arrest, and represent the predominant choice of veterinarians. By electing to use a chemical (potassium chloride) that causes extreme pain upon administration, the Delaware DOC has taken on the responsibility of ensuring, through all reasonable and feasible steps, that the inmate is sufficiently anesthetized and cannot experience the pain of potassium chloride injection.

**Pancuronium Bromide**

21.        Pancuronium bromide is a neuromuscular blocking agent. Its effect is to render the muscles unable to contract, but it does not affect the brain or the nerves. It is used in surgery to ensure that there is no movement and that the patient is securely paralyzed so that surgery can be performed without contraction of the muscles. In surgery, pancuronium bromide is not administered until the patient is adequately anesthetized. The anesthetic drugs must first be administered so that the patient is unconscious and does not feel, see, or perceive the procedure. This can be determined by a trained medical professional, either a physician anesthesiologist or a CRNA, who provides close and vigilant monitoring of the patient, their vital signs, and various diagnostic indicators of anesthetic depth. The Delaware DOC's procedure, to the extent disclosed, fails to provide an assurance that anesthetic depth will be properly assessed prior to the administration of pancuronium bromide. If sodium pentothal is not properly administered in a dose sufficient to cause death or at least the loss of consciousness for the duration of the execution procedure, then it is my opinion that the use of pancuronium places the condemned inmate at risk for consciously experiencing paralysis, suffocation and the excruciating pain of the intravenous injection of a high dose potassium chloride.

22.        If administered alone, a lethal dose of pancuronium bromide would not

9

immediately cause a condemned inmate to lose consciousness. It would totally immobilize the inmate by paralyzing all voluntary muscles including the diaphragm, causing the inmate to suffocate to death while experiencing an intense, conscious desire to inhale. Ultimately, consciousness would be lost, but it would not be lost as an immediate and direct result of the pancuronium bromide. Rather, the loss of consciousness would be due to suffocation, and would be preceded by the torment and agony caused by suffocation. This period of torturous suffocation would be expected to last at least several minutes and would only be relieved by the onset of suffocation-induced unconsciousness. Because the administration of a paralyzing dose of pancuronium bromide to a conscious person would necessarily cause excruciating suffering, it would be unconscionable to administer pancuronium bromide without ensuring that an adequate depth of anesthesia has been established and is maintained.

23.        Based on the information available to me, it is my opinion that Delaware's lethal injection protocol creates an unacceptable risk that the inmate will not be anesthetized to the point of being unconscious and unaware of pain for the duration of the execution procedure. If the inmate is not first successfully anesthetized, then it is my opinion that the pancuronium bromide will paralyze all voluntary muscles and mask external, physical indications of the excruciating pain being experienced by the inmate during the process of suffocating (caused by the pancuronium bromide) and having a cardiac arrest (caused by the potassium chloride).

24.        It is my opinion that pancuronium bromide, when properly and successfully administered, effectively nullifies the ability of witnesses and prison staff to discern whether or not the condemned inmate is experiencing a peaceful or agonizing death. Regardless of the experience of the condemned inmate, whether he is deeply unconscious or experiencing the

10

excruciation of suffocation, paralysis, and potassium injection, he will appear to the observers to
be serene and peaceful due to the relaxation and immobilization of the facial and other skeletal
muscles.

25.        Mr. Risley states in his affidavit that in the two executions that he observed he
"did not notice any sign that the prisoner had experienced any unnecessary pain, torture,
disgrace, or a lingering death. In fact, in both instances, it appeared as thought the prisoner
simply fell off to sleep and heaved his chest before he ceased breathing." It is very important to
understand that, because of the needless inclusion of pancuronium in the execution protocol, Mr.
Risley was not able to meaningfully ascertain whether or not the prisoners experienced torture.
Whether they were comfortably asleep, or wide awake and experiencing the torment of
suffocation, total paralysis, and the agony of potassium administration, the prisoners would have
a serene and placid appearance.

26.        It is my opinion that the doses of sodium pentothal and potassium chloride
administered in the execution procedure are lethal doses. Therefore, it is unnecessary to
administer pancuronium bromide in the course of an execution when it is quickly followed by a
lethal dose of potassium chloride. It serves no legitimate purpose and only places a chemical
veil on the process that prevents an adequate assessment of whether or not the condemned is
suffering in agony, and greatly increases the risks that such agony will ensue. Removal of
pancuronium bromide from the protocol would eliminate the risk of conscious paralysis from
occurring. It would also eliminate the risk that an inhumane execution would appear humane to
witnesses. Finally, removal of pancuronium bromide would vastly reduce the possibility that the
citizens, officials, and courts of Delaware could be inadvertently misled by witness reports

11

describing a peaceful-appearing execution when in fact the inmate could be experiencing

chemical entombment and excruciating torture.

27.        Many of the statements made above regarding the necessity of providing

anesthesia to a person receiving a lethal dose of potassium are also applicable to a person

receiving a paralyzing (and thus lethal) dose of pancuronium bromide. Specifically, because the

administration of a paralyzing dose of pancuronium bromide to a conscious person would

necessary result in excruciating suffering, it would be unconscionable to do so without first

taking all reasonable and feasible steps to ensure that the person is adequately anesthetized.

**Risks Inherent in the Current Delaware Execution Procedure**

28.        The provision of anesthesia has become a mandatory standard of care whenever a

patient is to be subjected to a painful procedure. Circumstances arise in which inmates in

Delaware prisons require surgery, and in many instances, the surgery requires the provision of

general anesthesia. In these circumstances general anesthesia is provided, and it is provided by

an individual with specific training and qualifications in the field of anesthesiology. It would be

unconscionable to forcibly subject any person, including an inmate in Delaware, to a planned and

anticipated highly painful procedure without first providing an appropriate anesthetic, and it

would be unconscionable to allow personnel who are not properly trained in the field of

anesthesiology to attempt to provide or supervise this anesthetic care.

29.        As a living person who is about to be subjected to the excruciating pain of a

potassium chloride injection, it is imperative that all inmates undergoing lethal injection be

provided with adequate anesthesia. This imperative is of the same order as the imperative to

provide adequate anesthesia for any Delaware inmate requiring general anesthesia (or any type

12

of anesthesia) before undergoing painful surgery. Given that the injection of potassium chloride is a scheduled and premeditated event that is known without any doubt to be extraordinarily painful, it would be unconscionable and barbaric for a potassium chloride injection to take place without the provision of sufficient general anesthesia to ensure that the inmate is rendered and maintained unconscious throughout the procedure, and it would be unconscionable to allow personnel who are not properly trained in the field of anesthesiology to attempt to provide or supervise this anesthetic care.

30.        It is my opinion that the lethal injection procedures selected for use in Delaware subject the inmate to an increased and unnecessary risk of experiencing excruciating pain in the course of execution. Because of the potential for an excruciating death created by the use of potassium chloride, it is necessary to induce and maintain an appropriate and deep plane of anesthesia. The circumstances and environment under which anesthesia is to be induced and maintained according to the Delaware DOC procedures create, needlessly, a significant risk that inmates will suffer the pain that accompanies the injection of potassium chloride.

31.        Presumably because of the excruciating pain evoked by potassium chloride, lethal injection protocols like the Delaware DOC procedures plan for the provision of general anesthesia by the inclusion of sodium pentothal. When successfully delivered into the circulation in sufficient quantities, sodium pentothal causes sufficient depression of the nervous system to permit excruciatingly painful procedures to be performed without causing discomfort or distress. Failure to successfully deliver into the circulation a sufficient dose of sodium pentothal would result in a failure to achieve adequate anesthetic depth and thus failure to block the excruciating pain of potassium chloride administration. The Delaware procedures do not

13

comply with the medical standard of care for inducing and maintaining anesthesia prior to and during a painful procedure. Likewise, the Delaware procedures are not compliant with the guidelines set forth by the American Veterinary Medical Association for the euthanasia of animals. Further, the Delaware procedures have made insufficient preparation for the real possibility, encountered in many other jurisdictions, and planned for in those jurisdictions, that peripheral IV access cannot be successfully established.          When anesthesiologists use sodium pentothal, we do so for the purposes of temporarily anesthetizing patients for sufficient time to intubate the trachea and institute mechanical support of ventilation and respiration. Once this has been achieved, additional drugs are administered to maintain a "surgical depth" or "surgical plane" of anesthesia (i.e., a level of anesthesia deep enough to ensure that a surgical patient feels no pain and is unconscious). The medical utility of sodium pentothal derives from its ultrashort-acting properties: if unanticipated obstacles hinder or prevent successful intubation, patients will likely quickly regain consciousness and resume ventilation and respiration on their own. The benefits of sodium pentothal in the operating room engender serious risks in the execution chamber.

32.          Because of the administration of pancuronium bromide during the lethal injection proceedings, which paralyzes the inmate, it would be impossible to monitor the plane of anesthesia during the execution without a trained individual monitoring the inmate's heart rate, blood pressure, pupil size, skin moisture, and other indicia. In a clinical setting, this monitoring would be done by a trained physician or CRNA. In addition to being appropriately trained, the person monitoring the inmate would have to be able to see the inmate, and could not be in another room or behind a curtain, even in close proximity.

14

33.        My research into executions by lethal injection strongly indicates that executions

have occurred where the full dose of sodium pentothal was not fully and properly administered.

If an inmate does not receive the full dose of sodium pentothal because of errors or problems in

administering the drug, the inmate might not be rendered unconscious and unable to feel pain, or

alternatively might, because of the short-acting nature of sodium pentothal, regain consciousness

during the execution. Thus, the concerns raised in this affidavit apply regardless of the size of

the dose of sodium pentothal that is prescribed under the protocol. The level of anesthesia, if any,

achieved in each individual inmate depends on the amount that is successfully administered,

although other factors such as the inmate's weight and sensitivity/resistance to barbiturates are

also important. Many foreseeable situations exist in which human or technical errors could

result in the failure to successfully administer the intended dose. The Delaware DOC procedures

both foster these potential problems and fail to provide adequate instruction for preventing or

rectifying these situations.

34.        Examples of problems that could prevent proper administration of sodium

pentothal include, but are not limited to, the following:

35.        Errors in Preparation. Sodium pentothal is delivered in powdered form and must

be mixed into an aqueous solution prior to administration. This preparation requires the correct

application of pharmaceutical knowledge and familiarity with terminology and abbreviations.

Calculations are also required, particularly if the protocol requires the use of a concentration of

drug that differs from that which is normally used.

36.        Error in labeling of syringes.

37.        Error in selecting the correct syringe during the sequence of administration.

15

38.         Error in Correctly Injecting the Drug into the Intravenous Line.

39.         The IV Tubing May Leak. An "IV setup" consists of multiple components that are assembled by hand prior to use. If the personnel who are injecting the drugs are not at the bedside, but are instead in a different room or part of the room, multiple IV extension sets need to be inserted between the inmate and the administration site. Any of these connections may loosen and leak. In clinical practice, it is important to maintain visual surveillance of the full extent of IV tubing so that such leaks may be detected. The configuration of the death chamber and the relative positions of the executioners and the inmate may hinder or preclude such surveillance, thereby causing a failure to detect a leak. For example, the practice of covering the inmate's body and extremities with a sheet can be a problem, because if the IV tubing runs under a sheet, makes it difficult or impossible to detect the leakage of drugs during injection. In particular, if the IV tubing were to be incorrectly inserted into the hub of the catheter, there would be leakage of the drug under the sheet and under the inmate's body that would not be detectable.

40.         Incorrect Insertion of the Catheter. If the catheter is not properly placed in a vein, the sodium pentothal will enter the tissue surrounding the vein but will not be delivered to the central nervous system and will not render the inmate unconscious. This condition, known as infiltration, occurs with regularity in the clinical setting. Recognition of infiltration requires continued surveillance of the IV site during the injection, and that surveillance should be performed by the individual who is performing the injection so as to permit correlation between visual observation and tactile feedback from the plunger of the syringe.

41.         Migration of the Catheter. Even if properly inserted, the catheter tip may move or

16

migrate, so that at the time of injection it is not within the vein. This would result in infiltration, and therefore a failure to deliver the drug to the inmate's circulation and failure to render the inmate unconscious.

42.         Perforation or Rupture or Leakage of the Vein. During the insertion of the catheter, the wall of the vein can be perforated or weakened, so that during the injection some or all of the drug leaves the vein and enters the surrounding tissue. The likelihood of rupture occurring is increased if too much pressure is applied to the plunger of the syringe during injection, because a high pressure injection results in a high velocity jet of drug in the vein that can penetrate or tear the vessel wall.

43.         Excessive Pressure on the Syringe Plunger. Even without damage or perforation of the vein during insertion of the catheter, excessive pressure on the syringe plunger during injection can result in tearing, rupture, and leakage of the vein due to the high velocity jet that exits the tip of the catheter. Should this occur, the drug would not enter the circulation and would therefore fail to render the inmate unconscious.

44.         Securing the Catheter. After insertion, catheters must be properly secured by the use of tape, adhesive material, or suture. Movement of or by the inmate, even if restrained by straps, or traction on the IV tubing may result in the dislodging of the catheter. If this were to occur under a sheet, it would not be detected, and the drug would not enter the inmate's circulation and would not render the inmate unconscious.

45.         Failure to Properly Administer Flush Solutions Between Injections of Drugs. Solutions of paralytic agents such as pancuronium bromide cause sodium pentothal to precipitate out of solution on contact, thereby interfering with the delivery of the drug to the inmate and to

17

the central nervous system.

46.        Failure to Properly Loosen or Remove the Tourniquet from the Arm or Leg. After placement of the IV catheter, failure to loosen or remove the tourniquet will delay or inhibit the delivery of the drugs by the circulation to the central nervous system. This may cause a failure of the sodium pentothal to render and maintain the inmate in a state of unconsciousness.

47.        Impaired Delivery Due to Restraining Straps. Restraining straps may act as tourniquets and thereby impede or inhibit the delivery of drugs by the circulation to the central nervous system. This may cause a failure of the sodium pentothal to render and maintain the inmate in a state of unconsciousness. Even if the IV is checked for "free flow" of the intravenous fluid prior to commencing injection, a small movement within the restraints on the part of the inmate could compress the vein and result in impaired delivery of the drug.

**Qualification and Training Required for Personnel Involved in the Administration and Monitoring of Anesthesia.**

48.        Because of these foreseeable problems in administering anesthesia, in Delaware and elsewhere in the United States, the provision of anesthetic care is performed only by personnel with advanced training in the medical subspecialty of Anesthesiology. This is because the administration of anesthetic care is complex and risky, and can only be safely performed by individuals who have completed the extensive requisite training to permit them to provide anesthesia services. Failure to properly administer a general anesthetic not only creates a high risk of medical complications including death and brain damage, but also is recognized to engender the risk of inadequate anesthesia, resulting in the awakening of patients during surgery, a dreaded complication known as "intraoperative awareness." The risks of intraoperative awareness are so grave that in October 2005, the American Society of Anesthesiologists published a new practice advisory on the subject of intraoperative awareness. If the individual providing anesthesia care is inadequately trained or experienced, the risk of these complications is enormously increased.

49.        In Delaware, and elsewhere in the United States, general anesthesia is administered by physicians who have completed residency training in the specialty of Anesthesiology, and by CRNAs. Physicians and nurses who have not completed the requisite training to become anesthesiologists or CRNAs are not permitted to provide general anesthesia. It is critical to understand that the great majority of physicians and nurses and other health care professionals do not possess the requisite training, skills, experience, and credentials to provide general anesthesia. In my opinion, individuals providing general anesthesia in the Delaware prison system should not be held to a different or lower standard than is set forth for individuals

19

providing general anesthesia in any other setting in Delaware. Specifically, the individuals

providing general anesthesia within the prison should possess the experience and proficiency of

anesthesiologists and/or CRNAs. Conversely, a physician who is not an anesthesiologist or a

nurse who is not a CRNA should not be permitted to provide general anesthesia within the prison

(or anywhere else in Delaware).

50.        Because the Delaware lethal injection protocol employs two drugs (pancuronium

bromide and potassium) that individually and together would necessarily cause excruciation and

agony, it is imperative that the preceding provision of general anesthesia be performed by an

individual who has no less experience or training than the individuals who provide general

anesthesia in all other instances in Delaware hospitals.

51.        I have reviewed the packaging materials from the thiopental sodium that is

administered to inmates during the lethal injection process. The package insert states that

"Pentothal solutions should be administered only by intravenous injection and by individuals

experienced in the conduct of intravenous anesthesia." The purpose of this type of warning in a

package insert is to inform physicians that the drug should not be used by individuals who do not

have appropriate training in how to induce and maintain a plane of anesthesia. It would not be

proper for physicians who are not specialized in anesthesiology or who do not possess

established and demonstrable comparable proficiency and experience with intravenous

anesthetics to administer thiopental or to supervise its administration.

52.        The Delaware DOC procedures fail to specify the training, certification or

qualifications of the personnel administering injections in the execution process. The absence of

any details as to the training, certification, or qualifications of injection personnel raises critical

20

questions about the degree to which condemned inmates risk suffering excruciating pain during the lethal injection procedure. The failure to require that the injection team have training equivalent to that of an anesthesiologist or a CRNA compounds the risk that inmates will suffer excruciating pain during their executions. While the lethal injection procedure does state that a physician must be present, it also states that the physician is present "only for the purpose of attending and pronouncing death." The presence of the physician, therefore, can not be considered to contribute to the processes by which anesthetic depth is established, assessed, and maintained.

53.        In addition to lacking any policy on the training necessary to perform a lethal injection, Delaware DOC procedures imposes conditions that exacerbate the foreseeable risks of improper anesthesia administration described above, and fail to provide any procedures for dealing with these risks. Perhaps most disturbingly, the procedures prevent any type of effective monitoring of the inmate's condition or whether he is anesthetized and unconscious. After the IV lines are inserted into the inmate but before the administration of the sodium pentothal, the execution personnel are present in the chamber, but stand behind a curtain or are in a separate room (the description on the Delaware DOC is ambiguous in this regard). Accepted medical practice, however, would dictate that trained personnel monitor the IV lines and the flow of anesthesia into the veins through visual and tactile observation and examination.

54.        In my opinion, having a properly trained and credentialed individual examine the inmate after the administration of the sodium pentothal (but prior to the administration of pancuronium bromide) to verify that the inmate is completely unconscious would substantially mitigate the danger that the inmate will suffer excruciating pain during his execution. Standards

21

of decency, and indeed the laws of many states, require such procedures for dogs and cats and other household pets when they are subjected to euthanasia by potassium injection. Yet the Delaware DOC procedures do not provide for such verification, and indeed they actively prevent the personnel administering the injections from determining whether or not the inmate remains conscious.

55.         The American Veterinary Medical Association (AVMA) periodically convenes an expert panel to promulgate guidelines for the euthanasia of animals. In many states these guidelines provide the basis for the laws enacted to govern and regulate the euthanasia of animals. The AVMA euthanasia guidelines permit the use of intravenous potassium for euthanasia only when the practitioner is experienced in the administration of anesthesia and the assessment of anesthetic depth and takes specific steps to ensure that the animal is in a surgical plane of anesthesia. Because the Delaware lethal injection protocol uses intravenous potassium, and because it does not require the use of personnel trained in the assessment of anesthetic depth, and because it does not require that said personnel actually assess anesthetic depth, and because it does not provide for the increase of anesthetic depth should it be deemed necessary, and because the personnel are not situated immediately adjacent to the head of the inmate so as to be able to assess anesthetic depth, the Delaware lethal protocol fails to meet the standard of care set forth by the AVMA for the euthanasia of animals.

56.         Delaware, like many states, promulgates its own standards for the euthanasia of animals. In Delaware the only permissible agent for achieving euthanasia in dogs and cats is sodium pentobarbital. Further, the regulation states that "Administration shall be by a licensed veterinarian or by a person certified as proficient in the injection of sodium pentobarbital by a

22

licensed veterinarian after passing both a written and practical examination." Thus, in both the drugs that are used, and the qualifications of the personnel specified in its regulations, the Delaware DOC fails to comply with the laws that are established to govern the lethal injection of dogs and cats.

57.     It is my opinion that to ensure a lethal injection without substantial risks of inflicting severe pain and suffering, there must be proper procedures that are clear and consistent: there must be qualified personnel to ensure that anesthesia has been achieved prior to the administration of pancuronium bromide and potassium chloride; there must be qualified personnel to select chemicals and dosages, set up and load the syringes, insert the IV catheter, and perform the other tasks required by such procedures; and there must be adequate inspection and testing of the equipment and apparatus by qualified personnel. The Delaware DOC's written procedures for implementing lethal injection, to the extent that they are available, provide for none of the above.

58.     My review of the materials from the Delaware DOC provides scant information about how the process by which the members of the execution team are selected. There appears to be no requirement that the individuals who are responsible for the provision of general anesthesia to possess any training in the field of Anesthesiology.

59.     The Delaware lethal injection protocol is also notable for its failure to specify the steps that should be taken if it is not possible to insert IV catheters in the inmate's arms or legs. This is a situation that has been encountered numerous times in lethal injection procedures in other states, and therefore should be anticipated by the Delaware DOC and addressed in its protocols. The only recognition of the possibility of difficult IV access that I could find in the

23

procedures is that a cut-down kit is included in the equipment list, as are scalpels, a hemostat, and surgical gowns. The protocol does not specify who will perform this highly invasive procedure, the credentials and experience and proficiency of the personnel performing this procedure, and it does not identify the person who holds the authority to make the decision to abandon attempts to obtain peripheral IV access.

60.        Some of the lethal injection procedures in Delaware have generated post-mortem thiopental toxicology data. The interpretation of post-mortem thiopental toxicology to make inference about anesthetic depth during lethal injection procedures must be performed with caution. For example, a process called post-mortem redistribution causes a lowering of blood thiopental values over time, and it is imprudent to draw inferences from samples that were obtained many hours after the execution. This being said, there are several post-mortem toxicology values that raise concern about the efficacy of the delivery of thiopental and therefore raise concern about whether a surgical plane of anesthesia was established and maintained during the execution.

61.        For example, the post-mortem blood thiopental concentration of Mr. Steven Pennell was determined to be 3.85 micrograms per milliliter. The records indicate that the blood was drawn 101 minutes after the time of death. Based on my review of hundreds of lethal injection procedures, this is a low value for blood thiopental to have been drawn so soon after the time of death. For example, the next execution to take place, that of Mr. James Allen Red Dog, resulted in a much higher thiopental value (8.42 micrograms per milliliter) even though the blood was drawn much later after the time of death (212 minutes) than was the case with Mr. Pennell. After the execution of Mr. Willie Sullivan, his blood was screened for the presence of drugs, the

24

results were reported as "Blood-Drug Screen: Negative". While I do not know which drugs were screened, it is routine to include barbiturates such as thiopental in blood toxicology screens, and in the other executions in which screens were done barbiturates were reported (and were positive). Finally, after the execution of Mr. Abdullah Hameen the urine was screened and found to be negative for barbiturates. I have limited experience in the evaluation of urine thiopental after lethal injection procedures. However, it is curious that in all of the other executions in Delaware in which urine thiopental was assayed it was detected. These post-mortem toxicology results raise concerns that the delivery of thiopental may have been incomplete in some executions in Delaware, and that therefore a surgical plane of anesthesia (as is required when potassium is used to stop the heart) may not have been achieved. Because pancuronium was used in these executions, and because apparently no steps were taken to assess and ensure anesthetic depth, there is probably no means of determining with certainty whether or not adequate anesthesia was established. As discussed above, the use of pancuronium also renders meaningless any impressions or conclusions held by witnesses or participants that, because the executions appeared tranquil and serene, the prisoners were in fact unconscious and unable to experience the torment of pancuronium and potassium.

62.        The Delaware lethal injection protocol recognizes in several ways the possibility that a legal development, such as the issuance of a stay, can necessitate the cessation of the execution if it is underway, and can therefore also necessitate the resuscitation of the prisoner should any of the drugs have reached circulation. However, based on the equipment list available to me it appears that the DOC is very poorly prepared to undertake the necessary measures should this foreseen circumstance develop. Numerous essential pieces of equipment,

25

medications, and monitors are not listed in the Delaware DOC procedures. Their absence renders meaningless the instruction in the protocol to "initiate life sustaining procedures".

## Conclusion

63.        Based on my research into methods of lethal injection used by various states and the federal government, and based on my training and experience as a medical doctor specializing in anesthesiology, it is my opinion that, given the apparent absence of a central role for a properly trained medical professional in the Delaware DOC's execution procedure, the chemicals used, the lack of adequately defined roles and procedures, and the failure to properly account for foreseeable risks, the lethal injection procedure Delaware employs creates medically unacceptable risks of inflicting excruciating pain and suffering on inmates during the lethal injection procedure. All of these problems could easily be addressed, and indeed have been addressed for the euthanasia of dogs and cats. It is difficult to understand why the Delaware has failed to address these problems and has failed to meet the minimum standards set forth for veterinary euthanasia.

64.        In order for the inmate and the Court to hold a reasonable assurance that a lethal injection procedure will be humane, it is essential that the personnel performing the procedure are credentialed, licensed, and proficient in the underlying knowledge, skills, and procedures upon which establishment of an appropriate plane of anesthesia throughout the lethal injection process is founded. In particular, it is essential that the execution team includes individuals with documented professional training and experience in placing IV catheters, setting up intravenous administration sets, preparation and handling of intravenous medications, administration of intravenous medications, and assessment of anesthetic depth. Further, the individuals should

26

have received formal education about the pharmacological properties of the intravenous medications being used. In order for the inmate and Court to hold an assurance that the individuals performing the lethal injection do indeed possess the above knowledge and experience it is essential that the individuals performing the procedure provide evidence of professional training, credentialing, and licensure.

65.       In conclusion, Delaware's overall system for performing lethal injection is deficient in multiple ways, notably including its failure to comply with fundamental elements of veterinary euthanasia set in place to ensure the humane end to the lives animals and its failure to provide the same level of professionalism for the provision of general anesthesia as is required in any other such setting in Delaware or the United States. As currently framed it should not be used.

66.       Finally, some of the issues discussed herein are presented in somewhat simplified form for purposes of clear communication and brevity. While there may be rare exceptions to the medical statements made above, these would only apply in arcane circumstances and would not affect the truth, significance, or relevant meaning of these statements as they pertain to discussion of lethal injection.

27

67.     I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information and belief, subject to 28 U.S.C. § 1746 and 11 Del. C. § 3103.

May 8, 2006

Mark J. S. Heath

# EXHIBIT 2

Curriculum Vitae

1)    Date of preparation:   March 10, 2006

2)    Name:                  Mark J. S. Heath

      Birth date:            March 28, 1960
      Birthplace:            New York, NY
      Citizenship:           United States, United Kingdom

3)    Academic Training:

|  |  |
|---|---|
| Harvard University | B.A., Biology, 1983 |
| University of North Carolina, Chapel Hill | M.D., 1987 |
| Medical License | New York:  177101-1 |

4)    Traineeship:

      1987 – 1988   Internship, Internal Medicine, George Washington University Hospital, Washington, DC.

      1988 – 1991   Residency, Anesthesiology, Columbia College of Physicians  and Surgeons, New York, NY

      1991 – 1993   Fellowship, Anesthesiology, Columbia College of Physicians  and Surgeons, New York, NY

5)    Board Qualification:

                 Diplomate, American Board of Anesthesiology, October 1991.
                 Diplomate National Board of Echocardiography Perioperative
                      Transesophageal Echocardiography 2005. (PTEeXAM 2001).

6)    Military Service:          None

7)    Professional Organizations:

                 International Anesthesia Research Society

8)    Academic Appointments:

                 1993 – 2002       Assistant Professor of Anesthesiology, Columbia University, New York, NY

                 2002 - present    Assistant Professor of Clinical Anesthesiology, Columbia University, New York, NY

9)    Hospital/Clinical Appointments:

|  | 1993 – present | Assistant Attending Anesthesiologist, Presbyterian Hospital, New York, NY. |

10) Honors:

Magna cum laude, Harvard University
Alpha Omega Alpha, University of North Carolina at Chapel Hill
First Prize, New York State Society of Anesthesiologists Resident Presentations, 1991

11) Fellowship and Grant Support:

Foundation for Anesthesia Education and Research, Research Starter Grant Award, Principal Investigator, funding 7/92 - 7/93, $15,000.

Foundation for Anesthesia Education and Research Young Investigator Award, Principal Investigator, funding 7/93 - 7/96, $70,000.

NIH    KO8 "Inducible knockout of the NK1 receptor"
Principal Investigator, KO8 funding 12/98 - 11/02,
$431,947 over three years
(no-cost extension to continue through 11/30/2002)

NIH    RO1 "Tachykinin regulation of anxiety and stress responses"
Principal Investigator, funding 9/1/2002 – 8/30/2007
$1,287,000 over 5 years

12) Departmental and University Committees:

Research Allocation Panel (1996 – 2001)
Institutional Review Board (Alternate Boards 1-2, full member Board 3)
(2003 - present)

13) Teaching:

Lecturer and clinical teacher: Anesthesiology Residency Program, Columbia University and Presbyterian Hospital, New York, NY

Advanced Cardiac Life Support Training

*Anesthetic considerations of LVAD implantation.* Recurrent lecture at Columbia University LVAD implantation course.

Invited Lecturer:

*NK1 receptor functions in pain and neural development*, Cornell University December 1994

*Anxiety, stress, and the NK1 receptor*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

*Anesthetic Considerations of LVAD Implantation*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

*NK1 receptor function in stress and anxiety*, St. John's University Department of Medicinal Chemistry, March 2002

*Making a brave mouse (and making a mouse brave),* Mt.Sinai School of Medicine, May 2002

*Problems with anesthesia during lethal injection procedures*, Geneva, Switzerland. Duke University School of Law Conference, "International Law, Human Rights, and the Death Penalty: Towards an International Understanding of the Fundamental Principles of Just Punishment", July 2002.

*NK1 receptor function in stress and anxiety*, Visiting Professor, NYU School of Medicine, New York, New York. October 2002.

*Anesthetic Depth, Paralysis, and other medical problems with lethal injecton protocols: evidence and concerns*, Federal Capital Habeas Unit Annual Conference, Jacksonville, Florida. May 2004.

*Medical Scrutinyof Lethal Injection Procedures.* National Association for the Advancement of Colored People Capital Defender Conference, Airlie Conference Center, Warrenton, Virginia. July 2004.

*Medical Scrutinyof Lethal Injection Procedures.* National Association for the Advancement of Colored People Capital Defender Conference, Airlie Conference Center, Warrenton, Virginia. July 2005.

*Medical Scrutinyof Lethal Injection Procedures  Advanced Criminal Law Seminar 2005, Fordham University School of Law, March 2005*

*Anesthetic considerations of LVAD implantation*. Recurrent lecture at Columbia University LVAD implantation course.


14)    Grant Review Committees:    None

15)    Publications:

**Original peer reviewed articles**

**Heath, M. J. S.**, Stanski DR, Pounder DJ.  Inadequate Anesthesia in Lethal Injection for Execution.  Lancet, 366(9491) 1073-4, correspondence.  2005

\*    Santarelli, L., Gobbi, G., Debs, P.C., Sibille, E. L., Blier, P., Hen, R., **Heath, M.J.S.** (2001). Genetic and pharmacological disruption of neurokinin 1 receptor function decreases anxiety-related behaviors and increases serotonergic function.  **Proc. Nat. Acad. Sci**., 98(4), 1912 – 1917.

\*    King, T.E. [δ], **Heath M. J. S**[δ]., Debs, P, Davis, MB, Hen, R, Barr, G. (2000). The development of nociceptive responses in neurokinin-1 receptor knockout mice. Neuroreport.;11(3), 587-91    δ authors contributed equally to this work

\*    **Heath, M. J. S.**, Lints, T., Lee, C. J., Dodd, J.  (1995).  Functional expression of the tachykinin $NK_1$ receptor by floor plate cells in the embryonic rat spinal cord and brainstem. **Journal of Physiology** 486.1, 139 -148.

\*    **Heath, M. J. S.**, Womack M. D., MacDermott, A. B. (1994).  Subsance P elevates intracellular calcium in both neurons and glial cells from the dorsal horn of the spinal cord. **Journal of Neurophysiology** 72(3), 1192 - 1197.

McGehee, D. S., **Heath, M. J. S**., Gelber, S., DeVay, P., Role, L.W.  (1995) Nicotine enhancement of fast excitatory synaptic transmission in the CNS by presynaptic receptors. **Science** 269, 1692 - 1696.

Morales D, Madigan J, Cullinane S, Chen J, **Heath, M. J. S**., Oz M, Oliver JA, Landry DW. (1999). Reversal by vasopressin of intractable hypotension in the late phase of hemorrhagic shock. Circulation. Jul 20;100(3):226-9.

LoTurco, J. J., Owens, D. F., **Heath, M. J. S**., Davis, M. B. E., Krigstein, A. R. (1995). GABA and glutamate depolarize cortical progenitor cells and inhibit DNA synthesis. **Neuron** 15, 1287 - 1298.

Kyrozis A., Goldstein P. A., **Heath, M. J. S.**, MacDermott, A. B. (1995).  Calcium entry through a subpopulation of AMPA receptors desensitized neighboring NMDA receptors in rat dorsal horn neurons.  **Journal of Physiology** 485.2, 373 - 381.

McGehee, D.S., Aldersberg, M. , Liu, K.-P., Hsuing, S., **Heath, M.J.S.** , Tamir, H.  (1997). Mechanism of extracellular $Ca^{2+}$-receptor stimulated hormone release from sheep thyroid parafolicular cells. **Journal of Physiology**:  502,1, 31 - 44.

Kao, J., Houck, K., Fan, Y., Haehnel, I., Ligutti, S. K., Kayton, M. L., Grikscheit, T., Chabot, J., Nowygrod, R., Greenberg, S., Kuang, W.J., Leung, D. W., Hayward, J. R., Kisiel, W., **Heath, M. J. S.**, Brett, J., Stern, D. (1994).  Characterization of a novel tumor-derived cytokine.  **Journal of Biological Chemistry** 269, 25106 - 25119.

Dodd, J., Jahr, C.E., Hamilton, P.N., **Heath, M.J.S.**, Matthew, W.D., Jessell, T.M. (1983). Cytochemical and physiological properties of sensory and dorsal horn neurons that transmit cutaneous sensation. **Cold Spring Harbor Symposia of Quantitative Biology** 48, 685 -695.

Pinsky, D.J., Naka, Y., Liao, H., Oz, M. O., Wagner, D. D., Mayadas, T. N., Johnson, R. C., Hynes, R. O., **Heath, M.J.S.**, Lawson, C.A., Stern, D.M. Hypoxia-induced exocytosis of endothelial cell Weibel-Palade bodies. **Journal of  Clinical Investigation** 97(2), 493 - 500.

### Case reports                    none

### Review, chapters, editorials

\*        **Heath, M. J. S.**, Dickstein,  M. L. (2000).  Perioperative management of the left ventricular assist device recipient. Prog Cardiovasc Dis.;43(1):47-54.

\*        Dickstein, M.L., Mets B, **Heath M.J.S**. (2000).  Anesthetic considerations during left ventricular assist device implantation.  Cardiac Assist Devices pp 63 – 74.

\*        **Heath, M. J. S.** and Hen, R. (1995). Genetic insights into serotonin function. **Current Biology** 5.9, 997 -999.

\*        **Heath, M.J.S.**, Mathews D. (1990).  Care of the Organ Donor.  **Anesthesiology Report** 3, 344-348.

\*        **Heath, M. J. S.,**  Basic physiology and pharmacology of the central synapse. (1998) **Anesthesiology Clinics of North America** 15(3), 473 - 485.

### Abstracts

**Heath, M.J.S.,** Analysis of postmortem thiopental in prisoners executed by lethal injection IARS Congress 2005.

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H. (2002).  Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus.  IARS American-Japan Congress A-15.

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H. (2002).  Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus.  Anesthesiology 95:A-811.

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H.  (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H.  (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212.

**Heath, M.J.S.,** Santarelli L, Hen H. (2001)  The NK1 receptor is necessary for the stress-evoked expression of c-Fos in the paraventricular nucleus of the hypothalamus.  Anesthesia and Analgesia 92; S233.

**Heath, M.J.S.,** Santarelli L, Debs P, Hen H. (2000).  Reduced anxiety and stress responses in mice lacking the NK1 receptor.  Anesthesiology 93: 3A A-755.

**Heath, M.J.S.,** King, T., Debs, P.C., Davis M., Hen R., Barr G. (2000).  NK1 receptor gene disruption alters the development of nociception.  Anesthesia and Analgesia; 90; S315.

**Heath, M.J.S.,** Lee, J.H., Debs, P.C., Davis, M. (1997).   Delineation of spinal cord glial subpopulations expressing the NK1 receptor.  Anesthesiology; 87; 3A; A639.

**Heath, M.J.S.,** MacDermott A.B. (1992).  Substance P elevates intracellular calcium in dorsal horn cells with neuronal and glial properties.  Society for Neuroscience Abstracts; 18; 123.1.

**Heath, M.J.S.,** Lee C.J., Dodd J. (1994).  Ontogeny of NK1 receptor-like immunoreactivity in the rat spinal cord.  Society for Neuroscience Abstracts; 20; 115.16.

**Heath, M.J.S.,** Berman M.F. (1991) Isoflurane modulation of calcium channel currents in spinal cord dorsal horn neurons.  Anesthesiology 75; 3A; A1037.

Presentations planned for 2006:  ASA

# EXHIBIT 3

| POLICIES AND PROCEDURES | NUMBER: 750 | PAGE 1 OF 13 |
|---|---|---|
| DEPARTMENT OF CORRECTION | TITLE: EXECUTION PROCEDURES (Confidential) | |
| STATE OF DELAWARE | | |
| APPROVED BY COMMISSIONER: | | |
| DATE SIGNED: | | |
| DISTRIBUTION: A,B,C,D | OPR: | |

## OBJECTIVE

The following procedures specify the responsibilities and required activities of the staff of the Department of Correction in the execution of condemned inmates. The condemned inmate will be referred to as the inmate subject to the death penalty (ISDP) throughout this document.

I. CONTENTS

| SECTION | TITLE | PAGE |
|---|---|---|
| I. | CONTENTS | 1 |
| II. | HOUSING | 2 |
| III. | INSTITUTIONAL PRIVILEGES | 2 |
| | A. Mail | 3 |
| | B. Visiting Procedures | 3 |
| | C. Telephone Privileges | 3 |
| IV. | MONITORING | 3 |
| V. | CROWD CONTROL/SECURITY | 4 |
| VI. | PREPARATION FOR EXECUTION | 4 |
| | A. Election Option | 4 |
| | B. Selection of an Executioner | 4 |
| | C. Attendees/Witnesses | 5 |
| | D. News Media | 6 |
| | E. Disposition of Personal Property And Inmate Account | 7 |
| | F. Stay of Proceedings | 7 |
| | G. Pre-Execution Isolation | 8 |
| | H. Lethal Injection Preparations | 9 |
| | I. Hanging Preparations | 10 |
| VII. | EXECUTION PROCEDURES | 10 |
| | A. Lethal Injection | 10 |
| | B. Hanging | 12 |
| VIII. | POST-EXECUTION PROCEDURES | 13 |
| | A. Death Certificates | 13 |
| | B. Disposition of the Deceased | 13 |
| | EXECUTION ELECTION REGULATION | Appendix 1 |

A - 1

| POLICIES AND PROCEDURES | NUMBER: 750     PAGE   2   OF   13 |
|---|---|
| DEPARTMENT OF CORRECTION | TITLE:    EXECUTION PROCEDURES |
| STATE OF DELAWARE | (Confidential) |

## II.   HOUSING

A.   All male inmates under sentence of death will be housed in an appropriate security level in the various male institutions until approximately 12 hours prior to the scheduled time of execution.

B.   All female inmates under sentence of death will be housed in an appropriate security level at the Women's Correctional Institution until approximately 12 hours prior to the scheduled time of execution.

C.   An appropriate execution holding cell, reasonably isolated from the general inmate population, will be designated by the Warden.

D.   Transfer to the execution holding cell will be effected approximately 12 hours, but not more than 24 hours, prior to the scheduled time of execution.


## III.   INSTITUTIONAL PRIVILEGES

The following procedures will be instituted when an inmate sentenced to death receives an execution date, thereby becoming an inmate subject to the death penalty (ISDP).

A.   MAIL

1.   The mail room officer will be notified in writing by the Deputy Warden when an execution date has been set for a specific inmate.

2.   The mail room officer will be instructed to forward all incoming mail for the ISDP to the Deputy Warden who will screen and exclude any items which would threaten the order and security of the institution with regard to the ISDP.  Mail intended to harass the ISDP will be considered a threat to the orderly operation of the institution and will be restricted in accordance with institutional procedures.

3.   Disposition of mail will be made by the Deputy Warden within 24 hours of receipt from the mail room.


A - 2

| POLICIES AND PROCEDURES | NUMBER: 750    PAGE  3   OF   13 |
|---|---|
| DEPARTMENT OF CORRECTION | TITLE:    EXECUTION PROCEDURES |
| STATE OF DELAWARE | (Confidential) |

4. All legal mail for the ISDP will be delivered within 24 hours of its arrival at the institution.  The Deputy Warden will assure the delivery of legal mail within the 24-hour guideline.

5. The mail room officer will be required to maintain a log of all incoming and outgoing mail for/from the ISDP.  A separate log will be required for all legal mail for/from the ISDP, noting the date and time of receipt and disposition.

B. VISITING PROCEDURES

1. Normal visiting procedures will apply to the ISDP, with the following exceptions:

   a. Exceptions to normal visiting procedures may be authorized or implemented by the Warden.

   b. One week prior to the scheduled date of execution, daily visits will be authorized in addition to attorney visits.

   c. After the ISDP is moved to the execution holding cell, visits will be restricted to approved clergy and the attorney of record.

C. TELEPHONE PRIVILEGES

1. The ISDP will be afforded normal telephone privileges prior to transfer to the execution holding cell.

2. No telephone will be authorized following transfer to the execution holding cell.

IV. MONITORING

A. In addition to the normal housing unit logs maintained by officers, logs will be kept by the two (2) officer teams on the twenty-four (24) hour death watch and by the staff on the telephone watch.

A-3

| POLICIES AND PROCEDURES | NUMBER: 750      PAGE   4   OF   13 |
|---|---|
| DEPARTMENT OF CORRECTION | TITLE:    EXECUTION PROCEDURES |
| STATE OF DELAWARE | (Confidential) |

B.  The Warden's office shall maintain a log on all actions regarding the execution beginning thirty (30) days prior to the date set for the actual execution.  This log will provide a comprehensive and chronological history of every aspect of the execution proceeding.  It will be maintained until the ISDP has been executed or has received a stay in the execution order.

## V.  CROWD CONTROL/SECURITY

A.  The Warden will notify law enforcement agencies of the scheduled date of the execution to enable them to prepare for any traffic problems and crowd control issues that may arise.  One week prior to the execution, the Warden shall hold a briefing for local law enforcement agencies and the Delaware State Police.

B.  The Warden shall formalize a perimeter control plan specifying the deployment of institution/bureau/department resources to provide adequate crowd control for the institution.  This plan will be briefed to police agencies.

C.  In the event that protesters and onlookers gather, they will be directed to a predetermined area that will be set aside for that purpose so as to ensure institutional security.  The area will be decided upon by the Warden and local law enforcement authorities.  One week prior to the execution, the Warden will recommend a location to the Commissioner for approval.

## VI.  PREPARATION FOR EXECUTION

A.  ELECTION OPTION

   1.  The process for allowing  the ISDP to elect the method of execution is contained in the Execution Election Regulation (Appendix 1).

B.  SELECTION OF AN EXECUTIONER

   1.  The selection process for executioner will begin no later than 60 days prior to the scheduled execution date.

A - 4

| POLICIES AND PROCEDURES | NUMBER: 750 PAGE 5 OF 13 |
|---|---|
| DEPARTMENT OF CORRECTION | TITLE: EXECUTION PROCEDURES (Confidential) |
| STATE OF DELAWARE | |

2. At a minimum, the Warden will ensure that the above deadline is met by someone in the administrative hierarchy of the Department. If it appears no one is actively seeking an executioner within the deadline, the Warden will take appropriate action to comply with the requirement.

3. Unless unavoidable, no member of the Delaware Department of Correction will be permitted to act as executioner.

C. ATTENDEES

1. Executions will be attended only by Department staff and others designated by the Court or the Department.

   a. The following staff members will be required to be in attendance at the execution:

      1. Commissioner of Correction
      2. Warden
      3. Chaplain
      4. Doctor
      5. Security escorts (as designated by Warden)

   b. The following personnel may attend the execution:

      1. Representative of the Attorney General's office.
      2. State Medical Examiner

D. WITNESSES

1. The number of required witnesses should be specified in the sentencing order. If unspecified, ten (10) witnesses will be selected to attend the execution.

   a. All witnesses, excepting the news media and required staff members not involved in execution matters, will be extended a written invitation by the Warden prior to the scheduled execution date with the requirement that they acknowledge their intent to attend.

A-5

| POLICIES AND PROCEDURES | NUMBER: 750   PAGE  6  OF  13 |
|---|---|
| DEPARTMENT OF CORRECTION | TITLE:   EXECUTION PROCEDURES |
| STATE OF DELAWARE | (Confidential) |

    b.  All witnesses will assemble in a single designated area at least 1 hour prior to the scheduled time of the execution.

  2.  Four (4) alternate witnesses will be invited and asked to stand by until the start of the execution process to provide for replacement of a primary witness in the event of last-minute reluctance.

E.  NEWS MEDIA

  1.  All media representatives arriving at the institution will be admitted upon presentation of valid press identification, searched, and escorted to the Visiting Room.

  2.  Six (6) representatives of the news media, to be selected as follows:  The Warden's Administrative Officer will meet with all news media personnel in the Visiting Room at the Delaware Correctional Center.  All news media personnel in attendance with the exception of the Associated Press and the United Press International wire services personnel will be divided into four (4) groups as follows:  Television, Radio, Print, and Media Representatives from out-of-state with national prominence.  Each member of the four groups (only one member of several representing a single entity) will place his/her name on a piece of paper and place it in the container for his/her respective group.  In order to have a representative from each group authorized to cover the actual execution process, ONE name will be drawn from each container by the Administrative Officer one (1) hour prior to the scheduled execution time.  The four persons whose names are drawn will be the news media witnesses to the execution in addition to one each from AP and UPI for a total of six.  These six individuals must agree not to release the story prior to returning to the Visiting Room and publicly briefing all other news media personnel in attendance.  News media personnel will be escorted to and from the execution site with all other official witnesses to the execution.  No cameras, recording devices, or writing materials will be allowed into the execution area.

A - 6

| POLICIES AND PROCEDURES | NUMBER: 750    PAGE   7   OF   13 |
|---|---|
| DEPARTMENT OF CORRECTION<br><br>STATE OF DELAWARE | TITLE:    EXECUTION PROCEDURES<br>(Confidential) |

3. Approximately 30 minutes prior to the execution and prior to the arrival of the ISDP at the execution site, the selected media representatives will be searched and transported to the execution site.

4. Immediately after the execution, the media representatives will be transported back to the Visiting Room to brief the rest of the media present.

F. DISPOSITION OF PERSONAL PROPERTY AND INMATE ACCOUNT

1. The ISDP will be notified to organize, mark, box, and designate to whom remaining personal property is to be given. If the ISDP so chooses or does not designate a recipient, such property will be disposed  of through normal procedures.

2. The ISDP will be given appropriate material with which to organize, mark, box, and designate the recipient of the property at least forty-eight (48) hours prior to the execution isolation period (transfer to execution holding cell). ALL personal property must be packaged. No personal property will be allowed in the execution holding cell.

3. At this time, the ISDP will also be given a Pay To slip to complete to designate the recipient of the remainder of the Inmate Account.

4. Any check drawn will be sent to the Warden for transmittal to the proper person or organization.

5. All property and any check for funds will be ready for distribution immediately after the execution.

6. In the event of a stay of execution, all funds and property will be returned as authorized.

G. STAY OF PROCEEDINGS

1. Written Stay of Proceedings or other official Order shall be received by a supervisory officer at the Delaware Correctional Center Control Room. Such document shall be delivered immediately to the Warden, who shall advise the Commissioner and provide him a copy of

A - 7

| POLICIES AND PROCEDURES | NUMBER: 750    PAGE  8  OF  13 |
|---|---|
| DEPARTMENT OF CORRECTION | TITLE:    EXECUTION PROCEDURES |
| STATE OF DELAWARE | (Confidential) |

same as soon as possible. Appropriate steps shall be taken to confirm the authenticity of such Order or Stay.

2. The Delaware Correctional Center Warden shall arrange for installation and maintenance of a separate tele-phone line with a confidential telephone number, to be available for the sole purpose of receiving incoming calls from the Governor, Chief Justice, or other person authorized by law to stay execution proceedings. During the eight (8) hour period preceding the execu-tion, this telephone line shall be continuously moni-tored by a DCC staff person assigned by the Warden for this sole purpose. All calls from the Governor, Chief Justice or other authorized person shall be reported to the Warden and Commissioner immediately.

- Upon installation of the special telephone line, the confidential telephone number shall be hand-delivered to the Governor, Chief Justice, Commissioner and Attorney General. Twenty-four (24) hours prior to the scheduled execution the Warden shall arrange to hand-deliver to the Governor, Chief Justice, Commissioner and Attorney General a confidential code to be utilized in the event a communication is to be made via the special telephone line. This code shall be changed prior to each scheduled execution. No telephone call on this telephone line during the eight (8) hours prior to the execution shall be deemed authentic unless accompanied by use of the designated code.

H.  PRE-EXECUTION ISOLATION

1. Twenty-four (24) hours prior to the scheduled execu-tion, death watch procedures will begin. Six (6) offi-cers will be provided by the Deputy Warden to provide constant two-officer supervision during the final twenty-four hour period. During the death watch, the ISDP will be under direct visual observation of at least one of the two officers at all times, with no exceptions.

2. At least six (6) hours prior to occupancy of the Execu-tion Holding Cell, the Administrative Officer will verify to the Warden that the Cell is prepared for

A - 8

| POLICIES AND PROCEDURES | NUMBER: 750    PAGE  9   OF   13 |
|---|---|
| DEPARTMENT OF CORRECTION | TITLE:   EXECUTION PROCEDURES |
| STATE OF DELAWARE | (Confidential) |

occupancy.  The Execution Holding Cell will be prepared with a bunk and mattress, a pillow, one pillowcase, two sheets, two blankets, and two towels.

3.  Staff for supervision and monitoring during the pre-execution isolation period will be specially designated by the Warden and will be provided with copies of their post orders regarding their duties prior to and during the execution.

4.  At least 24 hours in advance of the scheduled execution, the ISDP may request the food of his/her choice to be served at the last regularly scheduled dinner, not less than 8 hours prior to the execution.  Such request shall be granted subject to reasonable availability and cost of the items desired.  Alcoholic beverages are strictly prohibited.

5.  Between 12 and 24 hours prior to the scheduled execution time, the ISDP will be transferred to the execution holding cell.

I.  LETHAL INJECTION PREPARATIONS

1.  An appropriate team of qualified personnel will be assembled by the Commissioner's designee and the Department's Health Services provider.  The assignments shall be made in writing, at least five (5) days prior to the scheduled execution.

2.  All medications and solutions to be utilized in the execution shall be stored in a securely locked box or container, which shall be stored within a securely locked cabinet or closet.  The securely locked box or container shall only be used for the storage of medications and solutions to be used in the execution.  There shall be only one (1) set of keys to these secure areas and this set shall be retained by the Commissioner or his designee.

3.  During the forty-eight (48) hour period preceding the execution, the Medical Director shall arrange for training of all medical personnel in execution procedures.  The DCC Warden shall arrange for training of all custodial personnel who are to participate or assist in the execution.

A - 9

| POLICIES AND PROCEDURES | NUMBER: 750    PAGE 10 OF 13 |
|---|---|
| DEPARTMENT OF CORRECTION | TITLE:   EXECUTION PROCEDURES |
| STATE OF DELAWARE | (Confidential) |

J.  HANGING PREPARATIONS

   1.  When hanging is selected as the means of execution, the Medical Director and the Physical Plant Maintenance Superintendent will determine the proper distance for fall and weight for the height of the ISDP.

   2.  The Plant Superintendent will then arrange to have the rope cut and boiled and will prepare the noose and install and stretch the rope.

   3.  The Plant Superintendent will assure that a suitable collapse board is available.

   4.  Once the designated executioner has been contacted, he/she shall be consulted for inputs on detailed requirements for the hanging.

   5.  The Plant Superintendent will provide the Warden with written notification that these arrangements have been completed.

VII.  EXECUTION PROCEDURES

  A.  LETHAL INJECTION

    1. Preparation of ISDP

      a.  Medical and custodial preparation of the ISDP shall be effected pursuant to operational procedures developed by the Medical Director and Commissioner's designee.

    2.  Execution Chamber

      a.  The execution chamber shall be equipped as follows:

        1.  A cardiac monitor shall be positioned to provide visual access to the team physician(s), but to be obscured from vision by the witnesses.

        2.  An emergency cart will be located at the exterior wall of the chamber.  This cart shall contain such equipment and medications as may be

A-10

| POLICIES AND PROCEDURES | NUMBER: 750    PAGE 11    OF    13 |
|---|---|
| DEPARTMENT OF CORRECTION | TITLE: EXECUTION PROCEDURES |
| STATE OF DELAWARE | (Confidential) |

needed to revive the ISDP in the event a last minute stay of execution is imposed.

c.  The executioner's room shall be equipped with equipment, supplies and medications as are specified in the operating procedures referred to in a. above.

3.  Preparation of Execution Medications

a.  At least one (1) hour prior to the time set for the execution, the Commissioner or his designee shall remove the medications to be used in the execution from the place of storage and give them to the team nurse.

b.  Upon receipt of the execution medications, the team nurse shall be escorted to the executioner's room to prepare the execution materials. At this time, a uniformed correctional officer shall be posted at the entrance to the executioner's room. The executioner(s) shall then enter and take their assigned positions. The uniformed officer shall remain at his/her post throughout the execution procedures, or until ordered to leave by the Warden or his designee.

4.  Final Preparation of ISDP

a.  Upon arrival of the ISDP at the execution chamber, assigned team members shall position the stretcher, position and restrain the ISDP on the stretcher, and connect necessary operating systems in accordance with operational procedures. Upon completion of these assigned tasks, the ISDP shall be left alone in the execution chamber. The team physician(s) shall take designated positions to view the ISDP and the cardiac monitor.

5.  Execution Order

a.  The Warden shall, in the presence of the assembled witnesses and news media representatives, read the official death sentence Order. Upon completion, the Warden will ask the ISDP if he/she has any final comments.

A- 11

| POLICIES AND PROCEDURES | NUMBER: 750    PAGE 12 OF 13 |
|---|---|
| DEPARTMENT OF CORRECTION | TITLE:    EXECUTION PROCEDURES |
| STATE OF DELAWARE | (Confidential) |

6. Execution Command

    a. In the event of no final comments or at the comple-
tion of the comments, the Warden will state to the
executioner(s), "Proceed with the execution." At
that command, the final steps in the injection of
lethal solutions will be taken.

7. Confirmation of Death

    a. Upon completion of the execution procedures, the
team physician(s) shall enter the execution cham-
ber, examine the deceased, and confirm death. The
witnesses and media representatives shall then be
escorted from the execution area. Pursuant to
operational procedures, the deceased shall be re-
leased to the custody of the Medical Examiner. and
transported to a waiting hearse. The execu-
tioner(s) shall then depart.

8. Stay of Execution

    a. If during any stage of the foregoing execution a
stay of proceedings is ordered, execution proceed-
ings shall be halted and the witnesses shall be
removed. Team physician(s) shall then immediately
initiate life sustaining procedures. Where medi-
cally indicated, the inmate may be transferred to
an appropriate medical facility for further treat-
ment.

B. HANGING

1. Fifteen (15) minutes prior to the scheduled time of
execution, a cadre of correctional staff designated by
the Warden will escort the ISDP from the execution
holding cell onto the gallows. The executioner will
be in position. Witnesses will be in position. Media
representatives will be in position.

2. The ISDP will be placed on the collapse board if re-
quired.

A - 12

| POLICIES AND PROCEDURES | NUMBER: 750    PAGE 13   OF   13 |
|---|---|
| DEPARTMENT OF CORRECTION | TITLE:   EXECUTION PROCEDURES |
| STATE OF DELAWARE | (Confidential) |

3. Restraints will be applied as directed by the executioner.

4. The Warden will ask the ISDP if he/she has any final comments.

5. In the event of no final comments or at the completion of the comments, the Warden will state to the executioner, "Proceed with the execution."

6. The appropriate trigger(s) will be activated.

7. In the event the trap does not release, the executioner will operate the backup release.

8. After the ISDP drops through the trap, the physician(s) will determine that death has occurred.

9. The witnesses will be removed and excused. Pursuant to operational procedures, the deceased shall be removed from the gallows and transported to a waiting hearse. The executioner shall then depart.

## VIII.  POST-EXECUTION PROCEDURES

A. DEATH CERTIFICATES

1. Immediately after the execution the physician(s) shall examine the deceased and shall make a written report stating the nature of the examination and the occurrence of death. The Commissioner shall prepare and sign a separate certificate setting forth the time and place of the execution and stating that the execution was conducted in conformity to the sentence of the Court. The Commissioner's Certificate shall be filed within ten (10) days in the Superior Court in the county in which the person executed was convicted.

B. DISPOSITION OF THE DECEASED

1. Immediately after death has been certified, the remains will be transferred to the custody of the State Medical Examiner for final disposition.

DOCUMENT LOG NUMBER:38-01-87-11-001

A - 13

DELAWARE DEPARTMENT OF CORRECTION

EXECUTION ELECTION REGULATION

**OBJECTIVE:**   This regulation provides for a Delaware inmate who is conde    1
to death to elect lethal injection as the method of execution if su     1
option is allowed in the Sentencing Order.

ELECTION OPTION

1.   If the sentencing order allows the condemned inmate to elect l
injection over hanging, the Warden shall:

    a. provide the attached affidavit (Attachment 1) to the cond n
    inmate no later than 20 days prior to the date of execution set s
    the Court.

    b. explain the affidavit to the condemned inmate.   The inmate
    consult with his/her legal counsel prior to signing the affidavit.

2. The affidavit shall provide the condemned inmate an opportunity to
lethal injection as the method of execution.

3. If the condemned inmate does not sign the affidavit, the execution
be by hanging.

4.   The affidavit shall be signed by the Warden and notarized.

5.   The election shall be irrevocable.   If a stay or respite of 180 da s
more is granted, the condemned inmate shall be allowed a new election  r
this regulation.

A - 14

1

### ELECTION AFFIDAVIT

1.   THE PURPOSE OF THIS AFFIDAVIT IS TO ALLOW THOSE CONDEMNED DEL. INMATES WITH THE OPTION OF ELECTING LETHAL INJECTION OVER HANGING TO AND RECORD THAT CHOICE, OR TO REJECT THAT CHOICE.

2.   THE FOLLOWING DECISIONS ARE IRREVOCABLE UNLESS A STAY OF EXECUTIO 180 DAYS OR MORE IS GRANTED BY A COURT OF COMPETENT JURISDICTION.

3.   THE INMATE WILL INDICATE HIS CHOICE BY SIGNING SECTION A. OR B. BE

   A. I <u>DO</u> ELECT LETHAL INJECTION AS THE METHOD OF MY EXECUTION, SCHEDUL

FOR _____.

_____
INMATE'S SIGNATURE

   B. I <u>DO NOT</u> ELECT LETHAL INJECTION AS THE METHOD OF MY EXECU SCHEDULED FOR _____. I UNDERSTAND THAT MY EXECUTION BE BY HANGING.

_____
INMATE'S SIGNATURE

I HAVE EXPLAINED THIS AFFIDAVIT TO THE INMATE.

_____
WARDEN'S SIGNATURE

STATE OF DELAWARE     )
                      : SS
COUNTY OF NEW CASTLE  )

   On this _____ day of _____ in the year _____, be e _____, a Notary Public in and for said st personally appeared _____ and _____ nown to me to be the persons who executed the within affidavit a cknowledged to me that they executed the same for the purposes the tated.

_____
NOTARY PUBLIC FOR THE STATE OF DELAWAR
My Commission Expires _____

A-15

1

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

BILLIE BAILEY,               )
         Petitioner,       )
                  )
    v.                 )     Civ. Act. No. 92-209 RRM
                  )
ROBERT SNYDER, Warden,        )
Delaware Correctional Center,  )
                  )
        Respondent.        )

---

### AFFIDAVIT OF HENRY RISLEY REGARDING EXECUTIONS PERFORMED IN THE STATE OF DELAWARE

---

I, Henry Risley, Bureau Chief, Bureau of Prisons for the Delaware Department of Correction, being first duly sworn on oath, depose and say:

1. I have been employed as the Bureau Chief of the Bureau of Prisons for the Delaware Department of Correction since January 1988.

2. Prior to that time I was employed as Warden of the Montana State Prison from August, 1981 until January, 1988. I was previously employed in several capacities with the Michigan Department of Corrections from January, 1970 until August, 1981.

3. Chapter 11, Section 4209(f) of the Delaware Code provides that the responsibility for determining the execution procedure belongs to the Commissioner of the Department of Correction. Department of Correction's policy of the Commissioner requires the Bureau Chief, Bureau of Prisons and the Warden, Delaware Correctional Center to establish the procedure for carrying out the sentence of death.

## A - 16

4. For the purposes of developing a procedure of execution by lethal injection, I worked with Warden Snyder to construct the space for conducting executions and identify and train staff involved in conducting the procedure.

5. In 1983, while Warden at the Montana State Prison, I had the responsibility of setting up an execution procedure to utilize lethal injection. During my tenure in Montana, I visited officials with the State of Texas and modeled the procedure they had used to conduct an execution by lethal injection.

6. In 1992, Warden Snyder, myself and a designated employee of the Department of Correction, who had been selected as a member of the injection team which carries out the procedure, visited officials from Texas, witnessed a lethal injection execution there, and modeled the procedure they use in finalizing our procedure for execution by lethal injection.

7. The State of Texas has been selected as our model because: (1) I had had prior knowledge and experience with their system; (2) I was aware that, prior to our first execution in 1992, Texas had successfully performed over forty executions by lethal injection, to date Texas has performed over fifty executions by lethal injection; (3) to my knowledge and belief the execution procedure used in Texas has met judicial scrutiny.

8. Our Department maintains regular contact with officials in Texas to continually review and refine procedures for execution by lethal injection as necessary.

A - 17

9.  In assembling the injection team which carries out the procedure the Department has used a combination of volunteers and Department employees.  The Department has sought and obtained, as volunteers from outside the Department, individuals who are certified in their medical discipline and who have training and experience with intravenous procedures.  These persons have as part of their regular duties the initiation of intravenous procedures.

10.  The Department has also used a physician, licensed in the State of Delware, only for the purposes of attending and pronouncing death at the appropriate time.

11.  The Delaware Department of Correction has performed two executions by lethal injection.  The first was that of Steven Brian Pennell on March 14, 1992.  The second was the execution of James Allen Red Dog on March 3, 1993.  I was present, and witnessed the entire injection procedure, at both executions.

12.  The procedure as set forth in Department of Correction's regulations is, in general, as follows:

> a) Prior to the entry of the inmate into the execution chamber, two intravenous set-ups of Normal Saline IV bags are prepared for insertion into each arm.  These set-ups are common supplies used in regular medical practice.
>
> b) At that time the syringes which contain the lethal substances are also prepared by the injection team.  Those syringes consist of: (1) Two fifty (50)-cc syringes, each containing ten (10) - fifteen (15)cc of sterile Normal Saline, which are each labled "NS"; (2) Three fifty (50)-cc syringes, each containing fifty (50) milequiv of Potassium Chloride in fifty (50) cc., which are each labled "3"; (3) Three fifty (50)-cc syringes, each containing fifty (50) mgm of Pancuronium Bromide in fifty (50) cc., which are each labeled "2"; and, (4) One fifty (50)-cc syringe containing 2.0 grams of Sodium Pentathol which is in a clear suspension and is labeled "1".  While only two syringes of Pancuronium Bromide and Potassium Chloride are used the others are

A - 18

prepared as "stand-bys".

c) The inmate is brought into the execution chamber and strapped to the table by the arms, legs and trunk. The injection team then gains intravenous access in both arms and starts a flow of Normal Saline from the IV bags. While only one arm is actually used for injection purposes the other line is held in reserve as a contingency in case of malfunction or blockage in the first line.

d) When the signal to begin the injection is given, the substances are injected in the following order: (1) the flow of Normal Saline from the bag is cut off and the entire syringe of Sodium Pentothal ("1") is injected; (2) a syringe of Normal Saline ("NS") is injected to flush the line, this is done to avoid the chance of flocculation forming if the Sodium Pentothal and the Pancuronium Bromide were to come in contact in the line; (3) both syringes of the Pancuronium Bromide ("2") are injected; (4) the line is again flushed with the second syringe of Normal Saline ("NS"); and, (5) the first syringe of Potassium Chloride ("3") is injected, the second is injected if the attending physician has not pronounced death.

e) Upon completion of the injections, or at such earlier time as may be appropriate, the physician shall examine the inmate to pronounce death.

13. This procedure has been revised, including the amount of lethal substances and timing of the injections, since our original submission in this case during state court postconviction proceedings. The revisions have been made due to our own experience and consultations with Texas. Further revision shall be made only when the Department determines, from experience in carrying out the procedure, that such revision is necessary or with the assistance and consultation of other states' officials who have similar responsibility or after consultation with medical/pharmacological experts.

A-19

14.  As to my personal observations of the two executions which have taken place in Delaware, I observed the following:

Steven Brian Pennell - March 14, 1992

9:14 a.m. - Pennell walked from the holding cell to execution room.

9:15 a.m. - Pennell seated on table.

9:17 a.m. - Tie down team had completed applying all restraints.

9:18 a.m. - Injection team began initiation of intravenous lines.

9:35 a.m. - Injection team completed inserting lines.

9:36 a.m. - Priest performs final spiritual ceremony.

9:40 - 9:45 a.m. - Witnesses enter observation room, the curtain is open when they arrive.

9:48 a.m. - Signal to begin execution.

9:49 a.m. - Curtain is pulled between execution room and observation room.  Physician enters and pronounces death.  (Note - because the doctor had a different time on his watch than the Department staff on the logbook, the doctor's watch time was noted.  The actual time from the beginning of the injection to the time of pronouncement was approximately four minutes.)

The following is a narrative of my personal observations of Mr. Pennell's actions during the procedure.  Mr. Pennell was placed on the table and the team applied the restraints to hold him in a prone position.  The injection team then inserted the intravenous lines into each arm.  After the insertion of the intravenous lines was complete, his priest performed a short ceremony during which Mr. Pennell remained quiet and faced straight up at the ceiling.  The witnesses then entered the observation room at which time Mr. Pennell had his eyes closed and still faced the ceiling.  When asked at approximately 9:46 a.m. if he had a final statement, he opened his eyes briefly and shook his head "no".  At 9:48 a.m. the injection began with a signal from the warden.  The injection lasted approximately two minutes.  There was heave of Mr. Pennell's chest and the color drained from his face.  About two minutes after the injection was complete the observation curtain was closed and the physician was brought into the execution room to pronounce death.

A-20

After Mr. Pennell's execution the Department initiated two new procedures. The first was to have a central clock so that all participants in the execution procedure would be utilizing the same time source for record purposes. The second was to have a condemned prisoner medically screened several weeks before execution for (1) any medications which might inhibit easy vein access and (2) location of appropriate vein access sites. This screening procedure was proposed to facilitate easier intravenous insertion by the Injection Team.

<u>James Allen Red Dog - March 3, 1993</u>

10:05 a.m. - Red Dog walked from holding cell to execution room and sat on execution table.

10:07 a.m. - Tie down team completed application of restraints.

10:08 - 10:12 a.m. - Spiritual leader performed final ceremony.

10:14 - 10:17 a.m. - Injection team applies intravenous lines in each arm.

10:18 - 10:21 a.m. - Witnesses enter observation room, observation curtain is open.

10:23 a.m. - Red Dog's final statement is completed.

10:23 a.m. - Signal given to begin injection.

10:26 a.m. - Injection is finished.

10:27 a.m. - Observation curtain is closed, the physician enters the execution room and pronounces death at 10:28 a.m.

Because Mr. Red Dog was a Native American he requested that an autopsy not be performed after his death. I, therefore, supplied to the State Medical Examiner's Office two affidavits regarding his execution. Those affidavits are attached as Exhibits 1 and 2, and describe my personal observations and the specific substances given Mr. Red Dog, respectively.

15. In neither execution did I notice any sign that the prisoner had experienced any unnecessary pain, torture, disgrace or a lingering death. In fact, in both instances, it appeared as

A - 21

though the prisoner simply fell off to sleep and heaved his chest before he ceased breathing.

I swear that the facts recited above are true and that this affidavit was signed by me at Wilmington, DE, Delaware, on April _14_, 1993.

Henry Risley
Bureau Chief
Bureau of Prisons
Department of Correction
State of Delaware

SWORN TO AND SUBSCRIBED IN MY PRESENCE
THIS _14th_ DAY OF APRIL, 1993.

NOTARY PUBLIC

A-22

DELAWARE CORRECTIONAL CENTER
SMYRNA, DE 19977

I, Hank Risley, Chief, Bureau of Prisons observed on March 03, 1993 at approximately 10:23 a.m. Warden Snyder signaled The Injection Team to begin introducing the lethal injection to Inmate James Allen Red Dog. Shortly afterwards Inmate James Allen Red Dog said to his wife "I'm goin' home babe." His head was turned to the side to see her. He straighten his head toward the ceiling; said quietly he was going to sleep. His eyes were shut.

There was a slight shudder or heave of his chest, respiration appeared to cease. His complexion reddened and then blued. The injection was completed about 10:26. Shortly the physician was called to examine Inmate James Allen Red Dog and pronounced him dead at 10:28 a.m.

_____  _____
Hank Risley, Chief, Bureau of Prisons    Date   March 8, 1993

_____  _____
Notary    Date   8 March, 1993

George W. Glancock
My commission expires
Aug. 8, 1993

Exhibit 1

A-23

DELAWARE CORRECTIONAL CENTER
SMYRNA, DE 19977

I, Hank Risley, Chief, Bureau of Prisons observed The Injection Team administer the following to Inmate James Allen Red Dog on the morning of March 03, 1993 approximately 10:15 a.m.

2 gm Pentothal 2.5%
100 mg Pancuronium Bromide 1mg/ml
40 meq/20 ml Potassium Chloride, 120 ml given

The entire quantity of each drug was administered intravenously in the left arm without incident.

_____  / 3/4/93
Hank Risley, Chief, Bureau of Prisons       Date

_____  / 3/4/93
Notary                                      Date

George W. Giancoli:
My commission expires
Aug. 6, 1998

A-24

Exhibit 2

# EXHIBIT 5

## INJECTION TEAM

### SECTION I   PRE-EXECUTION INVENTORY AND EQUIPMENT CHECK

1.  Members of the injection team will conduct an equipment check of all materials necessary to perform the execution within 72 hours of the scheduled execution.

2.  An inventory check list will be completed, dated, and initialed by the injection team. (A copy of the check list is included. Items marked "C/I" in the check column shall be "carried in" by the injection team on the day of the execution).

3.  Quantities of items in locked box(es) in the injection room shall be AT LEAST those indicated in the left column of check list.

4.  Expiration and/or sterilization dates of all applicable items shall be:

    a.  Outdated items (i.e., normal saline bags) will be replaced.

    b.  Sterilized packs bearing a sterilization date in excess of thirty (30) days will be replaced.

5.  On the day of the execution, members of the injection team shall enter the injection room at least one (1) hour prior to the scheduled time of the execution. They will re-inventory the supplies and equipment to ensure that all is in readiness.

### SECTION II   OBTAINING DRUGS

1.  Prior to the scheduled execution, the Bureau Chief will obtain the drugs necessary for the execution. On the morning of the execution by lethal injection, a member of the injection team shall obtain the necessary agents (drugs) for the procedure from the Bureau Chief.

2.  When the drugs have been issued, the quantities verified, they shall be placed in the Lethal Injection Drug Box.

3.  A member of the injection team shall maintain personal, physical custody of the sealed drug box until such time as it is opened for use and/or for return if not used.

### SECTION III       IV SET-UP PROCEDURE

1.  The connecting needle of Administration Set (Travenol #2C0005 - or equivalent) shall be inserted into outlet of the bag of Normal Saline IV solution.

A-29

2.   The on-off clamp located between the "Y" injection site and the needle
     adapter shall be removed and discarded. The flow of solution shall be
     controlled by the Flo-Trol clamp located above the "Y" site.

     a.   The lip of the neoprene diaphram on the "Y" injection site shall
          be rolled back so that it can easily be removed for insertion of
          syringe tips instead of a needle.

     b.   A thirty five (35) inch extension set (Travenol #2C0066 - or
          equivalent) shall be connected to the needle adapter of the
          Administration Set. For the set-up for administration into the
          distal arm, a second Extension Set shall be required due to the
          additional distance.

3.   An Angiocath (no smaller than eighteen (18) Ga. X two (2) inch) shall be
     connected to the needle adapter of the Extension Set. Optimal injection
     flow may be achieved with a sixteen (16) Ga. Angiocath, if the veins will
     permit the use of the larger size.

4.   The tubing shall be cleared of air and the Angiocath recovered. The set-
     up is ready for use.

5.   Steps one (1) through six (6) shall be repeated for the second set-up.

6.   The syringes containing the drugs shall be prepared and loaded in the
     following order.

     a.   Two (2) fifty (50)-cc syringes, each contained ten (10)-fifteen (15)
          cc of sterile Normal Saline. Label syringes "NS".

     b.   Three (3) fifty (50)-cc syringes, each containing fifty (50)
          miliequiv of Potassium Chloride in fifty (50) cc. Label syringes
          "3".

     c.   Three (3) fifty (50)-cc syringes, each containing fifty (50) mgm of
          Pavulon in fifty (50) cc. Label syringes "2".

     d.   One (1) fifty (50)-cc syringe containing 2.0 grams of Sodium
          Pentothal (contents of two (2) one (1) gm vials dissolved in the
          least amount of diluent possible to attain complete, clear
          suspension). The Sodium Pentothal, being a Federally controlled
          drug, shall be prepared last, when it appears that it shall actually
          be used. Label syringe "1".

See enclosure III A for a list of syringes and contents. It is noted that
three (3) syringes of Pavulon and three (3) of Potassium Chloride are
prepared, even though the injection procedure only calls for two (2) of
each. The extra syringes are prepared as "stand-bys", in the event of one
(1) of the others is dropped in handling during the injection procedure.

A-30

## SECTION IV  INJECTION PROCEDURE

1. The angiocath shall be inserted into the vein of the left arm and secured in place. The flow of Normal Saline shall be started and administered at a slow rate of flow.

2. Step one (1) shall be repeated for the right arm. This line shall be held in reserve as a contingency line in case of a malfunction or blockage in the first line.

   **Note:** At this point, the administration sets shall be running at a slow rate of flow, and ready for the insertion of syringes containing the injection agents. Observation of both set-ups to assure that the rate of flow is uninterrupted shall be maintained. **NO FURTHER ACTION** shall be taken until the prearrange signal to start the injection of lethal agents is given by the Warden.

3. Witnesses to the execution shall be brought in ONLY AFTER the Normal Saline IV's have been started and are running properly.

4. Total anonymity of the injection team members in the injection room shall be maintained. At NO TIME shall they be addressed by name, or asked anything that would require an oral response. The members of the injection team shall remove all jewelry and wear long sleeve shirts to cover any identifiable marks, tatoos, or scars.

## WHEN THE SIGNAL TO COMMENCE IS GIVEN BY THE WARDEN:

5. The flow of the Normal Saline into the left arm shall be cut off utilizing the Flow-Control clamp.

6. The neoprene diaphram ("plug") shall be removed from the "Y" injection tube.

7. The tip of Syringe #1 (Sodium Pentothal) shall be inserted into the "Y" injection tube and the injection shall commence. A steady even flow of the injection shall be maintained with only a minimum amount of force applied to the syringe plunger. When the entire contents of the syringe have been injected;

8. Syringe #1 shall be removed from the injection tube. A syringe of Normal Saline (marked "NS" shall be inserted and the entire contents injected to flush the line. Then:

9. The "NS" syringe shall be removed and the one (1) of the #2 syringes (Pavulon) shall be inserted. The entire contents shall be injected with slow, even pressure on the syringe plunger. CAUTION: If all of the Sodium Pentothal has not been flushed from the line, there is a chance of flocculation forming when coming in contact with the Pavulon, which

A-31

will block the flow of fluid through the Angiocath. If this should happen, shift over to the contingency line running to the right arm. When the contents of the first #2 syringe have been injected, repeat with the second #2 syringe. when both syringes have been injected;

10. The second "NS" syringe shall be inserted and the entire contents shall be injected to flush the line. Then;

11. Insert the first #3 syringe (KCI) shall be inserted and the entire contents shall be injected. The second #3 syringe shall be repeated or until death has been pronounced by the physician.

12. Upon completion of the injections, or at such earlier time as may be appropriate, the physician shall examine the inmate to pronounce death. After the witnesses have been removed, both IV line from he veins shall be removed and the tubing shall be passed through the opening into the execution chamber.

A-32

Enclosure III A

## CONTENTS OF SYRINGES

| LABELED/MARKED | CONTENTS | QUANTITY |
|---|---|---|
| #1 | Sodium Pentothal, 2.0 Gm. (two 1 gm vials dissolved in the least amount of diluent possible to attain complete, clear suspension). | 1 syringe |
| N/S | Normal Saline, 10-15 cc. | 2 syringes |
| #2 | Pavulon, 50 mgm per 50 cc. (five 10 cc ampules of 10 mgm each in each syringe) | 3 syringes |
|  | Total injection; 100 cc/100 mgm., or 2 syringes. One extra made up as stand-by. |  |
| #3 | Potassium Chloride, 50 milequiv. pe 50 cc. (2.5 10 cc ampules of 20 milequiv. each in each syringe). | 3 syringes |
|  | Total injection; 50 cc/100 milequiv., or two syringes. One extra made up as stand by. |  |

A-33

## SUPPLY CHECK LIST

| AMOUNT | MATERIAL(S) | |
|---|---|---|
| 3 | SODIUM PENTOTHAL, 1 gm., w/diluent | C/I |
| 15 | PAVULON, 10 mgm. ampules | C/I |
| 9 | POTASSIUM CHLORIDE, 20 milequiv. ampules | C/I |
| 10 | SYRINGE, 50 cc | |
| 4 | SYRINGE 10 cc. | |
| 4 | SYRINGE 5 cc. | |
| 10 | NEEDLE, 18 Ga., 1 1/2" | |
| 6 | NEEDLE, 25 Ga., 1 1/2" | |
| 8 | ANGIOCATH, 20 Ga., 2" | |
| 8 | ANGIOCATH, 18 Ga., 2" | |
| 8 | ANGIOCATH, 16 Ga., 2" | |
| 4 | NORMAL SALINE, IV BAG, 1000 cc. | |
| 1 | LIDOCAINE HCL, 2 w//Epinephrine 1,100,00 30 cc. | |
| 6 | SOLUTION INJECTION SET, 96" Long with Y-Injection Site' Travenol Code #2C0005S | |
| 12 | EXTENSION SET, 35" Long; Travenol Code 2C0066 | |
| 1 | STETHESCOPE | |
| 1 | JAR OF ALCOHOL SPONGES | |
| 1 | COTTON, ROLL | |
| 4 | ADHESIVE TAPE, 1" | |
| 4 | ADHESIVE TAPE, 3" | |
| 1 | SCISSORS, BANDAGE, PR. | |
| 2 | TOURNIQUET | |
| 1 | CUT-DOWN SET, STERILE | |

A-34

## SUPPLY CHECK LIST CONTINUED

| | | |
|---|---|---|
| 2 | SCALPEL HANDLE, NO. 3, STERILE | _____ |
| 2 | SCALPEL HANDLE, NO. 4, STERILE | _____ |
| 4 | BLADE, SCALPEL, NO. 10, STERILE | _____ |
| 4 | BLADE, SCALPEL, NO. 11, STERILE | _____ |
| 4 | HEMOSTAT, STERILE | _____ |
| 3 | GLOVES, SURGICAL, SIZE ____ , STERILE | _____ |
| 3 | GLOVES, SURGICAL, SIZE 8, STERILE | _____ |
| 6 | SURGICAL MASK | _____ |
| 4 | SURGICAL/CLINICAL JACKETS | _____ |
| 1 | SURGICAL GOWN | _____ |
| 1 | FLASHLIGHT, w/batteries | C/I |
| 3 | BATTERIES, FLASHLIGHT, (Spares) | C/I |

A - 35

# **EXHIBIT 6**

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 05/05/2006

# GRIEVANCE REPORT

## OFFENDER GRIEVANCE INFORMATION

| | | |
|---|---|---|
| Offender Name : JACKSON, ROBERT W 3 | SBI# : 00251647 | Institution : DCC |
| Grievance # : 35063 | Grievance Date : 05/01/2006 | Category : Individual |
| Status : Unresolved | Resolution Status : | Resol. Date : |
| Grievance Type: Miscellaneous | Incident Date : 05/01/2006 | Incident Time : |
| IGC : McCreanor, Michael | Housing Location : Bldg 18, Lower, Tier A, Cell 9, Single | |

## OFFENDER GRIEVANCE DETAILS

**Description of Complaint:** It is my understanding that the protocol that will be used by the Department of Correction to carry out my execution will cause me undue pain and suffering, in violation of my constitutional rights. I am filing this grievance to request the Department of Correction alter the protocol or not use it in my execution. Further, I request that you not use either pancuronium bromide or potassium chloride in my execution, because these drugs cause me great pain.

**Remedy Requested** : If there are any other administrative remedies I can persue to ensure that the current protocol for lethal injection not be used in my execution, please let me know right away.

## INDIVIDUALS INVOLVED

| Type | SBI # | Name |
|---|---|---|
| | | |

## ADDITIONAL GRIEVANCE INFORMATION

| | |
|---|---|
| Medical Grievance : NO | Date Received by Medical Unit : |
| Investigation Sent : | Investigation Sent To : Carroll, Thomas L |
| Grievance Amount : | |

DCC Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 05/05/2006

# INFORMAL RESOLUTION

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| Offender Name : JACKSON, ROBERT W 3 | SBI# : 00251647 | Institution : DCC |
| Grievance # : 35063 | Grievance Date : 05/01/2006 | Category : Individual |
| Status : Unresolved | Resolution Status: | Inmate Status : |
| Grievance Type: Miscellaneous | Incident Date : 05/01/2006 | Incident Time : |
| IGC : McCreanor, Michael | Housing Location :Bldg 18, Lower, Tier A, Cell 9, Single | |

| INFORMAL RESOLUTION | |
|---|---|
| Investigator Name : Carroll, Thomas L | Date of Report 05/01/2006 |

**Investigation Report :** Due to the nature of the grievance, this matter was sent directly to Warden Carroll for action. A hearing was held on Thursday, May 4, 2006 with Inmate Jackson and Warden Carroll regarding this grievance. Inmate Jackson requested that his attorney attend the grievance hearing. This request was denied by Warden Carroll. Inmate Jackson stated that it has not been fully  determined if the procedure used in an execution causes pain.  As a result, Inmate Jackson is grieving the fact that the "cocktail" (i.e. the substances used in the execution) may cause pain.

**Reason for Referring:**

Offender's Signature:_____

Date              :_____

Witness (Officer)  :_____

Page 2 of 3

**DCC  Delaware Correctional Center**
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 05/05/2006

# GRIEVANCE INFORMATION - WARDEN

| OFFENDER GRIEVANCE INFORMATION | | |
|---|---|---|
| **Offender Name :** JACKSON, ROBERT W 3 | **SBI#** : 00251647 | **Institution** : DCC |
| **Grievance #** : 35063 | **Grievance Date** : 05/01/2006 | **Category** : Individual |
| **Status** : Unresolved | **Resolution Status :** | **Inmate Status :** |
| **Grievance Type:** Miscellaneous | **Incident Date** : 05/01/2006 | **Incident Time :** |
| **IGC** : McCreanor, Michael | **Housing Location :** Bldg 18, Lower, Tier A, Cell 9, Single | |

| REFERRED TO | | |
|---|---|---|
| **Due Date :** | **Referred to:** | **Name:** |
| **Type of Information Requested :** | | |

| DECISION |
|---|
| **Date Received** : |
| **Decision Date** : 05/04/2006    **Vote :** Deny |
| **Comments** : The protocol employed by the Delaware Department of Correction is in keeping with standards and norms of other jurisdictions. This protocol is designed to ensure that the execution will be carried out in a manner which will not cause undue pain and suffering nor violate any Constitutional rights.<br><br>The grievance is denied. This matter may be appealed pursuant to policy. |

_____    _____
**WARDEN / WARDEN'S DESIGNEE SIGNATURE**           **DATE**

**I WISH TO APPEAL THIS TO THE BUREAU GRIEVANCE OFFICER (B.G.O.)**    YES:_____    NO:_____

_____    _____
**GRIEVANT'S SIGNATURE**           **DATE**

_____    _____
**I.G.C. SIGNATURE**           **DATE**

## Grievance Appeal Form

This must be completed and returned to the IGC within 3 days of receipt of the
Warden/Designee/MGC Decision

Grievant: _JACKSON, ROBERT W_    SBI#: _00251647_

Housing Unit: _Bldg 18 A29_    Case#: _35063_

Date: _5-5-06_    Due Date: _5-12-06_

This form is to be used Only in the event of a decision appeal. Please specify the reason for the appeal in the space below.

This appeal is based on the protocol of the cocktail of drugs used during execution. That the "Risk" of them causing undue pain & suffering. The Warden states this not to be the case finding the methods/cocktail to be just. Therefore denying my Grievance. These assumptions are made without the warden being a medical doctor, or medicinal practitioner. In Conclusion I find the warden unqualified to properly rule on this matter, not being registered in any medical field or training.

    I request this Grievance be overturned, or immediately sent to the next level, in the appeal process.

Respectfully
Robert W Jackson III

R W Jackson III
INMATE SIGNATURE

If you need additional space, attach 8.5" X 11" size sheets of paper.

# EXHIBIT 7

THOMAS A. FOLEY
ATTORNEY AT LAW
1326 KING STREET
WILMINGTON, DELAWARE 19801

ADMITTED IN DELAWARE
AND THE DISTRICT OF COLUMBIA

TEL. (302) 658-3077
FAX (302) 656-1993
taf@taf-law.com

April 26, 2006

Mr. Stanley W. Taylor, Jr.
Commissioner of Correction
Department of Correction
245 McKee Road
Dover, DE 19901

## RE: <u>INMATE ROBERT W. JACKSON, III</u>

Dear Commissioner Taylor:

I represent Inmate Robert W. Jackson, III, who is scheduled to be executed by lethal injection on May 19. Pursuant to the Delaware Freedom of Information Act, 29 Del. C. Section 10001, *et. seq.*, we hereby request a copy of the following materials:

1.    Any and all documents from the Delaware Department of Correction (DOC) relating to lethal injection and its administration, including, but not limited to, all DOC regulations describing all aspects of the administration of the current lethal injection protocol;

2.    Any and all DOC documents relating to the administration of lethal injection that describe any revisions in the process from its inception to the present, including, but not limited to, the process for revising the lethal injection protocols; who may make such revisions; any changes in factors taken into consideration by the DOC with regard to the weight, age, or physical condition of the inmate in administering the dosage of chemicals; and the relation between the timing of the lethal injection and the time and quantity of food last ingested by the inmate;

3.    Any and all DOC documents describing the protocol for lethal injection that itemizes the amounts and concentrations of all chemical substances used during the execution by lethal injection;

4.    Any and all DOC documents regarding the actual preparations for, and executions by, lethal injection of inmates, beginning with the execution of Steven Brian Pennell on March 14, 1992, up to and including the execution of Brian D. Steckel on November 4, 2005;

Page Two
Commissioner Stanley W. Taylor, Jr.
RE: <u>Inmate Robert W. Jackson, III</u>
April 26, 2006

5.    Any and all documents, reports, telexes, or other reporting devices that
      pertain to the procedure for the DOC's planned administration of the lethal
      injection drugs in future executions, including, but not limited to, the timing
      of each step of the process, the anonymous description of each person
      involved in the administration of the lethal injection (names may be
      redacted for privacy), the credentials of each participant, and a description
      of the extent of medical training, if any, of each of the participants;

6.    Any and all DOC documents relating to execution by hanging and its
      administration, including, but not limited to, all DOC regulations describing
      all details of the administration of the current hanging protocol;

7.    Any and all DOC documents relating to the administration of hanging that
      describe any revisions in the process from its inception to the present,
      including, but not limited to, the process for revising the hanging protocols;
      who may make such revisions; any changes in the structure or
      construction of the gallows; any building or dismantling of the gallows; and
      factors taken into consideration by the DOC regarding the weight, size, or
      physical condition of the inmate;

8.    Any and all DOC documents regarding the actual preparation for, and
      execution by, hanging of inmates, including the execution by hanging of
      Billy Bailey on January 25, 1996;

9.    Any and all reports, records, or other documents, in any form, pertaining
      in any way to autopsies and/or toxicology screens conducted upon any
      inmate executed in Delaware from March 1992 to the present;

10.   Any and all documents from the DOC relating to the standard of care for
      inmate patients requiring surgery, including any contracts with any
      medical providers, the names of any company or individual
      anaesthesiologists retained for such surgical procedures, the
      qualifications of such anaesthesiologists, and whether inmates on death
      row are subject to a different standard of care from other inmates;

Page Three
Commissioner Stanley W. Taylor, Jr.
RE: Inmate Robert W. Jackson, III
April 26, 2006

11.    Any other notes (printed, typed, or handwritten), reports, statements, photographs, supplemental reports, initial reports, memoranda, scientific reports, tapes of statements, interview notes, interview summaries, narratives, affidavits, files, audio and video recordings, drawings, sketches, physical evidence, inventory logs, chronologies, summaries, witness statements, witness interviews, and witness affidavits that are responsive to the forgoing requests; alternatively, a list of the responsive documents and a supporting authority for its non-disclosure.

For the purposes of this public records request, the terms "reports" and "documents" are intended to include – without limitation – any and all written, typed, printed, recorded, graphic, computer-generated, or other matter of any kind from which information can be derived, whether produced, reproduced, or stored on paper, cards, tapes, film, electronic facsimiles, computer storage devices, or any other medium. They included – without limitation – letters, memoranda (including internal memoranda), calendars, schedules, books, indices, notes, printed forms, publications, press releases, notices, minutes, summaries, abstracts, reports, files, transcripts, computer tapes, printouts, drawings, photographs, recordings (video or audio), telegrams, and telex messages, as well as any reproductions thereof that differ in any way from any other reproduction, such as copies containing notes and/or other marginalia.

If any records or documents pertaining to this request are withheld for any reason, please make an inventory and complete copy of the withheld records; provide us with a copy of the inventory, as well as the specific reason for non-disclosure of each item; and preserve a complete copy to enable subsequent judicial review.

We happily will pay any appropriate and permissible charges for copying, but all costs must be approved in advance. Please contact us with an estimate of what the costs will be, so that the proper arrangements can be made.

Because we were not certain of the best way to effectuate this request, a similar letter has been sent to Thomas L. Carroll, Warden of the Delaware Correctional Center.

Page Four
Commissioner Stanley W. Taylor, Jr.
RE: Inmate Robert W. Jackson, III
April 26, 2006


     If you have any questions regarding this request, please contact me at (302)
658-3077.  Thank you very much for your assistance.


          Sincerely,


          Thomas A. Foley


TAF:mdf
xc:    Loren C. Meyers, Esquire

# EXHIBIT 8

THOMAS A. FOLEY
ATTORNEY AT LAW
1326 KING STREET
WILMINGTON, DELAWARE 19801

ADMITTED IN DELAWARE
AND THE DISTRICT OF COLUMBIA

TEL. (302) 658-3077
FAX (302) 656-1993
taf@taf-law.com

April 26, 2006

Thomas L. Carroll, Warden
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

RE: **INMATE ROBERT W. JACKSON, III**

Dear Warden Carroll:

As you know, I represent Robert Jackson, who is scheduled to be executed by lethal injection on May 19. Pursuant to the Delaware Freedom of Information Act, 29 Del. C. Section 10001, *et. seq.*, I hereby request a copy of the following materials:

1.  Any and all documents from the Delaware Department of Correction (DOC) relating to lethal injection and its administration, including, but not limited to, all DOC regulations describing all aspects of the administration of the current lethal injection protocol;

2.  Any and all DOC documents relating to the administration of lethal injection that describe any revisions in the process from its inception to the present, including, but not limited to, the process for revising the lethal injection protocols; who may make such revisions; any changes in factors taken into consideration by the DOC with regard to the weight, age, or physical condition of the inmate in administering the dosage of chemicals; and the relation between the timing of the lethal injection and the time and quantity of food last ingested by the inmate;

3.  Any and all DOC documents describing the protocol for lethal injection that itemizes the amounts and concentrations of all chemical substances used during the execution by lethal injection;

4.  Any and all DOC documents regarding the actual preparations for, and executions by, lethal injection of inmates, beginning with the execution of Steven Brian Pennell on March 14, 1992, up to and including the execution of Brian D. Steckel on November 4, 2005;

Page Two
Warden Thomas L. Carroll
RE: Inmate Robert W. Jackson
April 26, 2006

5.    Any and all documents, reports, telexes, or other reporting devices that
pertain to the procedure for the DOC's planned administration of the lethal
injection drugs in future executions, including but not limited to the timing
of each step of the process, the anonymous description of each person
involved in the administration of the lethal injection (names may be
redacted for privacy), and a description of the extent of medical training, if
any, of each of the participants;

6.    Any and all DOC documents relating to execution by hanging and its
administration, including, but not limited to, all DOC regulations describing
all details of the administration of the current hanging protocol;

7.    Any and all DOC documents relating to the administration of hanging that
describe any revisions in the process from its inception to the present,
including, but not limited to, the process for revising the hanging protocols;
who may make such revisions; any changes in the structure or
construction of the gallows; any building or dismantling of the gallows; and
factors taken into consideration by the DOC regarding the weight, size, or
physical condition of the inmate;

8.    Any and all DOC documents regarding the actual preparation for, and
execution by, hanging of inmates, including the execution by hanging of
Billy Bailey on January 25, 1996;

9.    Any and all reports, records, or other documents, in any form, pertaining
in any way to autopsies and/or toxicology screens conducted upon any
inmate executed in Delaware from March 1992 to the present;

10.   Any and all documents from the DOC relating to the standard of care for
inmate patients requiring surgery, including any contracts with any
medical providers, the names of any company or individual
anaesthesiologists retained for such surgical procedures, the
qualifications of such anaesthesiologists, and whether inmates on death
row are subject to a different standard of care from other inmates;

11.   Any other notes (printed, typed, or handwritten), reports, statements,
photographs, supplemental reports, initial reports, memoranda, scientific
reports, tapes of statements, interview notes, interview summaries,
narratives, affidavits, files, audio and video recordings, drawings,
sketches, physical evidence, inventory logs, chronologies, summaries,

Page Three
Warden Thomas L. Carroll
RE: Inmate Robert W. Jackson
April 26, 2006

witness statements, witness interviews, and witness affidavits that are responsive to the forgoing requests; alternatively, a list of the responsive documents and a supporting authority for its non-disclosure.

For the purposes of this public records request, the terms "reports" and "documents" are intended to include – without limitation – any and all written, typed, printed, recorded, graphic, computer-generated, or other matter of any kind from which information can be derived, whether produced, reproduced, or stored on paper, cards, tapes, film, electronic facsimiles, computer storage devices, or any other medium. They included – without limitation – letters, memoranda (including internal memoranda), calendars, schedules, books, indices, notes, printed forms, publications, press releases, notices, minutes, summaries, abstracts, reports, files, transcripts, computer tapes, printouts, drawings, photographs, recordings (video or audio), telegrams, and telex messages, as well as any reproductions thereof that differ in any way from any other reproduction, such as copies containing notes and/or other marginalia.

If any records or documents pertaining to this request are withheld for any reason, please make an inventory and complete copy of the withheld records; provide me with a copy of the inventory, as well as the specific reason for non-disclosure of each item; and preserve a complete copy to enable subsequent judicial review.

I happily will pay any appropriate and permissible charges for copying, but all costs must be approved in advance. Please contact me with an estimate of what the costs will be, so that the proper arrangements can be made.

You should also be aware that a similar request has been made of the Commissioner. If you have any questions regarding this request, please contact me at (302) 658-3077. Thank you very much for your assistance.

Sincerely,

Thomas Foley, Esq.

xc:    Loren C. Meyers, Esquire