IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT W. JACKSON, III, | : | Civil Action No. |
| | : | 06-CV-300 |
| Plaintiff, | : | |
| | : | |
| -against- | : | **Chief Judge Sue L. Robinson** |
| | : | |
| CARL C. DANBERG, et al., | : | **Electronically Filed** |
| | : | |
| Defendants. | : | |
| | : | **CLASS ACTION** |

**PLAINTIFFS' REPLY TO**
***DEFENDANTS' RESPONSE***
**TO PLAINTIFFS'**
**MOTION TO AMEND**
**THE DISCOVERY SCHEDULE AND**
**FOR A NEW TRIAL DATE**

Plaintiffs filed their *Motion to Amend the Discovery Schedule and for a New Trial Date* (document # 40) on May 30, 2007. Defendants filed their *Response* on June 1 (document #41), and Plaintiffs herein file this brief *Reply*.

Defendants complain that Plaintiffs have identified three new experts "at this late date" on issues "readily apparent to Plaintiff early in the litigation" *Response* at 3. This is not so, as two of the experts recently identified by Plaintiffs are needed as a direct result of information learned during the recent depositions of two of the anonymous executioners, and also learned from recent document production.

**PHARMACOLOGIST/TOXICOLOGIST**: The Pharmacologist/Toxicologist has been retained as a direct consequence of the testimony of the senior executioner (John Doe # 2), that in his experience over the eleven executions in which he has participated, the condemned prisoner died

1

after the administration of the first drug (sodium pentothal) which is supposed to merely anesthetize the prisoner. Plaintiffs were quite surprised to hear this testimony (which is contrary to the relevant science and to the testimony offered by others who were deposed in this litigation), and Plaintiffs do not believe that this testimony is accurate. Nonetheless, if John Doe #2's testimony were credited by this Court, it could present a formidable factual defense to a significant portion of Plaintiffs' Complaint with respect to the pain inflicted by the three drugs used in executions. Accordingly, in order to refute this expected testimony at trial, Plaintiffs have identified an expert in pharmacology and toxicology. Of course, if Defendants wish to stipulate that the prisoner does not die as a result of the injection of just this drug, Plaintiffs will reconsider the need for this expert.

The Pharmacologist/Toxicologist is also required because the timing and order in which the deadly drugs are mixed and injected are integral to any determination of whether the procedure violates the Eighth Amendment. Yet, depositions thus far show that <u>nobody</u> is responsible for recording the amounts of drugs <u>actually</u> injected during each execution, nor the order in which the drugs are mixed or how long before each execution commences the mixing takes place. Plaintiffs were again quite surprised in the depositions of the two executioners, and of others, that there appears to be nobody to record or log this critical information. Indeed, documents produced by Defendants show that in a number of executions, <u>different amounts of drugs were used</u>, even though the written protocol requires that the same amount of drugs be injected. The expert in pharmacology and toxicology will be responsible for providing an opinion, based on autopsy reports, that will shed some light on the timing and order in which the drugs are mixed and injected. Again, the lack of procedures to record this basic information is quite surprising, was learned only recently, and contradicts many of the documents produced by Defendants which led Plaintiffs to believe that such

information was being recorded.[1]

**PATIENT SAFETY EXPERT**: Plaintiffs have identified the need for this expert again based upon the testimony of the two anonymous executioners. Each has described a process that is rife with risks of error in the administration of the drugs. The two, and sometimes three, executioners go about the execution in a small room that is darkened for the entire time that they are mixing the chemicals, labeling the syringes, and injecting the chemicals. In addition to the two or three executioners, the room is crowded with people: the Commissioner, the DCC Bureau Chief, the head of the execution team (and at least in the last execution, a person who was being trained), and the physician (who, depending on whom one asks is either present only to announce death, or is present to oversee all medical aspects of the executions). Plaintiffs believe that these crowded and dark conditions fall well below any reasonable standard of care in a medical setting, thereby increasing the likelihood that the execution will violate the Eighth Amendment. A patient safety expert will explain how these conditions lead to the likelihood of error. Indeed, it would appear from the deposition of one of the anonymous executioners that the protocol is violated in multiple respects: the drugs are not mixed in the proper order; the proper number of syringes are not prepared; and backup syringes are also not prepared. This expert will be able to opine that such errors are to be expected under the conditions in which the executioners perform their tasks, and whether the departures from the protocol enhance the likelihood of errors that would violate the Eighth Amendment.

---

[1] Plaintiffs had hoped that this information might be provided in Defendants' recent document production of May 16 production. This production included documents related to autopsy reports and "after action" reports completed by correctional personnel. Regrettably, these reports and documents shed no light whatsoever on these questions.

**LIGHTING ENGINEER**: The so-called "medicine room" is where the lethal chemicals are mixed, the syringes are prepared and labeled, and the drugs are injected. Based upon the deposition testimony of a number of persons the lights in the room are turned off for all or part of the process (depending again on whom one asks), as a means of protecting the identity of the executioners. One witness described the ambient light in the room as equivalent to that of a full Moon. Plaintiffs previously advised defendants that they would be retaining a lighting engineer to opine on whether the lighting conditions extant in the medicine-room are adequate for the performance of the required tasks, and will make a comparison to other medical facilities in which similar work is done. A tour for the engineer has been agreed upon and the parties are awaiting finalization of the date.[2]

**DELAWARE ANESTHESIOLOGIST:** Admittedly, Plaintiffs have known for some time that they were hoping to retain an anesthesiologist licensed in Delaware in order to opine that the manner in which executions take place do not meet local standards of care. However, Plaintiffs have only recently been able to identify such an expert.

Defendants mischaracterize Plaintiffs' position when they state that Plaintiffs' requests are based only on the new experts. Indeed, as noted in the *Motion*, the new experts are only part of the need for additional time. See *Motion* at ¶¶ 8-10 (identifying other individuals who have not yet been deposed through no fault of Plaintiffs). Indeed, much of the need for additional time is attributable to Defendants' actions. For instance, plaintiffs were well within their rights to insist that expert depositions not take place until the conclusion of the depositions of fact witnesses, and Defendants

---

[2] In their *Response*, Defendants neglected to mention that during the first tour of the facility, they refused Plaintiffs' expert's request that the medicine room be set up as it would be during an actual execution. Defendants have since relented and accordingly Dr. Heath will be required to make a second tour to observe the conditions extant during an actual execution.

have been unable to produce a number of key fact witnesses for deposition.[3] Defendants have been unable to produce former Warden Snyder (who presided over all but the most recent execution) who is out of the country for an extended time. Similarly, Defendants have not been able to locate two of the five executioners who participated in executions since 1992. These missing witnesses are important to Plaintiffs' claims and Plaintiffs should not be required to sacrifice the development of their case because of the Defendants' inability to produce these witnesses.[4]

As noted in the *Motion*, under the Defendants' current counter-proposal, expert depositions would be started and finished within two weeks of the close of fact depositions (i.e. between July 31 and August 17), and that trial would start on September 4. Plaintiffs submit that this is not a workable or realistic schedule. Other than complaining about delay, Defendants have not articulated a vision for how the remaining work will be done in this time frame. It is also notable that the parties agreed to hold off on the exchange of expert reports until the completion of fact discovery. This additional, and time consuming task, is yet example of the unreasonableness of Defendants' position that expert discovery can be completed within the narrow window that they contemplate.

Defendants suggest that this Court's calendar may not accommodate a continued trial date any time in this calendar year. If Defendants' prediction is taken literally, than a new date could be set in the new year, which would only be four months from the current trial date, and which is not an unreasonable amount of time to postpone trial in order to insure that the parties are properly

---

[3]Defendants correctly state that they offered their expert for deposition. However, this would have had to take place in the Boston airport on less than one week's notice. Leaving aside that this was before the completion of fact discovery, Plaintiffs' counsel were not able to accommodate the date that was offered.

[4]In exchange for maintaining the secrecy of the identities of the executioners, Defendants agreed to make them available for deposition and trial. Obviously, Plaintiffs cannot serve subpoenas on these individuals without being given identifying information.

prepared in this important case.[5]

Finally, the Court should be aware that the parties spoke with Magistrate-Judge Thynge last week with respect to scheduled mediation. Both parties indicated a continuing interest in mediation, however, Plaintiffs voiced their concern that the mediation scheduled for June 15 would not be productive because of the number of problems with the manner in which executions are carried out that have thus far been identified, and because of the remaining discovery to be completed. The parties and Judge Thynge agreed to put off the mediation to a date during the first week in August and to speak telephonically on a number of occasions before then.

## Conclusion

Plaintiffs have litigated this case in good faith. They have moved with dispatch, and Defendants have failed to identify any fact to the contrary. Defendants state that they have a right to "carry out lawful sentences" of death without "undue interference" from this Court (*Response* at 3-4). That is true, but only as far as it goes. Ultimately, this protest begs the question: under the current manner in which executions are carried out, they are not "lawful" but rather violate the Eighth Amendment to the Federal Constitution. Thus viewed, a reasonable continuance of the trial date to enable Plaintiffs to prove that this is the case, is not "undue" interference. Rather, it is required by justice.

---

[5]Should the Court agree to postpone the September 4 trial date to accommodate the uncompleted discovery, Plaintiffs would be prepared to try the case on non-consecutive dates, if doing so would lessen the delay before the start of trial.

WHEREFORE, Plaintiffs request that the Court grant this Motion in full.

Respectfully Submitted,

/s/ Michael Wiseman

_____
Michael Wiseman
Helen Marino
Supervisory Assistant Federal Defenders
Megan McCracken
Assistant Federal Defender
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Dated: Philadelphia, PA
          June 4, 2007

## Certificate of Service

I, Michael Wiseman, hereby certify that on this 4th day of June, 2007 I served the foregoing upon the following person by e-mail and United States Mail:

Loren Myers, Esq. and Gregory E. Smith, Esq.
Office of the Attorney General
820 North French Street, 6th Floor
Carvel State Building
Wilmington, Delaware 19801

/s/ Michael Wiseman

_____
Michael Wiseman