# FEDERAL COMMUNITY DEFENDER OFFICE
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### Capital Habeas Unit

FEDERAL COURT DIVISION DEFENDER ASSOCIATION OF PHILADELPHIA

SUITE 545 WEST -- THE CURTIS CENTER
601 WALNUT STREET
PHILADELPHIA, PA 19106

**ELLEN T. GREENLEE**
DEFENDER

PHONE NUMBER (215) 928-0520
FAX NUMBER     (215) 928-0826
FAX NUMBER     (215) 861-3508

**MAUREEN KEARNEY ROWLEY**
CHIEF FEDERAL DEFENDER

September 19, 2007

Honorable Sue L. Robinson
United States District Judge
District of Delaware
By E-File

     Re:    Letter Brief, <u>Jackson v. Danberg</u>, 06-cv-300

Your Honor:

     We submit this Letter Brief addressing the Defendants' assertion of attorney-client privilege during yesterday's deposition of former Warden Thomas Carroll.[1]  Defendants asserted the privilege in response to many of Plaintiffs' questions regarding the new lethal injection procedure. Additionally, we requested that the Warden produce his personal notes regarding the promulgation of the new protocol.  Defendants objected and did not provide the notes, but instead asserted both attorney-client and work-product privileges.  Transcript, 32-33.[2]

---

    [1]Former Warden Carroll signed the Defendants' latest execution protocol on August 31, 2007 and was elevated to Deputy Commissioner on September 3, 2007.  We refer to him as Warden Carroll throughout.

    [2]We have obtained an expedited transcript of the deposition and are providing it as an attachment to this Letter-Brief.

Honorable Sue L. Robinson
September 19, 2007
Page 2

<hr>

### THE ISSUE PRESENTED BY THIS DISPUTE

During yesterday's phone conference with the Court, Plaintiffs articulated that they required discovery of the thought processes behind Defendants' promulgation of their new execution protocol. As shown below, the central question in this litigation is whether Defendants' protocol will cause a "substantial and unnecessary risk" of the infliction of pain during the execution process. Plaintiffs submit that is the appropriate standard in this case. Plaintiffs believe that under the unnecessary risk standard, the Defendants' reason(s) for assuming a particular risk(s) under the new lethal injection protocol may become relevant at trial. This would occur if, after Plaintiffs prove the existence of risk(s), Defendants respond with reasons for their assumption of it. If this were to occur, Plaintiffs would be severely disadvantaged if they are not permitted to conduct discovery with respect to the Defendants' reasons for constructing the new protocol as it currently stands.

The alternative standard – deliberate indifference to serious medical needs – would require that Plaintiffs prove that Defendants are aware of and indifferent to the risk of pain. The deliberate indifference standard contains an element of the Defendants' subjective intent, and therefore Plaintiffs' inquiry into the reasons for various of Defendants' decisions is potentially relevant to Plaintiffs' proof under this standard.[3]

Defense counsel asserted that Plaintiffs can only prevail in this case if they demonstrate that

<hr>

[3]For a number of reasons Plaintiffs believe that the standard set forth in <u>Taylor v. Crawford</u>, 487 F.3d 1072 (8th Cir. 2007) – unnecessary assumption of a substantial risk of the infliction of pain – is the appropriate standard in this context, as opposed to the deliberate indifference standard. Since under either standard Plaintiffs are entitled to probe Defendants' subjective intent, it is not necessary for the Court to definitely resolve this question at this time. Nonetheless, Plaintiffs below offer reasons for the adoption of the unnecessary assumption of risk standard.

Honorable Sue L. Robinson
September 19, 2007
Page 3

Defendants have engaged in "willful and wanton infliction of pain" and therefore the reasons for Defendants' actions or inactions are irrelevant.[4]  Plaintiffs are perplexed by Defendants' assertion because even if it were the correct standard – which it is not – it would still permit (indeed, expressly require) inquiry into the Defendants' subjective intent in both discovery and at trial.  In any event, as shown below, this is an academic question, as no court has adopted this standard as encompassing the Plaintiffs' burden in the Eighth Amendment or lethal injection context, and at least the Eighth Circuit rejected this standard in the Taylor case, discussed immediately below.

Defendants appear to want it both ways: on the one hand, they want to hold Plaintiffs to an extraordinarily high burden or proof – the willful and wanton infliction of pain – while keeping secret their reasons for their institution of various provisions of the protocol.  This is not fair.  If the Court were to not permit the requested discovery, Defendants in turn should not be permitted to justify their assumption of any of the risks identified by Plaintiffs.

### TO PROVE THEIR EIGHTH AMENDMENT CLAIM, PLAINTIFFS MUST SHOW THAT DEFENDANTS' PROTOCOL IMPOSES A "SUBSTANTIAL AND UNNECESSARY RISK" OF PAIN

The question in a lethal injection action is whether Defendants' lethal injection protocol and its implementation creates a substantial and unnecessary risk of serious harm.  Taylor v. Crawford, 487 F.3d 1072, 1079 (8th Cir. 2007) ("The State first argues that the district court erred in finding a

---

[4]Defense counsel articulated the standard as the "wanton and willful infliction of a grossly foreseeable risk that it shouldn't be allow to go forward."  Transcript at 53.  We believe that counsel mis-spoke when he used the term "willful" as this standard is only found in the context of whether a plaintiff is entitled to punitive damages, see Browing-Ferris Industries v. Kelco, 492 U.S. 257, 261 (1989), and we know of no case applying it in the context of establishing liability under the Civil Rights laws.  Moreover, Plaintiffs are unaware of any court applying the remainder of the standard articulated by defense counsel in a lethal injection or section 1983 case.

Honorable Sue L. Robinson
September 19, 2007
Page 4

---

constitutional violation on the basis of its determination that the Missouri lethal injection protocol involves an unnecessary *risk* of causing the wanton infliction of pain . . . [W]e respectfully disagree"); id. at 1080 ("we see no error in the district court's consideration of whether there is an unnecessary risk that the State's proposed lethal injection protocol will cause the unnecessary and wanton *infliction* of pain.")[5] (emphasis in original).[6]

If this Court were to adopt the unnecessary risk standard but not allow the requested discovery into Defendants' thought processes, Plaintiffs could still demonstrate that the lethal injection protocol fails to guard adequately against risk of pain and suffering. However, should Defendants seek to justify their assumption of risk, insight into Defendants' assessment of the risks in the procedure, the balance they struck between these risks and other considerations, and indeed, their entire thought process, would become highly relevant. Simply, without discovery into the rationale underlying various aspects of the lethal injection protocol, Plaintiffs will be hampered in

---

[5]A petition for certiorari was filed by plaintiffs in Taylor on September 7, 2007, but it is not yet reflected on the Supreme Court's docket.

[6] This standard has been applied in a number of other district court and state court decisions on lethal injection. See Morales v. Tilton, 465 F. Supp. 2d 972, 978-79 (N.D. Cal. 2006) (finding that California protocol and procedures fail to provide "constitutionally adequate assurance that condemned inmates will be unconscious when they are injected with pancuronium bromide and potassium chloride"); Cooey v. Taft, 430 F. Supp. 2d 702, 708 (S.D. Ohio 2006) (finding "unacceptable risk" where personnel were unqualified to implement protocol), vacated on other grounds, 479 F.3d 412 (6th Cir. 2007); Brown v. Beck, 2006 WL 3914717, *8 (E.D.N.C. Apr. 7, 2006); Baze v. Rees, 217 S.W.2d 207, 209-10 (Ky. 2006) (use of untrained personnel created a "substantial risk").

Plaintiffs recognize that Taylor applied the unnecessary risk standard to the protocol as written and the deliberate indifference standard to the implementation of it. Since under either standard Plaintiffs are entitled to the discovery requested herein, the Court need not address this dichotomy at this time.

**Honorable Sue L. Robinson**
**September 19, 2007**
**Page 5**

their ability to respond to Defendants' anticipated assertions that particular risks are "necessary." Moreover, if Plaintiffs were denied this discovery now, and this case were subsequently appealed and the standard changed, the record would not be complete with regard to the undisclosed information.

Plaintiffs offer the following examples from yesterday's deposition to illustrate the problems that could arise if the discovery is not permitted. Defendants objected on the basis of attorney-client privilege to Plaintiffs' question as to whether the change of dose of one of the three chemicals was done to decrease the likelihood that a prisoner would suffer pain in the execution process. Transcript at 41-42. Should the Court find that this change causes a risk, and Defendants seek to then justify it, Plaintiffs would be severely hampered in their ability to respond. In another example, the privilege was asserted in response to the question of why the new protocol does not address what Plaintiffs contend is inadequate lighting in the room where the drugs are mixed and administered. Transcript at 15. In a final example, the privilege was asserted in response to the question of why the new protocol does not require (as many jurisdictions do) that somebody involved in the execution be trained for and monitor the prisoner's anesthetic depth prior to and during the injection of the painful chemicals. Transcript at 17-18. Again, in both cases, Plaintiffs must be permitted to respond to the anticipated reasons that Defendants will offer to not addressing these risks.

If the Court applies the "deliberate indifference" standard,[7] Plaintiffs would be required to

---

[7]In Gregg v. Georgia, 428 U.S. 153, 173 (1976), the Supreme Court held that "punishment must not involve the unnecessary and wanton infliction of pain." Further, the scope of the Eighth Amendment's prohibition "acquire[s] meaning as public opinion becomes enlightened by humane justice," Weems v. United States, 217 U.S. 349, 373 (1910), and it "'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'" Gregg, 428 U.S.

demonstrate both the existence of a risk (an objective question) and whether Defendants are aware

of the risk, and have chosen to ignore it (obviously a subjective question).  Again, Plaintiffs cannot

make this showing without probing the reasons behind Defendants' decisions.

Defense counsel's formulation of the standard – the "unnecessary and wanton infliction of

pain" standard – is inapplicable in this case.  No court considering a section 1983 challenge to a

lethal injection protocol has adopted such a standard.  Moreover, the Eighth Circuit, relying on the

United States Supreme Court, expressly rejected it:

> The State begins by challenging the standard used by the district court. The State first
> argues that the district court erred in finding a constitutional violation on the basis
> of its determination that the Missouri lethal injection protocol involves an
> unnecessary risk of causing the wanton infliction of pain. The State asserts that the
> Supreme Court's articulation of the standard forbids only punishment that actually
> involves "the unnecessary and wanton infliction of pain," not a mere risk of pain. We
> respectfully disagree. "An inmate's challenge to the circumstances of his confinement
> ... may be brought under § 1983." Hill v. McDonough, --- U.S. ----, ----, 126 S.Ct.
> 2096, 2101, 165 L.Ed.2d 44 (2006). In Hill, the Court included within this rule an
> action challenging a state's lethal injection protocol. The Court quoted the
> petitioner's statement of his claim, noting, "[t]he specific objection is that the
> anticipated protocol allegedly causes 'a foreseeable risk of ... gratuitous and

at 173 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)).  The Supreme Court has made clear that
the prohibition on unnecessary and wanton infliction of pain "does not have a fixed meaning but
must be determined with due regard for the differences in the king of conduct" challenge.  Wilson
v. Seiter, 501 U.S. 294, 302 (1991).

Plaintiffs urge that the proper standard for judging the constitutional validity of Defendant's
method of administering lethal injection is whether the state's execution protocol, including both its
written procedure and the implementation of that procedure, creates a substantial and unnecessary
risk that the inmate will suffer unconstitutional pain.  This standard best addresses core Eighth
Amendment concerns, which are directly and palpably implicated in an execution: Does the state's
plan risk the unnecessary infliction of pain?  The standard of "deliberate indifference" was developed
to suit the distinctly different and far broader scope of challenges to prison conditions.  As such, the
test is designed to distinguish ordinary prison conditions from those which rise to the level of
additional punishment.

Honorable Sue L. Robinson
September 19, 2007
Page 7

---

unnecessary' pain." Id. at 2102. While we do not imply that the Court thereby adopted a new constitutional standard, we do observe that the Court expressed no dissatisfaction with that statement of the issue, and further, we find it to be consistent with settled Eighth Amendment jurisprudence.

Taylor, 487 F.3d at 1079 (one internal citation omitted).  The Taylor court then endorsed the

unnecessary risk standard.  Id. at 1080 ("We see no error in the district court's consideration of

whether there is an unnecessary *risk* that the State's proposed lethal injection protocol will cause the

unnecessary and wanton *infliction* of pain") (emphasis in original).[8]

---

[8]The phrase "unnecessary and wanton infliction of pain" can be traced to early Eighth Amendment cases litigated under section 1983.  See Estelle v. Gamble, 429 U.S. 97, 103 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976) ("[W]e have held repugnant to the Eighth Amendment punishments which . . . 'involve the unnecessary and wanton infliction of pain'")).  The phrase thus has been used to describe prohibited punishments, but has never been held to set forth a state actor's culpable state of mind under section 1983.  Indeed, the Supreme Court has made clear that "unnecessary and wanton infliction of pain" is an **objective** component of a section 1983 claim, but has nothing to do with the subjective state of mind of the state actor:

> Respondents nonetheless assert that a significant injury requirement . . . is mandated by . . . the 'objective component' of Eighth Amendment analysis. See Wilson v. Seiter, 501 U.S. 294, 298 . . . 1991).  Wilson extended the deliberate indifference standard applied to Eighth Amendment claims involving medical care to claims about conditions of confinement. In taking this step, we suggested that the subjective aspect of an Eighth Amendment claim (with which the Court was concerned) can be distinguished from the objective facet of the same claim. Thus, courts considering a prisoner's claim must ask both if 'the officials act[ed] with a sufficiently culpable state of mind' and if the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation.

> With respect to the objective component of an Eighth Amendment violation, Wilson . . . suggested a relationship between the requirements applicable to different  types of Eighth Amendment claims. [T]o show sufficient harm for purposes of the Cruel and Unusual Punishments Clause [the claimant must] allege and prove the unnecessary and wanton infliction of pain . . .

Hudson v. McMillian, 503 U.S. 1, 8 (1992) (some citations omitted) (emphasis added).

Honorable Sue L. Robinson
September 19, 2007
Page 8

---

### DEFENSE COUNSELS' ROLE IN THE LITIGATION

Based on the deposition testimony of Warden Carroll and Bureau Chief Kearney (also deposed yesterday), it is clear that Defense counsel are the State actors who acquired technical information from Defendants' expert witness (Dr. Dershwitz), were central to the decision making process regarding the new protocol, and in fact actually drafted it for the Warden's signature.

Plaintiffs mention this point because defense counsels' significant – indeed central – role in the Defendants' decision-making creates a purported layer of privilege against Plaintiffs' attempts to discover and prove Defendants' subjective intent.

Although Plaintiffs do not at this time have a specific application to make with regard to defense counsels' assumption of a role in this case which makes them in essence witnesses to the Defendants' subjective processes and creators of the historical facts of this case, and any resultant need for their recusal so that they may be called as witnesses, Plaintiffs do request an order requiring defense counsel to turn over their notes generated with regard to the generation of the new protocol. Under these circumstances, the attorney-client and work-product privilege are pierced and non-applicable.  See Livingstone v. North Belle Vernon Borough, 91 F.3d 515, 537 (3d Cir.1996) ("The attorney-client privilege is waived for any relevant communication if the client asserts as a material issue in a proceeding that: (a) the client acted upon the advice of a lawyer or that the advice was otherwise relevant to the legal significance of the client's conduct.") (quoting Restatement of the Law Governing Lawyers § 130(1) (Final Draft No. 1, 1996)); see also Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851, 863 (3d Cir.1994) ("[A] party can waive the attorney client privilege by asserting claims that put his or her attorney's advice in issue in the litigation.").

Honorable Sue L. Robinson
September 19, 2007
Page 9

---

### CONCLUSION

As the Court articulated during yesterday's conference, these questions must be addressed "so that no one is caught short, neither the plaintiff nor the defendant, in having evidence it needs to present to give the Court the best record to make this very important decision." Transcript at 52. In view of the uncertainty over the standard governing Plaintiffs' burden, Plaintiffs believe it would be inappropriate to limit their discovery and proof. This Court's determination of the proper standard may well be appealed by the party that does not prevail, and in that instance, and as the Court has recognized, neither party should be prevented from fully discovering and proving their case.

Should the Court decide to apply the unnecessary risk standard but hold that this standard does not permit inquiry into Defendants' reasons for taking or not taking particular steps in the new protocol, then Plaintiffs' burden should be appropriately lowered to reflect this standard. In that event, Plaintiff should prevail simply by showing the objective fact that there is a substantial risk of the infliction of pain, and Defendants' should not be heard to argue that the assumption of that risk is reasonable or required by particular circumstances to which only they are privy.

Respectfully Submitted,

/s/ Michael Wiseman

_____

Michael Wiseman
Helen Marino
Megan McCracken
Assistant Federal Defenders
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania

Suite 545 West – The Curtis Center
Philadelphia, PA 19016
215-928-0520

Counsel for the Plaintiffs

### CERTIFICATE OF SERVICE

I, Michael Wiseman, hereby certify that on this 19th day of September, 2007 I served the foregoing upon the following persons by United States Mail, First Class, postage prepaid:

Loren Myers, Esq.
Gregory E. Smith, Esq.
Elizabeth McFarlan, Esq.
Marc Niedzielski, Esq.
Deputy Attorney Generals
820 North French Street, 6th Floor
Carvel State Building
Wilmington, Delaware 19801


/s/ Michael Wiseman
_____
Michael Wiseman

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3    ROBERT W. JACKSON, III,      )
 4                                 )
 5              Plaintiff,         )
 6                                 )
 7    v.                           )  Civil Action
 8                                 )  Number 06-CV-300
 9    STANLEY W. TAYLOR, JR.,      )
10    Commissioner, Delaware       )
11    Department of Correction;    )
12    THOMAS L. CARROLL, Warden,   )
13    Delaware Correctional        )
14    Center, PAUL HOWARD, Bureau  )
15    Chief, Delaware Bureau of    )
16    Prisons; and OTHER UNKNOWN   )  VOLUME II
17    STATE ACTORS RESPONSIBLE     )  Pages 114 - 192
18    FOR AND PARTICIPATING IN     )
19    THE CARRYING OUT OF          )
20    PLAINTIFF'S EXECUTION, All   )
21    in their Individual and      )
22    Official Capacities,         )
23                                 )
24              Defendants.        )
25
26              Deposition of THOMAS L. CARROLL, taken
27    pursuant to notice at 245 McKee Road, Dover, Delaware,
28    beginning at 11:50 a.m., on Tuesday, September 18,
29    2007, before Julie H. Parrack, Registered Merit
30    Reporter, Certified Realtime Reporter and Notary
31    Public.
32
33
34
35              WILCOX & FETZER
36    1330 King Street - Wilmington, Delaware 19801
37                (302) 655-0477
38                www.wilfet.com
```

```
 1    APPEARANCES:
 2          MICHAEL WISEMAN, ESQUIRE
 3          HELEN A. MARINO, ESQUIRE
 4          MEGAN McCRACKEN, ESQUIRE
 5          FEDERAL COMMUNITY DEFENDER OFFICE
 6            For the Eastern District of Pennsylvania
 7            Capital Habeas Unit
 8            Suite 545 West - Curtis Building
 9            601 Walnut Street
10            Philadelphia, Pennsylvania  19106
11            On behalf of Plaintiff
12
13          MARC P. NIEDZIELSKI, ESQUIRE
14          ELIZABETH R. McFARLAN, ESQUIRE
15          GREGORY E. SMITH, ESQUIRE
16          STATE OF DELAWARE DEPARTMENT OF JUSTICE
17            820 North French Street, 6th Floor
18            Wilmington, Delaware  19801
19            On behalf of Defendants
20
21                    - - - - -
22
23                    THOMAS L. CARROLL,
24            the deponent herein, having first been duly
25            sworn on oath, was examined and testified as
26            follows:
27    BY MR. WISEMAN:
28      Q.   Morning, Warden.
29      A.   Mr. Wiseman, I need to correct you.  I am no
30    longer the warden.  My position has changed.
31      Q.   What is your new position?
32      A.   My position now is that of Deputy Commissioner
33    for the Department of Correction.
34      Q.   I see.  Who is your successor as warden of DCC?
```

```
1      A.    Elizabeth Burris has been appointed as acting

2    warden pending the posting, selection and appointment

3    of a permanent warden of the facility.

4      Q.    Okay, well congratulations.

5      A.    Thank you.

6      Q.    Have you reviewed any documents prior to today

7    in preparation for this deposition?

8      A.    It's my understanding this deposition is in

9    regard to the revised recent protocol, and I've spent

10   some time reviewing that.

11     Q.    Have you reviewed other documents?

12     A.    No.

13     Q.    Have you reviewed any of the depositions that

14   have been taken in this case?

15     A.    No.

16     Q.    Have you reviewed the reports of either

17   Professor Senders or Dr. Katz?

18     A.    I'm aware that Dr. Senders completed a report.

19   I do not specifically recall reviewing it.

20     Q.    And you haven't reviewed Dr. Katz's report at

21   all?

22     A.    Not that I can recall, no.

23     Q.    And you haven't looked at their depositions?

24     A.    No.
```

1    Q.   Have you made any notes, memoranda in regard to

2    your testimony today?

3    A.   No.

4         MR. WISEMAN:  I'd like to mark, we're up

5    to Plaintiff's 36.

6         (Plaintiff's Exhibit No. 36 was marked for

7    identification.)

8    Q.   What's been marked as Plaintiff's 36 is Bates

9    stamped discovery starting at page 2444 and it goes

10   through 2506.  I'd like you to identify that if you

11   can.

12   A.   Bate mark 2444 is the Department of Correction

13   policy on execution.  Bate mark 2445 is the Bureau of

14   Prisons procedure on execution.  And Bate mark 2446

15   apparently through Bate mark 2506 is the Delaware

16   Correctional Center procedure on execution, along with

17   the attachments thereto.

18   Q.   And did you sign off on that personally?

19   A.   Yes.

20   Q.   And that would have been on what date?

21   A.   August 31st.

22   Q.   When did this document come into its final

23   form?

24   A.   August 31st.

1    Q.   How long before you signed it did you have it

2    in your possession in its final form?

3    A.   The day before, August 30th.

4    Q.   Were there prior drafts of this document?

5    A.   This document was produced as a result of

6    consultation and conversation with my attorneys.

7    Q.   My question was were there prior drafts of it?

8    A.   Yes, in consultation with my attorneys.

9    Q.   Who actually wrote the protocol?

10           MR. SMITH:  Objection, attorney-client

11   privilege.

12           MR. WISEMAN:  As to who wrote it?

13   Q.   Did you write the protocol?

14           MR. SMITH:  I still have the same

15   objection, attorney-client privilege.

16           MR. WISEMAN:  I don't understand the basis

17   of the objection.  What's the privilege asking if he

18   wrote the document?  I didn't ask if a lawyer wrote

19   it.  I asked if he wrote it.

20           MR. SMITH:  That's the basis for the

21   objection.

22           MR. WISEMAN:  Are you directing him not to

23   answer?

24           MR. SMITH:  Yes.

1    Q.    Was the document written by lawyers?

2          MR. SMITH:  Same objection,

3    attorney-client privilege.

4    Q.    Did you or your staff have contact with any

5    other states or jurisdiction with regard to the

6    contents of Exhibit 36?

7    A.    No.

8    Q.    Have you or your staff attended any meetings,

9    trainings or demonstration with regard to any aspect

10   of the process described in Exhibit 36?

11   A.    No.

12   Q.    Aside from your counsel, who in the Department

13   of Corrections reviewed or commented on the protocol

14   before it was finalized?

15   A.    The document was made available to the Chief of

16   the Bureau of Prisons and to the Commissioner of

17   Correction prior to its signature on August 31st.

18   Q.    And do you know if in fact they reviewed it?

19   A.    I don't know for a fact that they did or did

20   not.

21   Q.    Did you receive any comments from them?

22   A.    I received no written comments from them, no.

23   Q.    Did you receive any oral comments from them in

24   regard to the protocol?

1      A.    As I recall, I received just, you know, it was

2    that they, you know, it was okay to go.

3      Q.    So would you say they gave you their approval?

4      A.    They acknowledged that it had been rewritten

5    and made no changes.

6      Q.    Did you personally consult with any medical

7    person prior to finalizing this protocol?

8      A.    No.

9      Q.    Did you ever speak specifically with

10    Dr. Dershwitz?

11      A.    No.

12      Q.    Did anyone on your staff employed by the

13    Department of Corrections speak with Dr. Dershwitz?

14      A.    No.

15      Q.    And did anyone on your staff speak with any

16    other medical personnel in regard to the protocol?

17      A.    To the best of my knowledge, no.

18      Q.    Well, did you ask anyone or direct anyone to

19    speak with Dr. Dershwitz or another medical person?

20      A.    No.

21      Q.    Who is, under this new protocol, and by who I

22    mean what position is in charge of the execution

23    process?

24      A.    The warden of the Delaware Correctional Center.

1    Q.    And what role does the protocol envision for a

2    medical doctor?

3    A.    The physician is envisioned to be there to

4    pronounce death.

5    Q.    Is there any other role for the medical doctor?

6    A.    There is none stated or intended in the

7    protocol.

8    Q.    If a substantive medical issue arises during an

9    execution, is it your view that the medical doctor

10   would or would not be consulted?

11   A.    According to the protocol, the physician is

12   there to pronounce death only.

13   Q.    And do you see that as a change from the prior

14   protocol?

15   A.    In this protocol, the purpose of the physician

16   is there to pronounce death only.

17   Q.    All right, my question is do you view that as a

18   change from the prior protocol?

19   A.    I would have to review the prior protocol in

20   detail as it relates to the requirements of the

21   physician before I could answer that.

22   Q.    I'd like to refer to your prior deposition of

23   March 27, 2007 to see if that would help you answer

24   the question.  In particular, if you'd just read to

1    yourself page 23.  And page 30 as well I think is

2    germane.

3      A.    Okay.

4      Q.    Can you answer my prior question now --

5      A.    Can you repeat the question for me?

6      Q.    Sure.  How is the physician's role in the new

7    protocol different than the physician's role in the

8    prior protocol?

9      A.    The physician's role in the new protocol is

10   there to pronounce death.  In the document that you've

11   shown me, my prior deposition, you presented a

12   hypothetical question, and I responded with a

13   hypothetical answer.  And that's reflected in the

14   narrative, the question and answer in the prior

15   deposition.

16           But once again, Mr. Wiseman, you were

17   asking me at that time a hypothetical, and I am

18   telling you that in the current protocol, the purpose,

19   the function performed by the physician is to

20   pronounce death.  And that is the sole function.

21     Q.    In your prior deposition testimony you answered

22   the hypothetical as to how you envisioned the ME,

23   medical examiner, assisting in an execution.  Is your

24   answer to the same hypothetical the same or different

1   as to this new protocol?

2       A.   As I've said in response to your prior

3   question, Mr. Wiseman, the purpose of the physician in

4   the new protocol is only to pronounce death.

5       Q.   And so would it be fair to say that you can

6   envision no circumstances under which the physician

7   would play any role in any medical aspect other than

8   pronouncing?

9       A.   It would be fair to say, as I've indicated

10  several times before, that the purpose of the

11  physician in the new protocol is to pronounce death.

12      Q.   In the prior protocol, which has been

13  previously marked as Plaintiff's 2, at Bates stamp

14  page 432, the protocol requires the presence of the

15  medical examiner or physician to be on site two hours

16  before the execution to, quote, assist if needed.  I

17  just want to be absolutely clear, that portion of the

18  prior protocol that envisioned a role of assisting is

19  completely absent from the new protocol.  Is that

20  right?

21      A.   The new protocol indicates that the physician

22  is there to pronounce death.

23      Q.   When did you become deputy commissioner?

24      A.   My first official day physically in the

1    position after the holiday was Tuesday, September the

2    4th.  For pay purposes and for payroll purposes, I

3    believe the position was actually effective on Sunday,

4    September the 2nd.  That's the way our pay and

5    personnel system works.

6       Q.   Getting back to the physician or the ME as it

7    relates to the new protocol, what was the reason that

8    you changed that?

9            MR. SMITH:  Objection, attorney-client

10   privilege.

11      Q.   Did you change that on the advice of your

12   counsel?

13           MR. SMITH:  Objection, attorney-client

14   privilege.

15      Q.   Did you have a reason that was based on medical

16   concerns for making that change?

17           MR. SMITH:  Objection, attorney-client

18   privilege.

19      Q.   Was that change based on your assessment as to

20   what would lower the risk of undue pain and suffering

21   being inflicted on the prisoner?

22           MR. SMITH:  Objection, attorney-client

23   privilege.

24      Q.   The old protocol at Bates stamp page 447-448

1    required that nothing could be said to the IV team

2    that would require a response.  Is that same

3    prohibition contained in the new protocol?

4      A.   The new protocol is silent on that.  So the

5    prohibition is not contained in the new protocol.

6      Q.   Does the prohibition still exist, in your mind?

7      A.   No.

8      Q.   Why was that change made?

9           MR. SMITH:  Objection, attorney-client

10   privilege.

11     Q.   Was the change made out of concern for the

12   integrity of the lethal injection process?

13          MR. SMITH:  Objection, attorney-client

14   privilege.

15     Q.   Are the IV team members under the new protocol

16   permitted to speak with each other?

17     A.   There is no prohibition against them speaking

18   with each other.

19     Q.   Is there anything in the new protocol that

20   addresses the lighting conditions in the medicine

21   room?

22     A.   The new protocol is silent on the lighting

23   conditions in the medicine room.

24     Q.   What is your view of what the lighting

1    conditions are to be in the medicine room from the

2    point in time that the members of the IV team arrive

3    until death is pronounced?

4       A.    The obvious, that the lights will be on

5    continuously during the preparation of the mixing and

6    preparation of the drugs and the drawing of the

7    syringes, and the lights are obviously on in the

8    execution chamber when the Angiocaths are inserted in

9    the inmate sentenced to the death penalty.

10           The new protocol does not require that the

11   lights be off in the medicine room during the course

12   of the actual execution itself, and I am -- do not

13   currently have sufficient current knowledge as to

14   whether or not I would insist that the lights be off.

15   The lights very well could be on during the process.

16      Q.    Is that something that the current acting

17   warden would have information about?

18      A.    I do not have knowledge as to what, you know,

19   what her position would be, what her thoughts would

20   be.

21      Q.    Would it be her decision as to whether the

22   lights would remain on or off during the process?

23      A.    It would be the decision of the warden of the

24   Delaware Correctional Center at the time of an

1    execution.  If that would occur during the tenure of

2    Elizabeth Burris as warden, it would be her decision.

3       Q.   And so is your view, as the person who signed

4    off on this protocol, that the lighting in the

5    medicine room during the actual administration of the

6    chemicals would be left to the discretion of the

7    current warden of DCC?

8       A.   What I'm saying is that the decision would be

9    the decision of the warden who by procedure is

10   responsible for the entirety the execution, and I

11   am not the warden of the institution as of this date.

12      Q.   At the time you signed off on the protocol,

13   what was your intention as to whether or not, or what

14   was your thought as to whether or not the lights would

15   remain on or off during the injection of the

16   chemicals?

17      A.   With the addition of the pan/tilt/zoom camera

18   on the monitor inside the medicine room, that has

19   altered the ambient light inside it.  And at the time

20   that I signed this document, I had not reached a final

21   decision as to whether or not I would have directed

22   that the lights be on or that the lights be off.

23      Q.   Did you have a view at the time you signed it

24   as to what factors you would consider in making that

1    decision?

2      A.    Did I have a view?  I'm not understanding

3    adequate your question, Mr. Wiseman.

4      Q.    At the time you signed this document, what

5    would you have considered in making a decision as to

6    whether or not the lights would remain on or off

7    during the injection of the chemicals?

8                MR. SMITH:  Objection, attorney-client

9    privilege.

10               MR. WISEMAN:  You're objecting to a

11   privilege based on what's in his mind?  Is that your

12   position?

13               MR. SMITH:  I'm objecting to

14   discussions --

15               MR. WISEMAN:  I didn't ask about

16   discussions.

17               MR. SMITH:  -- and what that would result

18   for his decision, yes.

19   BY MR. WISEMAN:

20     Q.    In deciding whether or not at the time you

21   signed this as to whether the lights should remain on

22   or off during the injection of the chemicals, would

23   you have considered the actual lighting in the room?

24               MR. SMITH:  Can you specify as to which

1    room?

2        Q.    The medicine room.

3        A.    Roll the question back to me, please.

4        Q.    At the time you signed this document, were you

5    of a mind that you would consider the actual lighting

6    in the medicine room in making a determination as to

7    whether or not the lights should remain on or off

8    during the injection of the chemicals?

9        A.    Yes.

10       Q.    What steps have you taken to measure the light

11   in that room with the new equipment that you

12   previously mentioned?

13       A.    When you say measure, I have conducted no

14   measurement with a light meter.  I have, with the

15   lights off in that room, been able to clearly read a

16   document and to have my reading of that document

17   verified by someone in another adjacent room that's

18   well lit, and I was able to read that document with no

19   error.

20            So if you want to qualify that as a

21   measurement, that's what I've done, with the lights

22   off in the room.

23       Q.    Where were you standing when you read the

24   document in the room?

1    A.   I was standing in front of the window in the

2    approximate position that members of the IV team would

3    be standing during the course of a lethal injection.

4    Q.   And did you read the document standing in front

5    of the IV stand to the right of the window?

6    A.   I was within probably six inches of that, yes.

7    Q.   Does the new procedure call for anyone to

8    assess the anesthetic depth of the prisoner once the

9    chemicals begin to flow?

10   A.   The new procedure, as indicated in one of the

11   attachments, specifies the process that is to occur in

12   the imposition of the chemicals.

13   Q.   And my question is, is there any portion of the

14   document that in your view requires anybody involved

15   in the process to assess the anesthetic depth of the

16   prisoner once the chemicals have begun to flow?

17   A.   To assess the anesthetic depth of the prisoner

18   once the chemicals have begun to flow.  No.

19   Q.   And is there a reason that you decided not

20   to --

21           MR. SMITH:  Objection, attorney-client

22   privilege.

23           MR. WISEMAN:  Why don't you let me finish

24   the question, it will be a lot smoother.

1    Q.    Is there a reason that you decided not to

2    include a requirement for the assessment of anesthetic

3    depth once the chemicals begin to flow?

4              MR. SMITH:   Objection, attorney-client

5    privilege.

6    Q.    In making the decision not to include such a

7    requirement in the protocol, did you consult with

8    anyone in the Department of Corrections other than

9    your counsel?

10   A.    No.

11   Q.    Did you consult with any experts or medical

12   people about that particular aspect of the process?

13   A.    Mr. Wiseman, the procedure was developed as a

14   result of conversations with my attorneys.

15   Q.    So I take it your answer is a "no" to that

16   question?

17   A.    My answer would be no.

18   Q.    What, in your view, at the time you signed the

19   protocol would happen under this procedure if after

20   the second bolus of thiopental the prisoner was fading

21   in and out of consciousness?

22   A.    How would you propose that I would recognize

23   that he would be fading in and out of consciousness?

24   Q.    I can't answer your question, but if you could

1    answer mine, that would be great.

2       A.   I don't understand your question.

3       Q.   Okay.

4       A.   I was seeking clarification.

5       Q.   Okay.  If the prisoner opened his eyes after

6    the second bolus of thiopental, what would you do?  Or

7    what should the warden of DCC do under this protocol?

8       A.   Renew or do another, start the process -- start

9    the protocol over again using the other Angiocath.

10      Q.   And if after that second Angiocath is used,

11   what if you saw the prisoner's eyes opening and

12   closing after the thiopental had been administered?

13      A.   In the hypothetical, I don't know what my

14   response would be.

15      Q.   Has the warden -- it's difficult to ask these

16   because I'm trying to account for the change in

17   personnel.  But at the time that you signed off on

18   this, did you envision the warden of DCC undergoing

19   any training with regard to the assessment of

20   anesthetic depth?

21      A.   Training, no.

22      Q.   Did you answer?  I'm sorry.

23      A.   Yes, I said, "Training, no."

24      Q.   Oh, I'm sorry.  I didn't even hear you.

1               Is it your understanding that any other

2      person to be involved in the execution process is to

3      undergo any such training?

4         A.   There is no requirement for that training to

5      occur in the procedure currently in place.

6         Q.   All right, and leaving aside the procedure, are

7      you aware of whether any other staff or participants

8      in the process are going to be asked to undergo such

9      training?

10        A.   As I indicated before, Mr. Wiseman, the

11     procedure does not require that.

12        Q.   Well, I understand it doesn't require it, but

13     not everything in the world is in the procedure.  My

14     question is are you aware of anything or any other

15     requirement outside the procedure that would require

16     staff to be trained in assessing anesthetic depth for

17     purposes of the lethal injection process?

18        A.   Your question based on a requirement that they

19     go to training?  My answer is no.

20        Q.   Are you aware of whether staff have attended

21     such training or plan to attend such training?

22        A.   No, I'm not aware.

23        Q.   On page 2467 of the document, Petitioner's 36,

24     there is a reference to -- excuse me for one moment.

1        I'm sorry for the interruption.  All

2   right, back on track.

3        On page 2467, four lines from the bottom,

4   there is a statement that, "An accounting of timed

5   activities starting with the time the ISDP is taken

6   from the holding cell shall be maintained."  What are

7   the timed activities that are to be recorded?

8   A.   They would include removal from the holding

9   cell, transfer to the gurney, presence of the IV team

10  member, securing of the -- I need to back up.

11       Transfer from the holding cell, travel to

12  the gurney, placement on the gurney, being secured to

13  the gurney by the tie-down team, the execution team

14  serving the tie-down function, the entry of the IV

15  team member into the execution chamber, the placement

16  of the Angiocath, the placement of the second

17  Angiocath, the review of the assessment that the

18  Angiocaths were functioning properly as indicated in

19  the procedure.  The departure of the IV team member,

20  the entry of the visitors or witnesses, official and

21  ISDP's family and victim's family into the viewing

22  area.  The request of the warden to enable the ISDP to

23  make a statement, the statement of the ISDP, the

24  signal of the warden to begin the process, and the

1    conclusion, the closing of the curtain, the entry of

2    the physician into the chamber, the assessment of the

3    physician of the ISDP, and the subsequent announcement

4    of the death of the ISDP by the warden.

5                As covered in No. 5 on Bate mark 2467,

6    that is the, what I believe would be the accounting of

7    timed activities starting with the time the ISDP is

8    taken from the holding cell shall be maintained, that

9    is a summary of those activities.

10   Q.   And are those written down anywhere?  Well, are

11   they written down anywhere?

12   A.   Are they written down anywhere?

13   Q.   Yeah, all the items you just covered.

14   A.   In this protocol, no, they're not.

15   Q.   Is there a reason they're not?

16              MR. SMITH:  Objection, attorney-client

17   privilege.

18   Q.   Are they written down somewhere other than in

19   the protocol?

20   A.   For the revised protocol dated August 31st of

21   2007, no.

22   Q.   On page 2468 it states that, "The warden shall

23   complete a summary of report of activities related to

24   the execution."  What would that summary report

1    include?

2       A.    It is a narrative document prepared by the

3    warden of the institution that provides a broad

4    chronological summary of actions that occur generally

5    during the 30 to 45 days preceding the execution, to

6    include the various matters, the various functions

7    performed regarding the execution, security for the

8    execution, visitors, operational activities, things of

9    that nature.

10      Q.    And from where do you derive your understanding

11   of what the report should include?

12      A.    I derive my personal understanding based on the

13   report that I completed for the execution that I

14   supervised in November of 2005.

15      Q.    And is there anything written anywhere that

16   would instruct the current or future warden as to what

17   the report should include?

18      A.    I know of no written instructions to that end.

19      Q.    The same page of the document indicates that

20   the warden is to maintain all records.  Can you tell

21   me for how long those documents are to be maintained?

22      A.    The procedure is silent.  It would be my

23   expectation that they would be maintained

24   indefinitely.

1    Q.    If you could turn to the next page, 2469.  Who

2    selects the members of the IV team?

3    A.    According to attachment 1 of the revised

4    execution procedure, the warden selects the members of

5    the execution team to include the members of the IV

6    team.

7    Q.    Can you show me specifically in the document

8    where it indicates that the warden is to pick the

9    members of the IV team?

10   A.    The document indicates that the warden selects

11   the remaining Department of Correction members and is

12   silent as to directing the warden to select that, to

13   select the members of the IV team.

14   Q.    And is there a reason that it is silent in that

15   regard?

16            MR. SMITH:  Objection, attorney-client

17   privilege.

18   Q.    What are the criteria for the selection of the

19   members of the IV team?

20   A.    They shall be emergency medical technicians or

21   paramedics.

22   Q.    Is that the sole criteria?

23   A.    No.

24   Q.    What are the other criteria?

1    A.   Ability to maintain confidentiality, maturity,

2    willingness to participate, professionalism, things of

3    that nature.

4    Q.   And how does the warden require to assess

5    those, the presence of those other criteria?

6    A.   The warden makes the selection of these

7    individuals.  This is an exceptionally unusual

8    circumstance, and the warden would use their judgment

9    as the individual who is responsible to effect and

10    carry out this execution in making that selection.

11    Q.   Other than leaving it to the judgment of the

12    warden, is there a process for that selection?

13    A.   I believe I've just described the process.

14    Q.   Nothing beyond what you just described then?

15    A.   Including those, but perhaps not limited to,

16    the items that I mentioned.

17    Q.   Well, by process, is the warden required or

18    permitted to interview prospective members of the IV

19    team?

20    A.   The procedure is silent on the requirements of

21    the warden to do that.  It is my belief that the

22    warden would do that.

23    Q.   Would the warden be required or permitted to

24    look at the employment records of any prospective

1    member of the IV team?

2        A.    I think the warden could be permitted, but the

3    procedure does not require the warden to look at the

4    employment records of the prospective IV team members.

5        Q.    Does this procedure envision the warden

6    considering whether the prospective members have

7    experience in the preparation and administration of

8    the drugs named in the protocol?

9        A.    This procedure envisions that the IV team

10   members will be emergency medical technicians or

11   paramedics, as indicated in attachment 1.

12       Q.    And so your answer to my last question is what?

13       A.    My answer to your last question is that the

14   procedure envisions that the warden would -- the IV

15   team members would be emergency medical technicians or

16   paramedics.

17       Q.    And does the procedure envision the warden

18   considering whether or not those particular paramedics

19   or EMT's have experience in the administration and

20   preparation of the drugs named in the protocol?

21       A.    The procedure, as I've indicated again,

22   envisions that the members of the IV team will be

23   emergency medical technicians or paramedics.

24       Q.    What would you envision the warden, in choosing

1    between several potential members of the IV team, do

2    you think the warden is permitted or required to

3    consider prior experience that those individuals may

4    or may not have with the preparation and

5    administration of the drugs named in the protocol?

6       A.    I'm sure -- my expectation is that the warden

7    would consider a whole range of factors in selecting

8    IV team members.  In the hypothetical you've just

9    presented, if they had, if there was determinative

10   fact that they had experience in the preparation and

11   administration of these drugs, it's my belief that

12   that would be a factor considered by the warden.

13      Q.    When the protocol says that the members of the

14   IV team have to be EMT's or paramedics, does the

15   protocol envision that they be currently licensed in

16   those fields?

17      A.    Yes.

18      Q.    Does the protocol envision that the prospective

19   members of the IV team, in addition to being licensed,

20   actually are employed at that moment as EMT's or

21   paramedics?

22      A.    The protocol is silent.  You're asking me to

23   make an assessment.  The protocol indicates that two

24   or more members of the execution team shall be

1    emergency medical technicians or paramedics.  In order

2    to be an emergency medical technician or paramedic,

3    you'd have to be currently licensed.

4      Q.    Right, but my question, the last question was

5    whether they have to be currently employed in the

6    field, in addition to being licensed?

7      A.    That is not a requirement in the protocol.

8      Q.    The expert that was retained by the defense in

9    this case has stated that in his view, the members of

10   the IV team should have as their day job, quote

11   unquote, being EMT's or paramedics.  My question to

12   you is how long can a prospective member of the IV

13   team be separated from such employment and still

14   qualify as an EMT or a paramedic?  I'm sorry, still

15   qualify as a member of the IV team.

16     A.    Your question is how long can they be separated

17   from that employment and still qualify?

18     Q.    Yes.

19     A.    If they are licensed emergency medical

20   technicians or paramedics, they would be, according to

21   the protocol, able to be selected as members of the IV

22   team.

23     Q.    Does the protocol expressly state that the

24   members of the IV team must be licensed, or is that

1   your interpretation of it?

2      A.   It says that they shall be emergency medical

3   technicians or paramedics in order to be an emergency

4   medical tech -- to be selected or to be members of the

5   team, they shall be EMT's or paramedic.  In order to

6   be an EMT or paramedic, they'd have to be currently

7   licensed by the State of Delaware.

8      Q.   Are the members of the IV team today the same

9   as for the last execution?

10     A.   There is no current execution scheduled or

11  planned, and as a result, there are no current -- I

12  cannot definitively say that the past members would or

13  would not be.  If they were to be, they would have to

14  meet the requirements as outlined in this procedure

15  that I've just described.

16     Q.   In the deposition of one of the John Doe

17  current executioners, current meaning involved in the

18  last execution, one of them stated in effect that, and

19  I'm paraphrasing, that infliction of pain on a

20  prisoner would not be of great concern to him,

21  inasmuch as the prisoner inflicted pain on the victim.

22  Would that, the substance of that comment, would that

23  in your view disqualify a person from being a member

24  of the IV team?

1    A.    Mr. Wiseman, I do not know the context in which

2    that question was asked, the questions that

3    immediately preceded it, the types of questions that

4    were asked, the responses to the prior questions, the

5    nature of the questions that were asked, the tone of

6    the question that was asked, nor the tone of the

7    response.  So I do not know that I am in a position to

8    evaluate the totality of that paraphrased report that

9    you've just given me.

10    Q.    Okay.  The protocol at page 2469 says, "All

11    execution team members shall read the portion of the

12    Lethal Injection Execution Procedure that pertains to

13    their task when they become members of the execution

14    team."  Do you interpret that to mean that the

15    protocol will only be made available at the time that

16    the person becomes a member of the team and not

17    subsequent?

18    A.    No.  I interpret that to require that it be

19    made available and that they read it when they become

20    a member of the team.  It is silent as to whether or

21    not that would not be available subsequent; in fact, I

22    think it would be.

23    Q.    And on what do you base that thought that it

24    would be available subsequent?

1      A.    That's my personal thought.

2      Q.    Is it based on anything, or is it --

3      A.    It's my personal belief, my personal

4   perspective.

5      Q.    Is that personal perspective based on the

6   manner in which executions have been carried out in

7   the past based on the history that you're familiar

8   with?

9      A.    My personal thought is based on the revisions,

10   the completion of DCC procedure 2.7 as revised

11   effective August 31st, and how, were I the warden of

12   the Delaware Correctional Center at the time of the

13   next execution, what I would do.

14      Q.    Is there a reason that the protocol does not

15   specify ongoing review of that document by members of

16   the team?

17             MR. SMITH:  Objection, attorney-client

18   privilege.

19             MR. WISEMAN:  We had requested documents

20   be produced with regard to the generation of the

21   protocol, and I'm just wondering if you had any

22   documents today to produce?

23             MR. SMITH:  No.

24             MR. WISEMAN:  You have none or are you

1    asserting a privilege?

2             MR. SMITH:  We have none, and we're

3    asserting privilege, but I don't know that that's --

4    are we jumping into this now?

5             MR. WISEMAN:  Well, I would like to see

6    the documents before I go further if you have them,

7    that's why I'm asking.

8             MR. SMITH:  We do not have any.

9             MR. WISEMAN:  Okay, are there such

10   documents?

11            MR. SMITH:  No, I do not believe so.  Not

12   that are not privileged.

13            MR. WISEMAN:  There are documents but

14   you're asserting privilege?

15            MR. SMITH:  Yes.

16            MR. WISEMAN:  Okay.  And I assume you're

17   asserting attorney-client privilege, or what privilege

18   are you asserting?

19            MR. SMITH:  Attorney-client and work

20   product.

21            MR. WISEMAN:  Any others?

22            MR. SMITH:  No.

23   BY MR. WISEMAN:

24      Q.   Does the protocol require that it be available

1    to review during practice sessions?

2    A.   Is there a requirement that the -- in the

3    protocol that it's available for review during

4    practice sessions?  I do not believe so.

5    Q.   Is there a requirement outside the protocol

6    that the protocol be available for review by the

7    members of the execution team during practice

8    sessions?

9    A.   The protocol requires that all execution team

10    members shall read the portion of the lethal injection

11    procedure that pertains to their task when they become

12    members of the execution team.

13    Q.   And my question was, is there anything outside

14    the protocol that requires that the protocol be made

15    available to members of the execution team during

16    practice sessions?

17    A.   There is no requirement to that effect.

18    Q.   Will the IV team members be present during

19    practice sessions?

20    A.   Yes.

21    Q.   And where is it stated in the protocol that

22    that is the case?

23    A.   The protocol states on Bate mark 2469 that the

24    execution team shall conduct did a minimum of three

1    simulations of the execution day within one month of

2    the execution, that paragraph.  The IV team members

3    are members of the execution team and they would be

4    present during those simulations.

5        Q.    And during those practice sessions would the IV

6    team members practice mixing and preparing the

7    chemicals?

8        A.    Yes.

9        Q.    And would they practice pushing the drugs,

10    obviously not into a person, but in any other manner?

11        A.    The protocol does not require that.

12        Q.    Do you have an idea of who would be designated

13    as the lethal injection recorder as envisioned by the

14    protocol?

15        A.    The lethal injection recorder would be one

16    member of the execution team.  I do not currently have

17    an individual who I believe would serve that

18    responsibility.

19        Q.    Have you spoken with Acting-Warden Burris as to

20    whether she has a view on that topic?

21        A.    I have not spoken with her about that topic.

22        Q.    Does the protocol require that the lethal

23    injection recorder be trained in any way to perform

24    their duties?

1    A.    The protocol requires that the lethal injection

2    recorder document the completion of tasks and to

3    initial a document relative to those completion of

4    tasks.

5    Q.    And my question was does the procedure require

6    that they be trained in regard to the completion of

7    those tasks?

8    A.    They are recording the accomplishment of the

9    task, much like a correctional officer would record

10    the activities of an inmate in a logbook.  They are

11    making a record of something of their observing a task

12    being completed.

13    Q.    And so do I take from your answer that it is a

14    self-evident task that doesn't require training?

15    A.    You may take from my answer that they are

16    observing that a task has been accomplished.

17    Q.    And therefore, training is not required?

18    A.    My response, Mr. Wiseman, is that they are

19    observing and documenting that a task has been

20    accomplished.

21    Q.    Now, it's a real straightforward question.

22    A.    I believe I have a straightforward answer.

23    Q.    Did they require --

24    A.    I've given you my answer.

1    Q.    Is there any training required?

2    A.    I've given you my answer.

3    Q.    How is the lethal injection recorder to know

4    what things are to be recorded and in what manner?

5    A.    The lethal injection recorder is to perform

6    their function as identified in the attachment to DCC

7    procedure 2.7.

8    Q.    And can you specifically point me to where that

9    information is?

10    A.    On Bate mark page 2471, letter A, No. 3, it

11    says, "The member of the execution team selected as

12    the Lethal Injection Recorder shall document the

13    preparation of each chemical on the Chemical

14    Preparation Time Sheet."  That's one place where the

15    lethal injection recorder's actions are indicated.

16    Q.    And are there any others?

17    A.    I need to refresh my recollection by reading

18    the balance of the document.

19         On Bate mark 2472, No. 6, it says the

20    process shall be repeated.  That would refer to the

21    prior actions.

22         Bate mark page 2475, No. 3, it says, "The

23    Lethal Injection Recorder shall enter the times of the

24    administration of the saline and chemicals on the

1    Chemical Administration Record."

2              I believe that's it.

3    Q.    The chemical preparation time sheet --

4    A.    Where are we?

5    Q.    I'm sorry, page 2477.  -- indicates the amounts

6    of chemicals that were prepared.  Do I take from that

7    that the lethal injection recorder does not

8    independently assess the amount of chemicals that were

9    prepared but merely notes the time that they're

10   prepared?

11   A.    According to page 9 of attachment 1 of the

12   procedure, it indicates that the lethal injection

13   recorder notes the date, who, they fill in the who,

14   there's a blank space, and the time prepared for the

15   various substances required in an execution.

16   Q.    And if the lethal injection recorder observes

17   that an incorrect amount of a particular chemical has

18   been prepared, are they to note the time or are they

19   to make their observations known to the members of the

20   team?

21   A.    I believe the protocol indicates that one

22   member of the injection team is responsible to prepare

23   the syringes, complete the mixture as required and

24   prepare the syringes.  That is observed by the second

1    member of the IV team, and that the function performed

2    by the lethal injection recorder is to memorialize on

3    this document who completed the task, what IV team

4    member completed the task and at what time.

5        Q.    Right.  And my question is if the lethal

6    injection recorder noted an error in that preparation,

7    would they have an obligation to report it or would

8    they note the time and do nothing more?

9        A.    You're asking me a hypothetical question?

10       Q.    I am.

11       A.    They are recording the preparation, the actions

12   of the IV team member.

13       Q.    On page 2471, it indicates -- I'm sorry -- in

14   the middle of the page, A-1, that the chemicals are

15   removed from the locked refrigerator to the injection

16   room three hours before the execution.  If the members

17   of the IV team have not yet arrived, what happens to

18   the chemicals before they arrive?

19       A.    A-1 says, "The Warden's designee transports the

20   chemicals from the locked refrigerator to the

21   Injection Room approximately three hours before the

22   execution."  They would remain -- "The amount of

23   chemicals and saline is sufficient to make up two

24   complete sets," et cetera, et cetera, et cetera.  They

1    would remain in the personal custody of the warden's

2    designee until they are turned over to the IV team.

3        Q.    Getting back to the lethal injection recorder,

4    is that person to be given any instruction on the

5    appropriate dosages, mixing or concentrations of the

6    chemicals?

7        A.    As I've indicated before, the lethal injection

8    recorder is, the function they are performing is to

9    record the actions taken by a member of the IV team

10   and the time it was taken.

11       Q.    Going back to the chemical preparation time

12   sheet, which is 2477, can you explain to me the reason

13   that the third entry, "If necessary, 1 syringe

14   prepared by _____ at labeled Sodium Pentothal 1c."

15   And I guess I'm particularly interested in what the

16   meaning of "if necessary" is in that context.

17       A.    Sodium thiopental may be manufactured by

18   different individuals.  It may come in different

19   packaging sizes.  And as a result, may require more

20   than two syringes to have an aggregate total dosage of

21   three grams.  That allows for given changes, potential

22   changes in manufacturing instructions associated with

23   manufacturers or packaging amounts that a third

24   syringe for sodium thiopental can be utilized if

1    needed in order to achieve the three-gram dosage.

2    Q.    What concentration of sodium thiopental is to

3    be achieved for purposes of the execution?

4    A.    The concentration required by the, required by

5    the procedure.

6    Q.    Can you show me where in the procedure the

7    concentration is indicated?

8    A.    It requires a total of three grams for each

9    color set.  It's my belief that the mixing

10    instructions that come associated with the

11    manufacturer would indicate the amount of material

12    that would need to be mixed in order to achieve the

13    total of three grams.

14    Q.    I'm going to show you what's been previously

15    marked in these depositions as Plaintiff's 27, ask you

16    to turn to page 6 of that document.  And in the middle

17    of the page you'll see that there are various

18    concentrations for thiopental ranging from .2 percent

19    all the way up to 5 percent solution.  Which of those

20    concentrations does the protocol envision being used

21    in the lethal injection process?

22    A.    You are asking me a question that requires a

23    degree of scientific knowledge that I do not have.

24    Q.    How is the member of the IV team to know what

1    concentration is appropriate?

2       A.    The member of the IV team is to, as indicated

3    in the protocol, mix so that there are three grams for

4    the dosage.

5       Q.    Right.  But I'm asking about concentrations.

6    How are they to know what concentration is the

7    appropriate concentration for this process?

8       A.    I do not know.

9       Q.    Do you know anyone who does know?

10      A.    Not that I am aware of right now.

11      Q.    Are you aware of the risks of having too high a

12   concentration of this solution of thiopental?

13      A.    No.

14      Q.    Are you aware of the risks of having too low a

15   concentration of thiopental?

16      A.    No.

17      Q.    Whose decision was it to change the thiopental

18   dosage from two to three grams?

19              MR. SMITH:  Objection, attorney-client

20   privilege.

21      Q.    Did you consult with anyone other than your

22   counsel in making that decision?

23      A.    No.

24      Q.    Did you consider whether the change would

1    lessen the risk of the prisoner sentenced to death

2    suffering untoward pain and suffering in this process?

3       A.   This procedure was developed in conversation

4    with my attorneys.

5       Q.   Can you answer the question?

6       A.   This procedure was developed in conversation

7    with my attorneys.

8       Q.   Well, are you asserting that, are you invoking

9    an attorney-client privilege in response to that

10   question?

11      A.   Repeat the question for me.

12      Q.   Sure.  When you decided to change the amount of

13   thiopental from two to three grams, did you consider

14   the effect on the risk that the prisoner would suffer

15   untoward pain and suffering in the process?

16           MR. SMITH:   Objection, attorney-client

17   privilege.

18      Q.   Did you do any independent research on the

19   question of the dosage of thiopental?

20      A.   No.

21      Q.   I'd like you to look at 2472, and tell me, if

22   you can, what the dosage of potassium chloride is, the

23   full dosage to be administered.

24      A.   Once again, Mr. Wiseman, your question requires

1    that I have an expertise that I do not have.

2      Q.    Did you independently decide to make that the

3    dosage of potassium chloride in the revised protocol?

4              MR. SMITH:  Objection, attorney-client

5    privilege.

6      Q.    Did you consult with anyone other than your

7    attorneys in making the decision to make that the dose

8    of potassium chloride?

9      A.    I consulted with no one else in regard to the

10    potassium chloride dosage.

11      Q.    And did you do any research on your own as to

12    the proper dosage?

13      A.    I did no research on my own in regard to the

14    dosage of potassium chloride.

15              MR. WISEMAN:  Can we take a three-minute

16    break so we can discuss something?

17              MR. SMITH:  Okay.

18              MR. WISEMAN:  We can go off the record for

19    now.

20              (A brief recess was taken.)

21              (Teleconference with The Honorable Sue L.

22    Robinson:)

23              THE COURT:  Good afternoon, Counsel.  This

24    is Judge Robinson.  It would be helpful, although I

1  don't have the court reporter, it would be helpful to

2  the record if you'd still identify yourself when you

3  spoke.

4         MR. WISEMAN:  Yes, Your Honor.  This is

5  Michael Wiseman.  We appreciate the Court

6  accommodating us.  We are in the midst of taking the

7  deposition of Warden Carroll, who has now become a

8  deputy commissioner.  I refer to him as Warden just

9  for ease.

10        We have asked a number of questions

11 related to considerations that went into a number of

12 the changes that are in the new lethal injection

13 procedure.  We have encountered attorney-client

14 objections to virtually all of those questions.  We've

15 asked quite a few.  I didn't want to interrupt the

16 Court with sporadic ones, but now that we've got a

17 good sampling, I wanted to alert the Court and ask for

18 a ruling.

19        So, for example, when I asked the warden

20 who wrote the protocol, that question was objected to

21 on attorney-client privilege.  When I asked him why

22 the amount of the anesthetic was increased from two to

23 three grams, I was met with the same objection.  When

24 I asked whether the change was made to lessen the risk

1       of a violation of the constitution during execution, I

2       was met with the same objection.

3               We've got quite a few questions that are

4       along those same lines.  I could give them all to Your

5       Honor, or I don't know if you want to hear them all,

6       or hear from Mr. Smith first.

7               THE COURT:  Well, let me hear from

8       Mr. Smith.

9               MR. SMITH:  Your Honor, Greg Smith here.

10              As Your Honor was aware when we had the

11      teleconference I believe last Wednesday and the Court

12      requested that we make several individuals available

13      for additional depositions and that this deposition

14      was to be limited to the new protocol, I raised with

15      Your Honor at that time the fact that certainly a lot

16      of what went into the new protocol was the result of

17      attorney-client communications.  And I believe Your

18      Honor acknowledged that and said, and I'll paraphrase

19      at the time, that the why questions don't matter, and

20      that you expected a lot to be protected by

21      attorney-client privilege.

22              And I would just represent to the Court

23      that while I've certainly objected on the basis of

24      attorney-client privilege a number of times, that that

1    hasn't been the majority of the way the deposition has

2    gone.  I mean I'll certainly acknowledge that it's

3    been more than a handful of times.  But the deponent

4    has been answering quite a few questions without that

5    objection in place.

6              THE COURT:  All right, I'll go back to

7    you, Mr. Wiseman.  In my mind, it really doesn't

8    matter why the protocol was passed, so I guess I'm not

9    clear on why these questions are relevant as opposed

10   to whether they are the best we can do in terms of,

11   you know, whatever standard we're going to -- well, I

12   guess rather than my trying to --

13             MR. WISEMAN:  Yeah, I think I can respond

14   to the Court's question.

15             We have a burden here to show that the

16   defendants are engaged in a deliberate indifference to

17   serious medical risk, risk of pain and suffering.

18   That's the Civil Rights 1983 standard in the context

19   of a prisoner medical care case.

20             Of course our view of the litigation is

21   that while the prisoner is alive, he is to be afforded

22   a standard of care that comports with the Eighth

23   Amendment.  I don't see how we can begin to prove

24   deliberate indifference without being able to show

1    what was in the mind of the person who made the

2    decision to ignore a risk.

3               So, for example, to put a little more

4    flesh on that, when I asked the warden whether anyone

5    was to monitor anesthetic depth during the process, he

6    said no.  When I asked him what the reason that there

7    was no such requirement, I was met with the

8    attorney-client objection.

9               I need to know, and I need to be able to

10   prove to the Court, why the warden, in promulgating

11   this protocol, ignored what is in our view a

12   significant risk of a constitutional violation.  And

13   that's why we need to get into this.

14              I would add that counsel -- I mean I'm

15   gathering from the warden's answer that his lawyers

16   wrote the protocol.  That's troubling, not in any

17   ethical sense, of course, but it's troubling in the

18   sense that the protocol is the corpus of our case.  We

19   need to prove that there are flaws in the protocol and

20   the ignoring of substantial risks in the way the

21   protocol was written.  I don't think we can be

22   prevented from getting to that evidence simply by

23   turning the whole endeavor over to one's counsel and

24   saying, "Well now you don't get to ask because it's

1      all privileged."

2              THE COURT:  Well, tell me something.  I

3      take it that your expert has -- I mean we all have to

4      work on the assumption that the death penalty is

5      constitutional and that the State can legally put

6      prisoners to death.  So I take it your expert,

7      Mr. Wiseman, has a standard of care.  Is that correct?

8              MR. WISEMAN:  Oh, sure.

9              THE COURT:  And obviously your standard of

10     care would be what we're comparing the new protocol

11     against.  Is that correct?

12             MR. WISEMAN:  Yes.

13             THE COURT:  All right.  Now, if the

14     standard of care does not meet your expert's

15     standards, and there is no -- so in my mind, the way

16     this analysis is going to go is if the standard of

17     care, the protocol proposed by the State isn't

18     consistent with your expert's standard of care in

19     material ways, then the question is whether those

20     differences reflect a deliberate indifference to

21     serious medical needs.  Is that correct?

22             MR. WISEMAN:  It's correct, but I don't

23     respectfully think it's complete.  And the reason I

24     would submit it's not complete is because we have an

1    obligation to show deliberate indifference, and in

2    order to show that, we should be entitled to probe the

3    decision-making process.

4              THE COURT:  But that is never the case.  I

5    mean the deliberative process is -- I've never had a

6    case where it isn't basically demonstrated through

7    objective facts.  I've never allowed discovery into

8    the deliberative process, because basically if the

9    standard of care that is being espoused by the State

10   is so wanting, then that demonstrates a deliberate

11   indifference.

12             So maybe what we need to do, maybe we need

13   to do this in two steps, because I'm not prepared to

14   give, Mr. Wiseman, you the right to go into the

15   deliberative process.  That is the last step.  So

16   maybe we need to break this down.  We need to break it

17   down, and so that the first step of this trial is

18   whether the protocol is so materially different that

19   the Court -- well, let me see.

20             If we're just comparing the protocols and

21   the Court finds it is so materially different that it,

22   per se, demonstrates a deliberative, a deliberate

23   indifference, then you've won the case, Mr. Wiseman.

24             If I find that it's not so materially

1    different, does the deliberative process how it came

2    to be matter?

3           MR. WISEMAN:  Well, it wouldn't matter if

4    that's going to be the Court's ruling, obviously.  But

5    I obviously don't want to be in a position of having

6    fallen short on deliberative indifference after having

7    proven that the protocol is deficient.

8           So in other words, if what the Court's

9    telling me is that we will not be in any jeopardy in

10   terms of our proof by not coming forward with evidence

11   of deliberate indifference other than what our experts

12   are going to say, then I have no problem with that

13   proposal.

14          THE COURT:  Well, and Mr. Smith, the risk

15   that you're running by allowing me to do that is that

16   I will find it wanting and constitutionally deficient.

17   You cannot then come back and say but we were well

18   meaning and we had good reasons to come up with this

19   and therefore you can't find us deliberately

20   indifferent.  In other words, you can't use this

21   privilege as both a sword and a shield.

22          So to some extent you all have to think

23   about what my decision-making process is going to be

24   like, and if I find deficiencies, then the question I

1    think is does the deficiency indicate a deliberate

2    indifference.  And I think a defense to that would be

3    what the process was.

4              And, Mr. Smith, if you're willing to risk

5    losing that defense, then I will not make your clients

6    answer these questions now.  But I'm not confident you

7    can have it both ways.  So if you need to go back and

8    talk to your people, I will even continue today to

9    make these objections --

10              MR. SMITH:  Your Honor, may I interject?

11              THE COURT:  Yes.

12              MR. SMITH:  Your Honor, here is the most

13    frustrating part about this.  This deposition is for

14    supposedly the new protocol.  But in the letter that

15    Mr. Wiseman addressed to the Court, he said, Well,

16    yes, we want to look at the parts of the new protocol,

17    but substantively it's the same as the old, and

18    there's still no doctor, there's still no measure of

19    anesthetic depth.  And without those two things,

20    that's really where it fails anyway.  And all these

21    other things are surplusage in terms of the, how they

22    view the analysis of it.

23              And it's very -- I simply don't see the

24    relevance of most of this, given their presentation of

1    the case on that basis, that theory that they've

2    offered to the Court.

3            THE COURT:  Well, then, if you're already

4    kind of settled in on how far the State's going to go

5    with its protocol, and what the plaintiff in this case

6    believes should happen, then the real, you know, maybe

7    Mr. Wiseman is correct, maybe the real nuts and bolts

8    of this is whether, because of all the factors that

9    the State has to take into consideration, whether

10   their protocol, although not perfect, is the best it

11   can do, and it does not demonstrate deliberate

12   indifference.  But I don't know how you can prove that

13   without telling us about all the factors that went

14   into it, which to some extent might get into this

15   deliberative process you're talking about.

16           Now maybe I don't understand what, how the

17   State is going to present its case, but I'm just

18   trying to figure out where we're headed so that no one

19   is caught short, neither the plaintiff nor the

20   defendant, in having the evidence it needs to present

21   to give the Court the best record to make this very

22   important decision.

23           MR. WISEMAN:  Your Honor, if I could jump

24   in, it's Michael again.  I think the Court really hit

1      the nail on the head just now.  I mean obviously the

2      defendants are going to take a position that they

3      can't make it perfect, and I don't think we expect

4      them to make it, quote, perfect.

5            What's involved here is a determination of

6      what is reasonable, given the attendant risks that

7      we've identified and will identify in the protocol,

8      and that is exactly why the decision-making process is

9      so germane here.  And I think the Court really

10     articulated better than I did initially the reason why

11     this information is relevant under the deliberate

12     indifference standard.

13           MR. SMITH:  Your Honor, Greg Smith here

14     again.  I guess, this, I feel like we keep saying

15     deliberate indifference, but this isn't a deliberate

16     indifference.  This is not seeking money damages.

17     This is seeking injunctive relief against these State

18     employees in their official capacity, saying they have

19     to -- that implementing this protocol would be such a

20     wanton and willful infliction of a grossly foreseeable

21     risk that it shouldn't be allowed to go forward.

22           THE COURT:  So does that mean you both are

23     working from different standards in the first place?

24           MR. SMITH:  I think that's very safe to

1    say.

2              THE COURT:  Mr. Wiseman, do you agree that

3    it's wanton and willful as opposed to deliberate

4    indifference?  That's a huge difference in what I'm

5    reviewing.

6              MR. WISEMAN:  Yeah, my view is that it's

7    deliberate indifference.  Deliberate indifference to

8    unreasonable -- I'm sorry, taking unreasonable risks,

9    being deliberately indifferent to serious medical,

10   serious medical issues involved in this process.

11             THE COURT:  So maybe before we even do

12   anything else we need to straighten that out.  I mean

13   I need to make a decision, maybe it makes sense for me

14   to make a decision before you start presenting

15   evidence as to what the proper standard is as opposed

16   to after so that, again, the discovery you take is

17   consistent with the decision that I'm making.

18             If Mr. Smith is right, that certainly

19   makes the deliberative process less relevant, because

20   the standard of review is so high.  But if you're

21   correct, Mr. Wiseman, then it seems to me, Mr. Smith,

22   that if it's my job to weigh the constraints placed on

23   the State versus the risks to the inmates, then I

24   would think that you'd want to include all the

1    constraints, and that might mean that the discovery

2    that Mr. Wiseman is trying to take today is absolutely

3    relevant.

4             So, you know, I haven't thought ahead to

5    the standard.  I've got lots of other cases I'm trying

6    to get through.  So if the standard makes a difference

7    to the scope of the discovery that you all are taking,

8    then maybe we need to have some kind of abbreviated,

9    very limited presentation to me so that everyone is on

10   the same page from the get-go, as opposed to, you

11   know, by the time I get to my decision.

12            MR. WISEMAN:  Well, that sounds like a

13   good course to the plaintiffs.  I guess I'm just

14   thinking of the practicalities of it.  We have

15   Dr. Dershwitz's trial testimony coming up on Monday.

16   It would be wonderful to have --

17            MR. SMITH:  We have Dr. Heath's deposition

18   before that on Saturday.

19            MR. WISEMAN:  Right.  So for both parties,

20   I think it would be appropriate and helpful to resolve

21   this.

22            I realize this is not a problem of the

23   Court's making, but that's where we are.

24            THE COURT:  Well, I think you could finish

1    up this deposition and, Mr. Smith, if you want to

2    continue making whatever attorney-client objections

3    you want to make, you can.  But I think, Mr. Smith,

4    you and your team need to make sure that you're not

5    foreclosing yourselves from a defense.

6            And the best I can say is if plaintiffs,

7    Mr. Wiseman, if you want to try to get in just a

8    letter brief, all I really need are the cases or

9    whatever it is you're depending on.  You don't need to

10   give me a 20-page explanation, because I can read

11   cases as well, by tomorrow at 4:30 and the State can

12   respond by Thursday at 4:30, and I will do my best to

13   get something out, although, although this is an

14   important enough decision that I really, I don't want

15   to be -- I don't know.  I don't want to be rushed in

16   making a decision that at the end of the day I'm not

17   happy with.

18           So, but certainly if you feel as though it

19   would be helpful to you, you can certainly submit

20   something along that timeline and I'll do my best to

21   get something out.  But I think the scope of discovery

22   really is related to the scope of the decisions or the

23   standard of review you're asking the Court to embrace.

24           So I'm not sure I've been helpful.  I

1    think the State needs to make sure it's not

2    foreclosing defenses by protecting itself by the

3    privilege.  I think there is an issue with respect to

4    the standard of review between the two parties and

5    that could affect the scope of discovery.

6              So if you want me to try to make a

7    decision, you can submit your best cases supporting

8    your proposed standard of review, and the plaintiffs

9    by Wednesday, defendants by Thursday.  I would do my

10   best to get something out on Friday.  If I don't feel

11   as though I can give it enough attention, then, you

12   know, you at least are put on notice that there is a

13   difference, and I can't do anything more than that.

14             MR. WISEMAN:  We appreciate that, Your

15   Honor.  Thank you.

16             THE COURT:  All right.  Counsel, thank you

17   for your time this afternoon.

18             MR. SMITH:  Thank you, Your Honor.

19             (End of teleconference.)

20             (A brief recess was taken.)

21   BY MR. WISEMAN:

22    Q.   Warden, if you would look, please, at page 2472

23   of the procedure, at the very bottom there's a

24   paragraph 6 that says, "The line is taped to the IV

1    stand with the port in an easily assessable position

2    and labeled either left or right as applicable."  What

3    does that mean?

4        A.    The line of, the IV line, that the solution set

5    line that goes from the medicine room to the execution

6    chamber is affixed to the stand, the IV stand which is

7    in the medicine room.  And since there's two lines

8    that are set up, they are noted as which one is to the

9    left side and which one is to the right side.

10        Q.    And what does assessable mean in that sentence?

11        A.    That, viewable.

12        Q.    On page 2473 in paragraph 5 at the bottom of

13    the page, the procedure indicates a number of areas

14    where the IV access is to be attempted.  Is this meant

15    to be a progression, in other words, starting with

16    antecubital fossa and moving all the way down to ankle

17    as being less desirable than the antecubital fossa?

18        A.    Yes.

19        Q.    And how is that progression determined?

20            MR. SMITH:  Objection, attorney-client

21    privilege.

22        Q.    Did you consult with anyone other than your

23    attorneys in arriving at that progression?

24        A.    No.

1    Q.    On the next page it says, paragraph 6, "Under

2    no circumstances shall a cut down procedure be

3    performed to gain venous access."  Am I to take from

4    that that if venous access is not accomplished through

5    one of the means listed in paragraph 5, that there's

6    no other way in which access will be accomplished?

7    A.    Mr. Wiseman, you're to take from that that

8    venous access will be accomplished through one of the

9    means as outlined in No. 5 on page -- on Bate mark

10   2473.

11   Q.    Okay.  And what is the plan if access is not

12   accomplished through any of those means?

13   A.    Access will be accomplished through one of

14   these means.

15   Q.    Well, what if it's not?  Well, let me ask you

16   this:  Is there any contemplation of the use of a

17   femoral vein access?

18   A.    The access that's contemplated is as outlined

19   in the protocol, which is on Bate mark 2473, No. 5.

20   Q.    Turn to page 2482, which is the supply

21   checklist.

22   A.    Yes.

23   Q.    Unlike in the prior protocol, this supply

24   checklist does not contain any scalpels.  Am I to take

1    from that fact that no access that would require use

2    of a scalpel is contemplated or permitted by the

3    procedure?

4        A.    You are to take from that that the access that

5    is contemplated is as shown on Bate mark 2473 that we

6    covered before.

7        Q.    Well, as the person who signed this protocol,

8    can you guarantee the court that if access is not

9    accomplished as provided for in paragraph 5, that

10   there will be no other means of access attempted?

11       A.    I can guarantee the court that access will be

12   obtained through the means outlined in paragraph 5 on

13   Bate mark 2473.

14       Q.    And on what do you base that assurance that

15   access will be accomplished through the means listed

16   on page 2473?  How do you know that?

17       A.    It's my understanding that in the past

18   experience in this state, comprising what, 12, 13, 14

19   executions, access each and every time has been able

20   to be obtained.  Past history has indicated access has

21   been obtained.  We are providing, the protocol

22   provides for access in a number of areas as outlined

23   on 2473.

24       Q.    Is that the reason why the provision for a cut

1    down was removed from the prior protocol?

2            MR. SMITH:  Objection, attorney-client

3    privilege.

4      Q.   On 2473 it talks about the process for starting

5    and running the left and right lines.  Can you explain

6    from the time the lines are inserted into the IV bag

7    until they're put into the catheters how that process

8    is to work?

9      A.   I'm not understanding your question.  Please

10   clarify.

11     Q.   Sure.  From the time that the IV bag is tapped

12   into with a left line and a right line, how are those

13   lines eventually run into the prisoner and attached to

14   the catheters?

15     A.   The lines are run through the opening between

16   the medicine room or injection room and the execution

17   chamber through a hole in the wall that you've seen

18   during prior tours.

19     Q.   And the procedure indicates that the lines are

20   to be labeled on the injection room side.  How close

21   to each other are those lines contemplated to be?

22     A.   Where?

23     Q.   In the injection room.

24     A.   They are, as indicated in the protocol, on the

1    IV stand.  So they would be -- the IV stand is

2    probably 12, 18 inches wide, maybe 20 inches wide.  So

3    they would be -- that's a guesstimate.  We would have

4    to measure it to give a specific amount.

5        Q.   And how far apart are the ports for each of

6    those lines while they're on the IV stand, same

7    distance or a different distance?

8        A.   I would have -- we'd have to look at the IV

9    stand itself.

10       Q.   The procedure calls for a pan/tilt/zoom camera

11   to be used in the process.  Has the camera --

12       A.   Where are you?

13       Q.   I'm sorry, 2474.  Has the camera been purchased

14   at this point?

15       A.   Yes, it has.

16       Q.   Has it been installed in the facility?

17       A.   Yes, it that is.

18       Q.   And who has been trained in its use?

19       A.   The camera has been purchased and installed.

20   As of this date no one has been specifically trained

21   in its use.

22       Q.   And are you aware of what the thought is as to

23   what training is going to be performed for the use of

24   the camera?

1    A.   The camera comes with a procedural manual, an

2    instructional manual, a user's manual.  That will be

3    available at the time of each of the training sessions

4    that will occur prior to the execution, and the

5    members of the IV team who will be participating will

6    be able to see the camera, use the camera, train with

7    the camera, drill with the camera, read the

8    instructions of the camera, become familiar with the

9    operations of the camera.

10            Having seen it, having touched it, having

11   controlled it, it's not a difficult thing to maneuver,

12   control or utilize.

13   Q.   During the procedure, where is the camera to be

14   focused?

15   A.   The camera, as indicated in the procedure, the

16   camera will be used by one of the members of the IV

17   team to examine the inmate sentenced to death to,

18   during the course of the execution.  That could be at

19   the Angiocath insertion site, it could look at, if

20   there was any issue with the Angiocath insertion site

21   or line or observe the inmate sentenced to death.

22   Q.   And where --

23   A.   It has a very, very fine degree of resolution

24   on it.

1    Q.    Where in the procedure does it indicate where

2    the camera is going to be focused?

3    A.    The procedure, I believe other than saying that

4    it is to observe, it is to be utilized to observe,

5    it's not specified, nor do I think it could be

6    specified to cover each and every area that would be

7    utilized.  It's a tool.

8    Q.    And whose decision will it be as to where to

9    focus at a given time during the execution?

10    A.    The person who is controlling the joy stick,

11    for lack of a better term, the controlling apparatus

12    for the camera would make that determination.  That

13    would be one of the members of the IV team who will be

14    immediately adjacent and, in, you know, proximity to

15    the other member of the IV team.

16    Q.    Is the camera color or black and white?

17    A.    Everything that I put in that room has been

18    black and white.  I believe it's black and white.

19    Q.    The protocol requires that the camera is to be

20    used to check for, among other things, discoloration.

21    What's your understanding of how the camera can

22    accomplish that?

23    A.    Well, I'm now wondering if I've erred in

24    whether or not it's a black-and-white camera, because

1    I really don't specifically recall.  I've looked at a

2    white piece of paper with printing on it, I've looked

3    at a white sheet, I've looked at various aspects, but

4    I cannot be absolutely certain that it is a -- I can't

5    say with 100 degree of certainty that it's a black or

6    white or a color camera.

7        Q.    Okay.  At what angle is the camera situated in

8    relation to the prisoner?  And by that I mean is it

9    above the prisoner --

10       A.    Yes.

11       Q.    -- is it above and to the side?

12       A.    It is the outside of the -- on the ceiling,

13   affixed to the ceiling, in the ceiling above the

14   prisoner.  And as the gurney is situated in an actual

15   imposition of the death penalty, as the inmate

16   sentenced to death would look up, it would be at

17   approximately two o'clock; based on a 12-hour clock

18   with the inmate sentenced to death's head being 12,

19   the inmate sentenced to death's feet being 6.  And has

20   full pan/tilt/zoom capability.

21       Q.    And is it envisioned that the camera is going

22   to be able to detect swelling, if any, at the site of

23   the catheters?

24       A.    I believe so.

1    Q.   And has that been tested in any way to

2    determine if it's capable of accomplishing that task?

3    A.   I have not had anyone have swell -- no.

4    Q.   Have you ever seen this camera demonstrated

5    prior to its installation anywhere?

6    A.   No.

7    Q.   Has anyone else from the department seen the

8    camera demonstrated prior to its installation?

9    A.   Not that I am aware of.

10    Q.   Where did the idea come from to utilize this

11    camera?

12         MR. SMITH:  Objection, attorney-client

13    privilege.

14    Q.   Did you consult with anyone other than your

15    counsel in making a decision to utilize this camera?

16    A.   No.

17    Q.   On 2474, paragraph A-1 -- well, let me ask you

18    this.  That paragraph envisions a point in time when

19    there is one member of the IV team in the injection

20    room and one in the execution chamber?

21    A.   I'm reading it.

22         Bate mark 2474 A-1, I believe they are

23    both envisioned to be in the medicine room, injection

24    chamber, injection room.

1    Q.   Can you explain then the last sentence in that

2    paragraph that says, "The IV team member leaves the

3    Execution Chamber and reenters the Injection Room"?

4    A.   I'm sorry, I was mistaken in my prior response.

5    This would, this A-1 would be when the lines have

6    been, the Angiocath lines have been inserted and it

7    has been determined that there is, that they have been

8    satisfactorily inserted both by the IV team member who

9    has made the insertion, by the IV team member who is

10    monitoring on the pan/tilt/zoom camera, and the IV

11    team member who is monitoring on the pan/tilt/zoom

12    camera.  My prior response was incorrect, based on my

13    second review of A-1.

14    Q.   Am I to assume then that the sentence preceding

15    the one we just read where it says, "The IV team

16    members," plural, "observe the drip chambers in both

17    lines to ensure a steady flow," that that is in error

18    then?

19    A.   No, it is to the contrary.  I think if you go

20    back to the Bate mark 2469, it says, "Two or more

21    members of the Execution Team."  So there could, in

22    fact, be more than one member of the -- "shall be

23    referred to as the IV team," could in fact be in the

24    room making the observation.

1    Q.    I guess I was making an assumption of my own

2    then.  What does the protocol contemplate being the

3    number of people on the IV team?

4    A.    Two or more.

5    Q.    And how is the decision to be made whether more

6    than two is required?

7    A.    The members of the team would be the decision

8    made by the warden of the Delaware Correctional Center

9    responsible for the implementation of the death

10   penalty.  If the warden at that time believed that

11   there was potential to require additional, another IV

12   team member for potential future executions, they

13   could make the determination to have more than the

14   required two members.

15   Q.    And do you know on what the warden would base

16   that decision?

17   A.    Based on their thoughts at that time.  If I

18   were the warden, I would, you know, base it on

19   potentiality for the future.

20   Q.    Training, you mean?

21   A.    Yes.  Potential.

22   Q.    So under ordinary circumstances you would

23   envision two people constituting the IV team?

24   A.    The procedure requires two.  I would envision

1    it would be two or more, but at least two.

2    Q.    Can you explain then the reference on page

3    2475, last paragraph 3, where it says, "Both IV team

4    members observe the correct order of the syringes"?

5    A.    Once again, the requirement requires two,

6    allows for more, but the minimum is two.

7    Q.    Have you determined whether the camera is able

8    to view the entire IV line as it's run from the

9    medicine room into the prisoner?

10    A.    No, I have not.  Since the camera has been

11    installed, I have not performed a session by running

12    an entire IV line as it would be during an execution.

13    Q.    Is that something that would be desirable?

14    A.    It's something I would anticipate likely

15    occurring prior to an execution as part of the ongoing

16    preparation.

17    Q.    What I meant is, would it be desirable to have

18    the camera be able to visualize the entire IV line?

19    A.    The camera is one of several redundancies to

20    observe a potential problem.  An IV line that, other

21    than the Angiocath site, an IV line, only other --

22    another, I wouldn't say the only, another problem

23    would be potential leakage in the line.  That could be

24    observed by the warden and other personnel who would

1    be in the room in addition to that that would be

2    visible by the camera.

3     Q.   Is there anything in the protocol that tasks

4    anyone other than the IV team members with checking to

5    see if there's any leakage in the line?

6     A.   I don't know that there's anything specific in

7    the protocol, but you know, the protocol is a very

8    specific guide as it relates to the lethal injection

9    materials, the order, the preparation, the monitoring,

10    et cetera.  It is not in and of itself a document that

11    could or would account for every single potential

12    contingency and every single potential circumstance.

13     Q.   Does the procedure anticipate any use of the

14    pan/tilt/zoom camera to do anything other than monitor

15    the catheter sites?

16     A.   Such as?

17     Q.   Monitoring any other part of the prisoner or

18    any other aspect of the process.

19     A.   The pan/tilt/zoom camera could be used to view

20    the prisoner and not only the Angiocath sites, but

21    other areas that are viewable by the camera.

22     Q.   You're indicating again the camera can do that.

23    My question is does the procedure envision such a use

24    for the camera?

1    A.    The procedure is silent on that aspect.

2    Q.    Who actually purchased the camera?

3    A.    The Delaware Correctional Center.

4    Q.    And how did the person who submitted the order

5    or actually purchased it know what camera to get?

6    A.    The person who purchased it is an individual

7    who works at the Delaware Correctional Center who made

8    the order for the camera is the person who is

9    responsible for cameras, monitoring, things of that

10   nature for the entire complex.  That is their job.

11   Q.    And what was that person told with respect to

12   what type of camera to get?

13   A.    They were instructed that I needed a high

14   quality pan/tilt/zoom camera for installation in

15   Building 26.

16   Q.    Were any specifications given other than that

17   it be, quote, high quality?

18   A.    No, the person who made the, who did the

19   ordering and made the purchase is a, that's their job,

20   that's their expertise.

21   Q.    Was this person told what the camera was going

22   to be used for in the process?

23   A.    The person was told that it was a pan/tilt, the

24   request was for a pan/tilt/zoom camera to be installed

1    in the execution chamber, Building 26, yes.

2    Q.    I just want to know, was there anything beyond

3    that in terms of we need it to check this or look at

4    that, or anything with any specificity?

5    A.    They were told that it was to be used for

6    observing and aspects of the execution.

7    Q.    Was this done orally or in writing?

8    A.    It was done orally.

9    Q.    By whom?

10    A.    Myself.

11    Q.    Does the protocol envision that the plunging of

12    the chemicals is to be done only by one member of the

13    IV team?

14    A.    I believe that's what the protocol states, yes.

15    Q.    So does that mean that the members of the IV

16    team will not be switching back and forth between the

17    various syringes, but for a particular execution there

18    will be one person only who will do the pushing of the

19    drugs?

20    A.    That would be my belief, yes.

21    Q.    What is the purpose of the two-minute waiting

22    period on page 2475 between the thiopental and the

23    pancuronium?

24                    MR. SMITH:  Objection, attorney-client

1    privilege.

2       Q.    Did you consult with anyone other than your

3    attorneys in deciding to put in this two-minute

4    waiting period?

5       A.    No.

6       Q.    On 2475, paragraph B-2, it says that, "If there

7    is resistance to the plunger, the IV team member pulls

8    the plunger back.  If the extension line starts to

9    fill with blood, the execution may proceed."  My

10    question is, are those two sentences to be read

11    together, or can the execution proceed even if

12    resistance is felt, so long as blood begins to fill

13    the line?

14       A.    Repeat the question for me again?

15       Q.    Sure.  If the person who is administering the

16    chemicals feels resistance and sees blood in the line,

17    does the execution go forward or do they go to the

18    other line?

19       A.    They would use, the IV team member who is a

20    paramedic or EMT would use their experience as to the

21    level of resistance that they in their training and

22    experience would believe to be appropriate in the

23    plunging of the syringe.

24       Q.    All right, I guess the point I'm trying to

1      understand is that, just the way it's written is not

2      clear to me, and I realize that's not necessarily of

3      any import, but the point I'm trying to understand is

4      that if the IV team member feels resistance and sees

5      blood, does the protocol tell them to go ahead with

6      the execution or to go to the other line?

7         A.    I don't know that that's a, that I can answer

8      the question, because the feeling resistance is a very

9      speculative term as to how much resistance is felt.

10     I'm not trying to quibble with you, but I don't know

11     how that can be quantified.

12        Q.    Is the seeing of blood as a condition to

13     allowing the execution to proceed, where is that blood

14     supposed to be visible?  Is it visible on the

15     injection room side of the wall or on the chamber side

16     of the wall?

17        A.    It indicates, "If the extension line starts to

18     fill with blood," based on the reading of paragraph 2

19     it would be my belief that it would be just adjacent

20     to the Angiocath site, wherever that has ended up

21     being in the protocol, in the execution.

22        Q.    All right, just so I'm clear on it, what you're

23     saying then is that the seeing of blood is on the

24     chamber side at the beginning of the line near the

1    catheter?

2      A.   Yes.

3      Q.   And are you envisioning that the ability to see

4    this blood in the line would be visible through the

5    window or through the use of the camera?

6      A.   It could be visible through both.  If the left

7    line is being used, then it's right in front of the

8    window, it would be visible through the window.  It

9    would always be visible through the camera.

10     Q.   And if there is no blood, is the line

11   discontinued even if there's no back pressure?

12     A.   The protocol indicates that if there is no

13   blood, based on the preceding sentences, and based on

14   the amount of resistance that the IV team member

15   feels, and they do not observe blood, then the

16   protocol would direct that they would discontinue the

17   use of that line.

18     Q.   And is it your belief that the camera can

19   visualize all potential IV sites given the number of

20   potential ones that you discussed earlier?

21     A.   Yes.

22     Q.   And what have you done to verify that?  How do

23   you know that?

24     A.   Based on the placement of the camera and the

1    quality, the pan/tilt/zoom capability of the camera,

2    the degree of fineness that you can see with the

3    camera.

4              MR. WISEMAN:  All right, if we can have a

5    couple minutes just to make sure I haven't left

6    anything out, I think we're about done.

7              (A brief recess was taken.)

8    BY MR. WISEMAN:

9      Q.    Just another question for you.  If you would

10   look at 2473, the very top of the page.  It says, "The

11   remainder of the line is passed through the opening in

12   the wall and is taped in place to keep it from being

13   pinched closed."  Could you explain what that means?

14     A.    To ensure the, that the line is not in such a

15   position where it could be impinged upon by movement,

16   would get trapped in the bottom of the IV stand or

17   anything like that.  It's a precaution to ensure that

18   the line is available for free flow.

19             MR. WISEMAN:  Okay, thank you.  We have no

20   other questions.

21             MR. SMITH:  No questions.

22             (The deposition concluded at 2:17 p.m.)

23

24

```
 1                    I N D E X

 2   Deponent:  THOMAS L. CARROLL              Page

 3   By Mr. Wiseman.................................. 115

 4   Teleconference with Court...................... 156

 5                  E X H I B I T S

 6   Plaintiff's:                               Page

 7   36     State of Delaware, DOC Policy No. 2.7   117

 8          August 31, 2007

 9                    - - - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
```

1

2

3

4

5

6                          Replace this page

7                      with the Errata Sheet

8                          after it has been

9                      completed and signed

10                          by the Deponent

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                          CERTIFICATE
 2      STATE OF DELAWARE)
 3                       )
 4      NEW CASTLE COUNTY)
 5                 CERTIFICATE OF REPORTER
 6           I, Julie H. Parrack, Registered Professional
 7      Reporter and Notary Public, do hereby certify that
 8      there came before me on the 18th day of September,
 9      2007, the deponent herein, THOMAS L. CARROLL, who was
10      duly sworn by me and thereafter examined by counsel
11      for the respective parties; that the questions asked
12      of said deponent and the answers given were taken down
13      by me in Stenotype notes and thereafter transcribed by
14      use of computer-aided transcription and computer
15      printer under my direction.
16
17           I further certify that the foregoing is a true
18      and correct transcript of the testimony given at said
19      examination of said witness.
20
21           I further certify that I am not counsel,
22      attorney, or relative of either party, or otherwise
23      interested in the event of this suit.
24
25                         _____
26                         Julie H. Parrack, RMR, CRR
27                         Certification No. 102-RPR
28                         (Expires January 31, 2008)
29
30
31      DATED:_____
32
33
34
35
36
37
```