```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3                            - - -

 4

     ROBERT W. JACKSON, III,        :   CIVIL ACTION
 5                                   :
                    Plaintiff,       :
 6                                   :
          vs.                        :
 7                                   :
     CARL C. DANBERG, et al.,        :
 8                                   :
                                     :
 9                  Defendants.  :   NO. 06-300 (SLR)

10

                                 - - -
11
                                 Wilmington, Delaware
12                               Wednesday, May 14, 2008
                                 10:30 o'clock, a.m.
13
                                 - - -
14
     BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.
15
                                 - - -
16
     APPEARANCES:
17
                     FEDERAL COMMUNITY DEFENDER OFFICE FOR
18                   THE EASTERN DISTRICT OF PENNSYLVANIA
                     BY:  MICHAEL WISEMAN, ESQ.,
19                        HELEN MARINO, ESQ. and
                          MARIA K. PULZETTI, ESQ., ESQ.
20                        (Philadelphia, Pennsylvania)

21
                     Counsel for Plaintiffs
22

23

24
                                 Valerie J. Gunning
25                               Official Court Reporter
```

1    APPEARANCES (Continued):

2

3                    OFFICE OF THE ATTORNEY GENERAL
                     BY:  MARC P. NIEDZIELSKI, ESQ.,
4                         GREGORY E. SMITH, ESQ. and
                          ELIZABETH ROBERTS McFARLAN, ESQ.
5

6
                          Counsel for Defendants
7

8                              -  -  -

9

10

11

12

13                    (Proceedings commenced in the courtroom,

14    beginning at 10:30 a.m.)

15

16                    THE COURT:  Good morning, counsel.

17                    It does not appear to me as though this should

18    be a very long hearing, because from reading the Supreme

19    Court's opinion, it seems to me as though the only issue

20    before us is whether the State of Delaware has a protocol

21    that is either the same as Kentucky's or substantially

22    similar.

23                    If there is some dispute about that, we will

24    need to have an evidentiary hearing.  If the parties share

25    information and the plaintiff is satisfied, or plaintiffs

1    are satisfied that that test has been met, then this case

2    gets resolved.

3                So let hear from counsel for plaintiffs first.

4                MR. WISEMAN:  Sure.

5                THE COURT:  Do you disagree or have any other

6    thoughts?

7                MR. WISEMAN:  Good morning, your Honor.

8                I guess, in a nutshell, we disagree that the

9    protocol and the recent history of the effectuation of the

10   protocol is substantially similar to the protocol in

11   Kentucky that was at issue in Baze.

12               I've got a list of differences.  I don't know if

13   the Court wants to hear those now.

14               THE COURT:  No.  As I said, unless the State has

15   embraced exactly Kentucky's protocol, and unless you all can

16   agree, then I think we need to have a hearing, because I

17   don't think this can be resolved on the paper, and so, as I

18   said, we're just here to either schedule a hearing or to

19   have the State tell me that they have embraced Kentucky's

20   protocol.

21               MR. WISEMAN:  Yes.  Given those options, we

22   agree that a hearing is appropriate and required.

23               THE COURT:  And did we reach the point before

24   the stay where all discovery has been done and we're ready

25   to proceed?

1                MR. WISEMAN:  We would -- because there are

2       two new personnel, the warden and a deputy warden, new

3       since discovery ended, and the protocol itself has changed,

4       we would be asking to depose those two folks before a

5       hearing.

6                THE COURT:  All right.  And any notion as to how

7       long of a hearing this might be?

8                MR. WISEMAN:  I believe we had talked about a

9       four-day hearing, and I think that's probably still about

10      right.

11               THE COURT:  All right.  Thank you very much.

12               MR. WISEMAN:  Sure.

13               THE COURT:  Let's hear from counsel for the

14      State.

15               MS. McFARLAN:  Good morning, your Honor.

16               THE COURT:  Good morning.

17               MS. McFARLAN:  The State would agree with

18      your Honor's position as to what the issue is.  We believe

19      that the Delaware protocol is substantially similar, almost

20      identical to that of Kentucky, and the defendants believe

21      that a motion for summary judgment would, in fact, be

22      appropriate.  That in terms of factual disputes, there

23      really aren't any at this point.  It is really a question of

24      interpretation of the standard in Baze and whether the

25      protocol as written is the same as Kentucky's.

1          THE COURT:  It seems to me as though -- well, I

2     think the hearing has to be limited to the differences, and

3     if the test of whether it's substantially similar has to do

4     with whether the differences create a demonstrated risk of

5     pain, then I need expert witnesses.  I don't want to read

6     affidavits.  I want to see them.  I want to hear them.  I

7     want to ask questions, if I need to.

8          I don't think this is a case for summary

9     judgment, where you are just throwing paper at me.  This is

10    a fact-specific life-and-death case.  I'm not going to do it

11    on summary judgment.

12          MS. McFARLAN:  All right, your Honor.

13          THE COURT:  Now, I don't know what the

14    differences are yet.  I think, before we go forward, I need

15    to get a better idea of what the differences are and what

16    the hearing is going to be focused on.  So I think we need

17    to put up procedure where those are identified, the

18    witnesses that you all expect to call are identified.  In

19    other words, you basically need a pretrial, prehearing

20    conference, so that we are all on the same page and we're

21    not ships crossing in the night.

22          MS. McFARLAN:  Yes, your Honor.

23          As to the discovery, however, the protocol is

24    designed to have changing personnel, and there really --

25    given that the new warden has not been involved in any prior

1    executions, it does not seem productive that -- to have a

2    deposition.  Had two years of litigation.  Discovery,

3    they've had plenty of time.  The current protocol has been

4    available and public for a lengthy period of time.  You did

5    not halt discovery during this time period.

6            They had an opportunity to request depositions

7    at any time.  They didn't.  We think that discovery

8    is complete, and there really is no need for any

9    additional.

10            THE COURT:  All right.  And I guess I will ask

11   counsel for plaintiffs what purpose these depositions might

12   serve if these folks have never been involved.

13            I take it they weren't involved -- well, I'm not

14   sure it matters whether they were involved in developing the

15   protocol.

16            MS. McFARLAN:  I mean, the protocol is designed

17   that even the ones that have been deposed certainly may not

18   be involved in future.  But that is not the point of the

19   protocol.  It is designed to have changing personnel.

20   People leave, people move, and it's not down to whether a

21   particular person is qualified.  The question is whether the

22   protocol calls for a qualified person.

23            THE COURT:  Right.  Okay.

24            Let's hear from plaintiff's counsel as to why

25   these depositions, what purpose they serve.

1              MR. WISEMAN:  Your Honor, it is our view, based

2    on prior depositions, that the protocol as written has

3    seldom been implemented in that way.  There have been great

4    variations in the way it is written.  While I would agree

5    with Ms. McFarlan that, in theory, a protocol could be

6    designed to apply to fungible people, the reality of the

7    past administration is that each person who has had to

8    administer it from differing positions, in other words, the

9    warden, the deputy warden, the I.V. team members, have all

10   had vastly different understandings of what is required by

11   the protocol.

12             THE COURT:  Isn't that the purpose of this

13   hearing?  I mean, it seems to me if I'm serving any purpose,

14   it's to determine whether the protocol as written passes

15   constitutional muster and then to impose on the State the

16   obligation to follow that protocol as written.

17             MR. WISEMAN:  Well, I would make one addition to

18   that, your Honor.  I think that Baze talks about not just as

19   written, but as applied, and so variations in the

20   application.  For example, Baze makes a point --

21             THE COURT:  But these people have not done

22   anything.  I mean, these folks, apparently, have not been

23   involved, so what purpose does it serve to depose them?

24             MR. WISEMAN:  I want to know what the warden's

25   understanding is of whether the light should be out.  I want

1    to know what the warden's understanding is --

2              THE COURT:  That's irrelevant, because it does

3    not matter what he understands now, quite frankly.  He has

4    not done it and it only matters once the protocol has been

5    approved by the Court what he understands.  I mean, I think

6    that's a ridiculous purpose that you want to depose these

7    folks, to say, this is what the protocol is.  Are you going

8    to apply it this way?

9              MR. WISEMAN:  No.  No.  No.  If you were to lift

10   the stay at some point and they were to schedule an

11   execution and the warden walks in to the execution chamber

12   and has a vastly different understanding of how this thing

13   is supposed to work than the lawyers do, then I think that

14   that speaks to the question of whether there's a substantial

15   risk of unnecessary pain.

16             THE COURT:  No.  I disagree.  I think it's a

17   waste of time to ask people, how are you going to apply the

18   standard that may or may not even be applicable by the time

19   this hearing is over.  I mean, that's what you are asking

20   them.

21             MR. WISEMAN:  I'm afraid I'm not being very

22   articulate.

23             Let's take an example.  What role does the

24   doctor play in the execution process?  We had the prior

25   warden say that the doctor was in charge of all medical

1    aspects of the procedure.  The doctor said, I have no role

2    to play other than announce death.  The current protocol is

3    silent on that.  I think it's highly relevant what the

4    person is who is going to be in charge of carrying out the

5    protocol.

6              THE COURT:  But that has nothing to do with the

7    warden.  That has to do with whether the protocol passes

8    constitutional muster.

9              I mean, what you are saying is, if I don't

10   impose that specific safeguard, then we ought to know

11   whether the warden is going to impose it as a matter of his

12   own procedure.

13             MR. WISEMAN:  Right.  And I should be entitled

14   to discover what his answer is going to be to those

15   questions at the hearing.  It as simple as that.  If he get

16   up here and says, this is my understanding of the protocol,

17   why should I not be entitled to discover that answer before

18   the hearing?

19             THE COURT:  I truly hate that word, entitled,

20   truly.

21             MR. WISEMAN:  Entitled?

22             THE COURT:  Entitled.  I think there are very

23   few things we are entitled to in this world.

24             This is my problem.  If these folks had -- these

25   people have not had the obligation yet to go through an

1    execution, so what you're asking them to do, as lay people,

2    is to take a protocol and to say, well, this is how I would

3    enforce it if the Court does not make any changes.  And

4    that's what you are basically asking them to tell you; is

5    that correct?

6            MR. WISEMAN:  Well, would I be permitted to ask

7    those question at the hearing, what is your understanding of

8    what this paragraph means?  How are you going to carry this

9    out?  If I'm -- excuse me -- if I'm permitted to ask those

10   questions --

11           THE COURT:  A much better word.

12           MR. WISEMAN:  Thank you.

13           If I'm permitted to ask those questions at the

14   hearing, then I should think I would be permitted to

15   discover what those answers are going to be.

16           This is -- you know, we're not talking about

17   months of discovery here.  We're talking about two

18   depositions, which, you know, two days, at most.

19           THE COURT:  Well, I'm trying to think through

20   as to what -- so you are saying that not only could it be

21   unconstitutional as written, that you could try to prove

22   that it would be unconstitutional as applied based on the

23   answers of two people who are new to the position and have

24   never had to apply this protocol?

25           MR. WISEMAN:  Right.  Because if the protocol is

1    vague in its terms, in material terms, it does not give

2    adequate guidance to the execution folks who are carrying it

3    out, that is a flaw.  And if its terms are susceptible to

4    multiple meanings, one of which would constitute an Eighth

5    Amendment violation, that's relevant to whether the

6    defendant are going to carry out the execution in a

7    constitutional manner.

8              And under those circumstances, it would be

9    relevant to your determination as to what their

10   understanding is.  Is it vague?  Do you know what this

11   paragraph means, Warden?  What are you going to do with this

12   paragraph?

13             THE COURT:  All right.  Let's hear from counsel

14   for the State.  There is a point there.

15             MS. McFARLAN:  Your Honor, if -- taking his

16   point, any time a warden changes, then, this Court would

17   need to readdress the issue of whether that warden

18   understood now what the protocol meant.

19             The idea is whether a general -- a person, a

20   reasonable person reading the protocol understands what it

21   means.  Whether this particular warden -- we don't even know

22   if this warden will be there when there's the next

23   execution.

24             THE COURT:  And how does one prove what a

25   reasonable person was?  Through expert testimony?  I mean,

1    I'm just asking.  I'm trying to think about how this hearing

2    is going to go forward.

3                And if, for instance -- and, again, it hard for

4    me to know, because I don't know what the differences are

5    yet between Delaware's protocol and Kentucky's protocol.

6    But if the differences are omissions of fact, of detail, of

7    instructions, then I would think that unless you want me to

8    conclude, just per se conclude that those omissions make it

9    substantially dissimilar, that there's got to be some

10   testimony about how any reasonable person would infer these

11   safeguards.

12               MS. McFARLAN:  Your Honor, we can certainly

13   explain that.  The Delaware protocol is, in fact, more

14   detailed than the Kentucky protocol, and also, a minor

15   point, but the deputy warden has not changed and they've

16   already deposed him, so there would, in fact, only be one

17   deposition at issue.

18               But the protocol is very clear as written, and

19   I believe that once your Honor sees the protocols, that

20   you'll understand our position in that if it comes down to

21   someone's interpretation -- these are not -- it is very

22   clear, it's very straightforward.  It is not something that

23   an expert would need to testify as to, and, in fact, really

24   don't see the point of a deposition.

25               THE COURT:  All right.  Counsel for plaintiff,

1   one last opportunity.

2           MR. WISEMAN:  Yes.  I think I can give your

3   Honor a very concrete example of the concern.

4           Kentucky's protocol requires the warden to do a

5   rudimentary consciousness check before allowing more painful

6   chemicals to be administered.  Delaware's protocol does not

7   say that.  Does the warden in Delaware, is he required to do

8   such a consciousness check or not?  Who decides that?  It's

9   not in the protocol.  In that respect, it's significantly

10  less detailed than Kentucky's.  I think we should be

11  permitted to ask a question about that.

12          THE COURT:  Well, but --

13          MR. WISEMAN:  Serious questions.

14          THE COURT:  Again, if it's an omission, it seems

15  to me it would be the defendant who would -- well, it seems

16  to me that an omission is something that counts against the

17  defendant from the get-go, and it does not matter what this

18  warden would do.  It's still an omission, and I understand

19  that different people might do it differently, and so it is

20  vague.

21          So, to me, it would not help you whether this

22  person said yes, I would do it, or no, I wouldn't, because

23  it does not matter.  He might be on the job one week and

24  then someone else would come in with a different

25  interpretation.

1                So the omissions I think are already weighing in

2      favor of the plaintiff's point.  I don't know how his

3      interpretation would sway me one way or another.

4                MR. WISEMAN:  Well, I guess getting back to the

5      touchstone for discovery, would it lead to admissible

6      evidence?  And I think that, depending on those answers, we

7      might want to elicit such testimony at the hearing.  We

8      might choose not to.  We may decide what your Honor just

9      said is absolutely on the mark and not want to present that

10     evidence, but --

11               THE COURT:  But this is the thing.  I think it

12     is very unfair, quite frankly, to put someone who is not a

13     lawyer and who has not had to go through the protocol -- I

14     don't know whether he has been trained in the protocol.  I

15     don't know anything about that, to say, what would you do?

16     To me, that's just pure speculation, and it isn't admissible

17     evidence.

18               MR. WISEMAN:  All right.

19               THE COURT:  All right?  All right.

20               So there's no further discovery.  The question

21     is when we can schedule four days for this hearing, and I am

22     not sure when that is.

23               MS. McFARLAN:  Your Honor --

24               THE COURT:  Yes?

25               MS. McFARLAN:  -- we don't really believe it

1   would take four days at this point.  It comes down to the

2   legal question of the protocol, and, really, we're at a loss

3   as to what would take four days.

4            THE COURT:  Well, you know what I think we

5   should do?  I'm going to set aside some time today, but I

6   think that time may -- it's flexible, because I want to have

7   a pretrial where I understand exactly what the differences

8   are that we're going to be discussing and what witnesses are

9   going to be called, and at that point, I will do a final

10  schedule.  But let me just find some time for you.

11           When might you all be prepared to go?  I don't

12  know how many witnesses are involved or anything else.  I

13  mean, sooner rather than later?

14           MS. McFARLAN:  Your Honor, if you need the

15  expert witness live, that will take some scheduling.  We did

16  not anticipate that and have not contacted them.

17           THE COURT:  Okay.  Then this is what we're going

18  to do.  We're going to have a telephonic scheduling

19  conference.  You all contact your witnesses, find out -- and

20  confer with each other and find some blocks of time when

21  everybody is available.  We'll get together on the phone and

22  find out whether any of those blocks coincide with my

23  availability, and we'll also schedule, again, this little

24  pretrial conference, so that I know for sure that we're all

25  on the same page in terms of what we're doing.

1                    MS. McFARLAN:  Your Honor, would we be able to

2       have a teleconference with you at some point in limiting the

3       witnesses?

4                    THE COURT:  Well, I think that's what the

5       pretrial conference is for.

6                    MS. McFARLAN:  Okay.

7                    THE COURT:  Basically for us to decide what

8       we're really going to go forward on.

9                    MS. McFARLAN:  Okay.  I'm just thinking in terms

10      of scheduling.

11                   THE COURT:  Yes.  But I'm not going to schedule

12      that until I find out when the hearing is, although

13      actually it might make more sense for us to do that first,

14      because then, if there are witnesses that I decide really

15      are not appropriate, you don't have to worry about

16      scheduling them.

17                   All right.  So let's schedule that in the next

18      couple weeks.

19                   Would you all be available on June 23rd, at

20      2:30?

21                   MR. WISEMAN:  That's fine with plaintiffs.

22                   MS. McFARLAN:  Yes, your Honor.

23                   THE COURT:  And I think what I would like before

24      then are written submissions, and I will -- by June 18th,

25      where you all basically -- if you could do it jointly,

```
 1    that's fine.  Otherwise, let me know what issues you think

 2    we will be addressing at the hearing and what witnesses you

 3    believe you will be presenting.  You don't have to give me

 4    documents or anything, but just issues and witnesses.  And

 5    then at that time, we'll figure out what kind of a hearing

 6    this is really going to be and schedule -- well, and I guess

 7    it would help to find out when your experts are available so

 8    that we can go ahead and schedule them at that time.

 9              So that is basically our mini pretrial

10    conference.  And I think it probably should be in court, not

11    by telephone.  All right?

12              And I will put out -- I will issue an order

13    to that effect so that we're all on the same page once

14    again.

15              All right.  Is there anything else that we can

16    helpfully address this morning?

17              MR. WISEMAN:  Not from us, your Honor.  Thank

18    you.

19              MS. McFARLAN:  No, thank you, your Honor.

20              THE COURT:  All right.  Thank you very much,

21    then, counsel.  I have to close-out my computer, so you may

22    leave before I stand up.

23              (Court recessed at 10:52 a.m.)

24                        -  -  -

25
```