IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

_____

| | |
|---|---|
| ROBERT W. JACKSON, III, | : |
| | : |
| Plaintiff, | : |
| | : |
| -against- | : |
| | : |
| CARL C. DANBERG, et al., | : |
| | : |
| Defendants. | : |

_____

**Civil Action No.**
06-CV-300

United States District Judge
Sue L. Robinson

Electronically Filed

**CLASS ACTION**

## PLAINTIFFS' PRE-TRIAL SUBMISSION

### INTRODUCTION

At the May 14, 2008 status conference to discuss the impact of <u>Baze v. Rees</u>,

128 S. Ct. 1520 (2008), on this litigation, the Court asked for this submission to

identify the differences between the Delaware and Kentucky protocols and the

witnesses who will be called to explain why the differences are material.  Plaintiffs

understand that the Court is interested in hearing evidence regarding the protocol as

written.  Those substantial differences and the relevant witnesses will be discussed

below.  However, there are other differences between the protocols that are not

facially apparent, but which require proof of the manner in which past Delaware

executions have taken place.  To prove the existence and importance of these *de facto*

1

differences, Plaintiffs intend to call witnesses to testify to past executions and procedures. These witnesses will demonstrate the errors and overall confusion that were patent during executions, and accordingly, this evidence is relevant to show that Defendants are not able to consistently administer a complicated three drug protocol, without a substantial risk of violating the Eighth Amendment.

In Part I of this submission, Plaintiffs provide a brief summary of the legal framework under which the differences in the protocols should be analyzed. In Part II, Plaintiffs review the facial differences in the protocols, as written. In Part III they address the *de facto* differences by reviewing errors and bad practices from past executions.

Because Plaintiffs believe that they will be able to prove that the Delaware protocol, and the history of Defendants' maladministration of prior protocols, create a substantial risk of serious harm, they should be permitted to present proof regarding alternatives to the current protocol. Accordingly, Part IV addresses the evidence that will be presented regarding alternatives. Finally, Part V is a witness list, in which Plaintiffs set forth each witness they intend to call.

## I.    LEGAL FRAMEWORK.

In <u>Baze v. Rees</u>, 128 S.Ct. 1520 (2008), a three-Justice Plurality held that to prove that a state's method of execution violates the Eighth Amendment, prisoners

must demonstrate that the challenged protocol would subject them to a "substantial risk of serious harm."[1] Baze, 128 S. Ct. at 1532. The Plurality recognized that such a risk exists where an inadequately anesthetized inmate is given pancuronium and potassium. Id. at 1533 ("failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride."). The Plurality further held that a method of execution is unconstitutional where it imposes a substantial risk of serious harm, and there is a feasible and readily available alternative to the State that significantly reduces the risk. Id. at 1532.

It is also apparent from Baze that, in addition to what the protocol says, the actual administration of the protocol is important to a determination of the presence of risk of an unconstitutional execution. The plurality first concluded that Kentucky's written execution protocol contained facially adequate safeguards that, if followed, would ensure successful delivery of the full dose of thiopental. Baze, id., at 1533-34. The plurality then determined that Baze had failed to present evidence that Kentucky's personnel would be unable to perform the protocol as intended. Id., at

---

[1]No opinion in Baze garnered the votes of more than three Justices. The Plurality opinion is controlling as it represents the narrowest reasoning necessary to support the judgment. All citations to Baze are to the Plurality opinion.

1533-35, 1537.   The Plurality's repeated consideration of whether there was "maladministration" of the written protocol that could lead to a "substantial and unconstitutional risk" of pain, *id.* at 1533-34, presupposes that a court ought to review not just the four corners of a protocol, but must also look at the history of the administration of it.

Because there was only one execution by lethal injection pursuant to the protocol at issue in <u>Baze</u>, at 1528, there were no reported problems with it, and none of the Kentucky IV team testified in the state court trial, the Supreme Court had no evidence before it showing maladministration of the written protocol.   Delaware, in contrast, has carried out 13 executions by lethal injection.   Plaintiffs have uncovered compelling evidence, discussed below, that many executions have not followed the various written protocols that were in effect at the time of each execution.   In this case, depositions of execution team members reveal rampant confusion and errors among the members of the execution and IV teams, and practices departing from the written protocol, ranging from erroneous dosages being administered to a lack of required training.   Nothing in the most recent protocol can provide this Court with confidence that the Defendants will remedy the prior confusion, errors and maladministration of the process.   This information should be considered in determining whether Defendant's ability to implement the death penalty pursuant to

4

the protocol creates a substantial risk of unconstitutional pain and suffering, and thus, whether the alternative proposed by Plaintiffs should be utilized.

Thus, in Delaware, not only the significant deficiencies in the written protocol are pertinent to the Court's inquiry. Defendants' history of departing from its written protocol is also highly relevant to whether there is a risk of an Eighth Amendment violation. Civil rights liability arises when defendants fail to follow an otherwise constitutional, written policy. See Morales v. Tilton, 465 F. Supp. 2d 972, 978-79 (N.D. Cal. 2006) (California's written protocol provides for humane executions; but "in actual practice [the protocol] does not function as intended"); Simmons v. Uintah Health Care, 506 F.3d 1281, 1285 (10th Cir. 2007) ("Holding municipalities immune from liability whenever their final policymakers disregard their own written policy would serve to encourage city leaders to flout such rules"); Women Prisoners v. District of Columbia, 877 F.Supp. 634, 670 (D.D.C., 1994) ("Clearly, the Defendants do not have an official policy which requires the Defendants to create a firetrap . . . [however] the evidence demonstrates that written policies notwithstanding, the Defendants fail to train their employees in the area of fire safety and the Defendants do not follow their plan which calls for quarterly drills."); Wood v. Idaho Dept of Corrections, 2007 WL 1381786, *19 (D. Idaho, March 28, 2007) (despite existence of written policy to provide proper medical care, "because of the pervasive recurring

problems . . . the Court concludes that there is a genuine issue of material fact as to whether [the prison] has a <u>de facto policy or a well-settled practice of</u>" denying proper care); <u>Sutton v. Hopkins Co., Kentucky</u>, 2007 WL 119892 *7 (W.D. Ky., Jan. 11, 2007) ("a reasonable jury could find that the [] jail failed to follow its <u>written policy</u>, and instead followed a custom or practice" leading to the constitutional violation); <u>Thomas v. Cook Co. Sheriff</u>, 499 F.Supp.2d 1062, 1096-97 (N.D. Ill., 2007) (plaintiffs state a claim for, *inter alia*, failure to follow an existing written policy).

Here, the current protocol is substantially different from Kentucky's as written. Moreover, Delaware's history of maladministration makes clear that Defendants are not able to administer a complicated three drug protocol without a substantial risk of violating the Eighth Amendment.

## II.    DIFFERENCES IN THE PROTOCOLS AS WRITTEN.

The following differences between the Kentucky and Delaware protocols show a significant risk of errors in the administration of anesthesia in Delaware. Delaware places no time limit on venipuncture, creating the risk that a condemned prisoner may become a "human pincushion" before the IV lines are successfully sited. The Delaware protocol lacks a contingency plan for highly likely-to-occur instances where the IV team is unable to site peripheral lines, and it does not specify a decision-

maker should that problem arise.  Delaware lacks a consciousness check before administering the paralytic drug. Delaware lacks professional experience and licensing requirements for execution team members; at least one retired, unlicensed individual has participated in an execution.  Delaware has historically failed to conduct practice sessions required by past protocols, and even the more extensive practice required under the current protocol pales in comparison with that required by Kentucky.  Delaware lacks provisions, equipment and training for resuscitation in case of a last-minute stay of execution.

The following differences exist between the two protocols.

A.    Unlike the Kentucky Protocol, Delaware's Protocol Has no Limits on the Time or Number of Attempts that the Executioners May Make to Establish Peripheral Intravenous Access, and It Fails to Provide for a Contingency Plan if Peripheral Lines Cannot be Sited.

A Kentucky execution team has up to one hour to establish primary and secondary peripheral IV access.  Baze, at 1528.  If access is not attained within 60 minutes, "the Governor's office shall be contacted by the Commissioner and a request shall be made that the execution be scheduled for a later date."  976, JA Vol. IV.[2]

Delaware's protocol has no similar time limit and no contingency plan in the

_____

[2]JA Vol. IV, refers to the publicly-available Volume Four of the Joint Appendix" filed in Baze, which contains the redacted Kentucky protocol.  A copy of the portion of Volume Four containing the Kentucky protocol is attached.

event that peripheral access is not obtainable, even though Defendants are aware that sometimes peripheral access will not be obtainable.

Until the most recent protocol, all of Defendants' prior protocols included provision for a cut-down procedure in the event that peripheral access was not obtained. Although the reasons that one may not be able to obtain peripheral access have not changed (see below), the current protocol has no contingency plans in the event that peripheral access cannot be obtained.[3]

---

[3]In his deposition, former Warden Carroll insisted that peripheral access would be obtained, without regard for the reality that in some instances, peripheral access will not be possible. Deposition of former Warden Carroll, 8/18/07, 172-73:

A:    Mr. Wiseman, you're to take from that that venous access will be accomplished through one of the means as outlined in No. 5 on page – on Bate mark 2473.

Q:    Okay. And what is the plan if access is not accomplished through any of those means?

A:    Access will be accomplished through one of these means.

Q:    Well, what if it's not? Well, let me ask you this: Is there any contemplation of the use of a femoral vein access?

A:    The access that's contemplated is as outlined in the protocol, which is on Bate mark 2473, No.5.

Q:    Unlike in the prior protocol, this supply checklist does not contain any scalpels. Am I to take from that fact that no access that would require use of a scalpel is contemplated or permitted by the procedure?

A:    You are to take from that that the access that is contemplated is as shown on

Defendant's expert witness, Dr. Mark Dershwitz (the same expert relied upon by Kentucky) testified in his trial testimony here,[4] that an execution protocol ought to include a contingency plan in the event that peripheral venous access is not attainable. Dr. Dershwitz said that failure to obtain peripheral access has happened in executions around the country; therefore, procedures should be in place in the event that placement cannot be obtained.[5] Such contingencies could include placement of an IV in the neck or groin, which Dr. Dershwitz testified would require "a greater degree of skill" than placement of a peripheral IV; if people with such skills are not part of the execution team, then the execution should be postponed. Tr.

---

Bate mark 2473 that we covered before.

Q:    Well, as the person who signed this protocol, can you guarantee the court that if access is not accomplished as provided for in paragraph 5, that there will be no other means of access attempted?

A:    I can guarantee the court that access will be obtained through the means outlined in paragraph 5 on Bate mark 2473.

[4]Because Dr. Dershwitz was not available for the original time set for trial in this case, the parties agreed to conduct his trial testimony before trial. Plaintiffs refer here to the transcript of that testimony.

[5]Indeed, Nelson v. Campbell, 541 U.S. 637, 640 (2004), notes that the authorities there could not obtain peripheral access because "due to years of drug abuse, petitioner has severely compromised peripheral veins, which are inaccessible by standard techniques for gaining intravenous access, such as a needle." According to Dr. Dershwitz, IV drug use and obesity are among the reasons why it is difficult, if not impossible, to obtain peripheral IV access in some prisoners. Tr. 9/24/07, 60.

9/24/07, 58-61.

The Delaware protocol's lack of a time limit and lack of contingency plans put enormous pressure on the IV team to establish peripheral access at the cost of inflicting undue pain and suffering on the condemned prisoner. Since there is no time limit, nor guidance on what to do if access cannot be obtained, including no clear decision making process, there is a risk that a prisoner can become a human pincushion, as the IV team tries to obtain access. Indeed, deposition testimony revealed that IV Team members believe that their task is not complete until death is accomplished – see e.g. John Doe III, Deposition, 5/25/07, 99-100, 106. Such attitudes combined with no limit on the duration or number of attempts to establish access, pose a substantial risk of pain and suffering. This risk is all the more certain inasmuch as the Delaware protocol has no provision for the use of local anesthetic (e.g. Lidocaine) (Discovery, 2482)[6] to mitigate the pain that could be inflicted by multiple attempts to establish access over an unlimited amount of time.

The only provision in the Delaware protocol addressing this question is the prohibition on a "cut-down" procedure. However, that prohibition does not address the number of attempts or the time span during which attempts can be made to gain

---

[6]"Discovery" refers to the Bate-stamped pages of discovery documents produced by Defendants.

peripheral access.    Thus, the prospect that Delaware executioners can act without any

protocol-based guidance about the duration and types of action they can employ to

establish access presents a risk of an Eighth Amendment violation.[7]

In a related difference, Kentucky's protocol directs the IV team to "insert one (1) primary IV line and one (1) backup IV line in a location deemed suitable by the team members." 975, JA Vol. IV.   Delaware's protocol, on the other hand, gives contradictory and/or ambiguous directions to the IV team regarding the placement of the IV sites.  Delaware's protocol directs that the "IV team shall have reviewed a venous access memo previously prepared regarding the ISDP (Inmate Sentenced to Death Penalty)," (Discovery, 2533), but it does not explain what deference, if any, the memo is to be given.  Instead, Delaware's protocol directs that "One IV team member inserts the first catheter into a vein on the right side of the ISDP in the anticubital fossa area," regardless of the information contained in the venous access memo, or

---

[7]As shown below, given the history of who has been selected to participate on the IV team, and the current protocol's flimsy selection criteria, there is a real chance that the siting of IV lines could be done in a manner intended to cause gratuitous pain. See Deposition of John Doe III, 5/25/07 at 106:

Q:    If you became aware that the execution procedure did not guard against pain and suffering by the prisoner, would you be okay with that?

A:    Probably . . . the prisoner didn't appear to care about the pain and suffering of his victims.

Q:    And so are you saying that if they experience pain and suffering, they would deserve it?

A:    No, I'm saying it wouldn't matter to me.

regardless of observations the IV team member makes regarding the suitability of that vein. The same process is to be completed for insertion of a second line on the inmate's left side. From the anticubital fosse, the IV team is supposed to follow a strict order of sites until a satisfactory one is achieved. Again, the relationship between this strict order of sites, and the venous access memo is not explained in the protocol, leaving the IV team without clear guidance.

Finally, Plaintiffs' expert will testify that there is a relationship between the number of attempts it takes to obtain peripheral access and compromised integrity of the access. Multiple needle sticks run a risk that the vein wall will be weakened or pierced, with resulting infiltration. Thus, not having a limit on the time in which access can be obtained further increases the already substantial risk of causing pain and suffering.

**B.    Delaware's Protocol Does Not Require a Consciousness Check to Ensure Adequate Anesthesia Before Injecting the Paralytic and Heart-Stopping Agents.**

Because "proper administration of the first drug, sodium thiopental, eliminates any meaningful risk that a prisoner would experience pain from the subsequent injections of pancuronium and potassium chloride," Baze, at 1530, the Kentucky protocol requires the Warden to check that the prisoner is unconscious after the initial injection of sodium thiopental but before the second drug is administered:

13

> If it appears to the Warden that the condemned is not unconscious within 60 seconds to his command to 'proceed', the Warden shall stop the flow of Sodium Thiopental in the primary site and order that the backup IV be used with a new flow of Sodium Thiopental.

978-79, JA Vol. IV.

Delaware has no similar requirement that the condemned prisoner be checked for unconsciousness. Rather, the protocol requires that the succession of drugs be administered without regard for whether the anesthetic is having its intended impact. Discovery, 2474-75 (requiring only that the execution team waits 2 minutes after the administration of the sodium thiopental before injecting the Pancuronium Bromide). Delaware's protocol has no contingency or chain of command to determine if the prisoner is still conscious, and if so, what should happen.

## C.  Delaware's Protocol Does Not Contain Experience or Licensing Requirements for Execution Team Members.

The Kentucky Protocol has specific and demanding experience and licensing requirements for members of its execution team. Baze describes these requirements as the "most significant" safeguard to ensuring that sodium thiopental will be properly delivered, and hence that the execution will be carried out in a constitutional manner:

> Kentucky has put in place several important safeguards to ensure that an adequate dose of sodium thiopental is delivered to the condemned prisoner. The **most significant** of these is the written protocol's requirement that members of the IV team must have at least one year of professional experience as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman. Kentucky currently uses a phlebotomist and an EMT, personnel who have daily experience establishing IV catheters for inmates in Kentucky's prison population.

Baze, 1533. Moreover, the Kentucky protocol requires that members of the IV team are currently licensed in their field. 984, JA Vol. IV ("members of the IV team must remain certified in their profession and must fulfill any continuing education requirements in their profession.").

All past executions by lethal injection in Delaware were conducted under a protocol that contained no experience or licensing requirements for members of the injection team. There was no formal selection process, and past Wardens picked members based on relationships with other members of the team, or DOC personnel, or because the team members had performed past executions and the Wardens had not heard about any problems – depositions show that no Warden has ever asked about past problems or conducted formal or informal inquiry about past problems.[8]

On the eve of this trial, in August 2007, Defendants added to the protocol a

---

[8]Depositions revealed that there was a problem with the primary IV line in the Steckel execution. Yet, no inquiry – formal or informal – was ever conducted by any person with regard to this incident.

section called "Member Selection Criteria," Discovery, 2469-70.[9]  Despite this recent

change, the protocol still does not contain any of the safeguards identified in <u>Baze</u> as

the "most significant" guarantors of a constitutional execution.[10]

Thus, in Delaware, an inexperienced or no longer licensed EMT or Paramedic

could participate in an execution.  This is not just a speculative or theoretical concern.

Plaintiffs learned that in at least one case, a retired paramedic who was no longer

licensed participated in a lethal injection in Delaware in 2005.  John Doe III,

Deposition 5/25/07, 10, 12, 133.  John Doe III had retired from his paramedic job in

2003, two years before the Steckel execution.

Without an experience and licensure requirement, such as Kentucky's, there

is a substantial risk the IV teams in Delaware will lack minimum competence in

inserting IVs "as part of their typical day jobs," which was proposed by Defendants'

expert Dr. Dershwitz as a "reasonable litmus test" for IV team selection. Dr.

_____

[9]The relevant portion states:

> <u>Member Selection Criteria</u> . . . . Two or more members of the Execution Team shall be Emergency Medical Technicians ("EMTs") or Paramedics. These members shall be referred to as the IV team.

[10]Nor does the current protocol contain any requirement for determining if members of the execution team may have a personal grudge against the condemned. John Doe II participated in the execution of James Clark, despite Doe's knowing both of Mr. Clark's victims.  Deposition of John Doe II, 5/21/07 at 158-59, 164-65.

16

Dershwitz, Tr. 9/24/07, 84.

> **D.    Delaware's Protocol Lacks the Practice Requirements Contained in Kentucky's Protocol, and Even the Minimal Requirements Contained in the Delaware Protocol Have Not Been Honored.**

Baze identified Kentucky's requirement for frequent practice sessions as

another "important safeguard to ensure" the delivery of the critical anesthetic:

> Kentucky has put in place several important safeguards to ensure that an adequate dose of sodium thiopental is delivered to the condemned prisoner. . . these IV team members, along with the rest of the execution team, participate in at least 10 practice sessions per year. These sessions, required by the written protocol, encompass a complete walk-through of the execution procedures, including the siting of IV catheters into volunteers.

Baze, at 1534.

Delaware's protocol requires far less rigorous training.  Even this minimal

training has been largely ignored in the past.   Under prior protocols, the practice

requirement was limited to two practice sessions during the week prior to the

scheduled execution.   Testimony indicates that the two practice sessions that were

required under the older protocols were rarely conducted.  This lack of practice was

significant because, as Plaintiffs have learned, some participants never even saw the

protocol under which they were supposed to act.

The August 2007 Protocol has a new section on "Training," Discovery, 2469-

70, which requires participants to read the protocol and calls for 3 training sessions

within 30 days of an execution.[11]  Even then, the sessions do not call for practicing the critical function of "siting" IV lines.

###    E.    Delaware's Protocol Lacks Stabilization Procedures, Personnel and Equipment in the Case of a Last-Minute Stay of Execution.

In Kentucky, "a physician is present to assist in any effort to revive the prisoner in the event of a last-minute stay of execution." <u>Baze</u>, at 1528.  The Kentucky protocol also requires the Warden to arrange for an ambulance and staff to be present on institutional property, and for a medical crash cart and defibrillator to be in the execution building. 985, JA Vol. IV.

No such safeguards are present in Delaware.  Delaware has no requirement for the presence of trained personnel, equipment, and procedures to resuscitate the prisoner should the execution be called off after it commences.  The protocol does not have a procedure for resuscitation, and does not assign that responsibility to any

---

[11]The relevant portion of the protocol states:

> <u>Training</u> . . . . The Execution Team shall conduct a minimum of three simulations of the execution day within one month of an execution.  The simulation shall include training on all activities from removal of the ISDP [Inmate Subject to Death Penalty] from holding cell through pronouncement of death **excluding insertion of IV lines** and introduction of chemicals or saline. A Department of Correction volunteer shall play the role of the ISDP."

Discovery, 2469, 2529.

person or persons.  The protocol does not require that a crash cart, oxygen tank, defibrillator, other stabilization equipment, or an ambulance be on-site.  Execution team members have testified they are not aware of any resuscitation equipment on-site, and that they do not know how to reverse the effects of the drugs administered. See e.g. John Doe III, Deposition 5/25/07, 99-100 (when asked about contingencies in the event of a stay, IV team member stated he would do nothing beyond "stop[ping] where we're at"); John Doe II, Deposition 5/21/07, 75 (IV team member testified that once the warden gives the signal and the injections begin, "the stopping point is the flushing after the third medication, as far as my job is concerned at that point.").

The physician who has attended all past Delaware executions also does not know how to reverse the effects of the drugs. Physician, Deposition 5/23/07, 80-82. Alarmingly, the IV team members and the Physician stated if the execution had to be stopped, they would call outside paramedics.

Dr. Dershwitz, Defendants' expert, and Dr. Heath, Plaintiffs' expert, have testified that in most executions death does not occur until after the third injection, potassium chloride.  Thus, in theory resuscitation could be achieved if an execution were called off before the administration of potassium chloride.  Delaware has not provided for this contingency.

**F.    The IV Team's Distance from the Prisoner, and the Length of IV Tubing Used in Delaware Increase the Risks of Inadequate Delivery of the Anesthetic.**

In Kentucky, "the execution team administers the drugs remotely from the control room through five feet of IV tubing." Baze, at 1528.

Delaware uses relatively long IV tubing that increases the risk of inadequate delivery of the required dose of anesthesia. The tubing used is ninety-six (96) inches long, with two thirty-five (35) inch extensions. See Discovery, 451-52.[12] Thus, the IV tube is between eight feet and thirteen feet, ten inches long.

The length of tubing affects several risk factors. Most importantly, it indicates how far away from the prisoner the IV team works. Distance affects the IV team's ability to monitor and observe the tubing for leaks and occlusions, the catheter sites for signs of infiltration, and the prisoner for signs of consciousness. While Defendants have recently installed a camera to be used in the process, the protocol again provides little guidance about what the team should be trying to visualize. Discovery, 2534. The protocol calls upon the IV team to use the camera only to visualize the injection sites. Thus, the lengthy tubing, with its multiple connections,

---

[12]Prior execution protocols specified the length of tubing used. Since August 2007, Delaware's protocol has not specified the length of tubing. Discovery, 2482. Without a specification for length, Defendants can use any length of tubing during an execution.

could be leaking, and the IV team will be unaware of this failure. The protocol fails to charge any person with the responsibility of watching for leakage in the lines. Plaintiffs' expert will testify that this camera does not insure the success of its intended purpose – monitoring the IV sites.

Not surprisingly, longer tubing and more connections between extensions increase the risk of leaks. The length of tubing used in Delaware increases the risk of inadequate delivery of the sodium thiopental, and thus the risk of an inhumane execution.

The IV team's distance from the condemned prisoner makes it more likely that the only medical personnel involved in the process (the IV team), will be unable to visualize problems with the process.

## G.    Delaware's Failure to Require Pre-Execution Medical and Psychiatric Exams of the Prisoner Increases the Risk of Error.

The Kentucky protocol requires extensive medical and psychiatric monitoring of the prisoner during the two weeks prior to a scheduled execution. The Delaware protocol, as written and in practice, does not require any medical or psychiatric monitoring of the prisoner. Failure to monitor the prisoner prior to an execution increases the risk of medical complications that subject the prisoner to undue pain and suffering.

In Kentucky, a special section of the prisoner's medical records is started fourteen days prior to execution. 971, JA Vol. IV. Regular nurse visits (once per shift, seven days a week) and doctor visits (daily, five days per week), to be immediately recorded in the special section, are required. A Department of Corrections official is responsible for reviewing the nurses' reports daily, and another official is responsible for reviewing the doctors' and nurses' reports weekly. 971-72, JA Vol. IV. The Kentucky protocol requires separate physical and psychiatric examinations to be conducted no later than seven days prior to execution; the Warden is to review these reports. 973, JA Vol. IV. Another person [title redacted] is to personally observe and evaluate the prisoner's medical condition weekly. Finally, all medical staff are "to immediately notify the Warden, [redacted], or designees, and [redacted] of any change in the inmate's medical or psychiatric condition." 974, JA Vol. IV.

These safeguards in the Kentucky protocol ensure that medical professionals and the Warden are monitoring the prisoner's medical condition prior to an execution, and have knowledge of any changes in the inmate's condition that could affect the execution by lethal injection. Delaware's protocol, as written and in practice, does not contain any of these safeguards.

The only related provision in Delaware's protocol requires the IV team to review a venous access memo prepared on the prisoner. Discovery, 2533. However,

the protocol is silent as to who is to prepare it, or when in relationship to the
execution it is to be prepared.

III.  *DE FACTO* DIFFERENCES BETWEEN THE PROTOCOLS.

Experience in Delaware shows that in practice, defendants do not consistently
follow the written protocol in ways that increase the risk that the drugs will not be
administered properly.  In past executions, some prisoners have erroneously been
given dosages inconsistent with the protocol.  The requirement for practice sessions
is mostly not followed; IV team members have participated in executions without
participating in practice sessions.  The IV team works in a dark room.  Execution
team members do not have a clear idea of who is in charge in the medicine room,[13]
or of what to do in case of a problem.

A.  **Records and Depositions Reveal Dosage Errors in Five of the
    Thirteen (38%) Prior Delaware Executions.**

There have been dosage errors in at least 38% of the prior Delaware executions
by lethal injection.  Execution records show that five prisoners in Delaware were
given the wrong dose of one of the drugs, potassium chloride.  Mr. Red Dog was
given 240mEq of potassium chloride, and Mr. Clark, Mr. Lawrie, Mr. Weeks, and Mr.

---

[13]The so-called "medicine room" is the chamber from which the members of
the IV team mix and administer the three chemicals that are used in the execution
process.

Steckel were given 200mEq of potassium chloride. At all relevant times, the Delaware protocol called for the administration of 100mEq of potassium chloride. Defendants' expert, Dr. Dershwitz, acknowledged in his trial testimony that these dosages were given in error. Tr. 9/24/07, 47-49.

Moreover, in four other executions, it is unknown whether the IV team administered correct dosages, because dosages of one or more of the drugs were not recorded, although such recording was required by the protocol. Defendants' failure to ensure that condemned prisoners receive correct dosages of the lethal drugs creates a substantial risk of serious harm.

In the most recent execution, that of Mr. Steckel, the first IV line infiltrated. Reportedly, the IV team noticed the infiltration during the injection of the first drug, sodium thiopental. Although the team allegedly switched to the second line – and should have given another dose of sodium thiopental – DOC records indicate Mr. Steckel was not administered the second dose. Discovery, 1849 (Death Investigation Report - Final); 1870 (List of Drugs Administered to Brian Steckel). Thus, as far as records indicate, Mr. Steckel was administered a paralytic drug and then an extremely painful heart-stopping drug without having received adequate anesthesia, in violation of the Eighth Amendment and Baze.

The recorded errors in five of Delaware's thirteen executions by lethal

24

injection, as well as the failure to record dosages in four of the thirteen executions, show an overwhelming risk that condemned prisoners will not receive the correct doses of lethal drugs.

**B.    The Protocol Lacks a Clear Chain of Command and in Practice Execution Team Members Are Confused About the Chain of Command.**

As written, the Protocol does not contain a clear chain of command to address contingencies that can arise in an execution by lethal injection.  Depositions show that confusion abounds among execution team members about the chain of command during the lethal injection in the event anything goes awry.   Because the protocol does not spell out contingency plans for potential problems (such as difficulty gaining peripheral venous access, the occurrence of infiltration or the grant of a last-minute stay of execution), the execution team members do not know what to do, or to whom to defer should a problem arise.

Depositions show confusion amongst all the participants as to who has decision-making authority.  One IV team member stated the Physician is supervising them and has authority to perform procedures the IV team are unlicensed to perform, such as insertion of a central line.  Jane Doe I, Deposition 6/5/07, 64. Another stated that although he would defer to the physician, he would (although unqualified and unlicensed) insert a central line if necessary.  John Doe II, Deposition 5/21/07, 85-96.

While most point to the Warden as the person in charge, it is unclear what authority the Warden has over what seem to be medical decisions. Ironically, even the Warden defers to the Physician as the ultimate authority on medical decisions, such as how to address a difficulty with gaining peripheral access. Thomas Carroll, Deposition 3/27/07, 22-24, 29-30, 50.

In contrast to statements made by the IV team and the Warden, the Physician states his only role is to pronounce death, and that he is not in charge of the medical aspects of the execution and has no role to play other than to pronounce death. Physician Deposition, 5/23/07, 11, 66, 74. The Physician also states that he does not, in his daily work, induce anesthesia, detect anesthetic awareness or insert IVs, and would not participate in any way in these activities in the lethal injection setting. Id., at 15-16-, 26-27. He does not know the drugs used in the lethal injection protocol or how to mix them. Id., at 29, 65. The Physician has also never evaluated a prisoner's venous access prior to an execution, and has no knowledge of whether anyone assesses the inmate's veins, having never seen such a report. Id., at 41, 50.

The Physician's understanding flatly contradicts the testimony of John Doe II, who, having participated in eight executions, believes the Physician is the one who evaluates the prisoner's veins prior to execution, believes the Physician is "in charge of the medicine room . . . from a medical standpoint," and believes the Physician has

evaluated the prisoner's demeanor and prescribed any necessary sedatives before the execution. John Doe II, Deposition 5/21/07, 70-71, 74.

The confusion among members of the execution team shows inadequate training and practice, as well as failures in the protocol itself to specify a clear chain of command dictating who will make decisions when unexpected events occur.

### C.    Execution Team Members Work in the Dark, Greatly Increasing the Risk of Error.

The execution team members literally prepare and inject the lethal drugs in a dark room. Although the deposition testimony of team members was inconsistent as to when they turn off the lights in the medicine room, and as to the lighting during the execution itself, Plaintiffs can show that preparing and injecting lethal chemicals without adequate light greatly increases the risk of error, and that at its best, the lighting is inadequate.

Plaintiffs can show that the lighting in the medicine room when the lights are turned off is as low as .1 foot candles and the space where the IV team works varies from 21 to .3 foot candles. Even with the lights turned on, the lighting is so poor in the medicine room, there exists a probability of about 0.046 (1 in 22 opportunities), that the wrong quantity of a drug, or the wrong sequence of drugs will be used in an

execution.[14]  Any error in the drug, the quantity, or the sequence could affect the adequate administration of anesthesia. The probability of error increases when the lights are turned off, as they are during an execution.

Although personal observations and conclusions about lighting levels are unreliable, and lighting levels must be assessed with specialized equipment, it is sobering to note that the physician who has attended eleven lethal injections in Delaware stated he would not be comfortable doing a medical procedure under the lighting conditions in the medicine room.  Physician, Deposition 5/23/07, 70.

Because Delaware's protocol does not specify the lighting of the medicine room, the lighting conditions – whether the room's lights are on or off – pose a significant risk of harm to the condemned.

### D.    Defendants Do Not Consistently Follow the Safeguards Within Delaware's Protocol.

Although some minimal safeguards have been built into Delaware's protocol, Defendants' failure to follow consistently the existing safeguards increases risk and also reduces the arguable effect of any new safeguards.

For example, execution team members testified in deposition that they have not

---

[14]The lighting in the medicine room is actually significantly lower than any lighting level that has been studied in a medical setting.  Report of Plaintiff's expert witness, Professor John Senders, at 4-5.

attended the required practice sessions. Delaware lethal injection protocols since 1992 have stated that execution team members shall attend practice sessions in the period immediately prior to an execution. See, e.g., Discovery, 15 (1992), 144 (1993), 221 (1995), 291 (1999), 368 (2000), 429 (2005), 2469 (8/31/07), 2529 (10/2/07). In 1992 the procedure for preparations within seven days of execution read: "The execution team shall be notified establishing times and dates for at least two (2) practice sessions prior to the execution as determined by the Delaware Correctional Center (DCC) Warden." Id. at 15. It was the Warden's responsibility to arrange these practice sessions. This wording remained essentially unchanged until 2007, when the section entitled "Training" was added. This new section requires the execution team to conduct a minimum of three simulations within one month of execution, including "training on all activities from removal of the ISDP from holding cell through pronouncement of death excluding insertion of IV lines and introduction of chemicals or saline." Id. at 2529. Under the 2007 protocol, it is unclear whose obligation it is to arrange the simulations.

Execution team members have conducted executions in Delaware without attending any training sessions, or without attending the requisite number of training

sessions immediately prior to the execution date.[15]  This shows disregard for the written protocol and ignorance of the training necessary to conduct a humane execution. Defendants' failure to follow basic provisions of the protocol through multiple prior executions raises the question of whether additional safeguards added to the protocol will have any effect.

Injection team members also do not consistently check the equipment and materials prior to an execution, although the protocol requires two inventory checks. The protocol before August 2007 required that members of the injection team conduct an equipment check within one week of the execution date, and re-inventory the supplies on the day of execution upon entering the injection room.  Discovery, 444. The supply check list is to be checked, verified, initialed and signed by a member of the execution team.  Discovery, 451-452; 2482.

Execution team members report that this elementary step of the protocol is routinely ignored.  One execution team member reports conducting executions without seeing any paperwork at all (John Doe I, Deposition 7/6/07, 56); IV team

---

[15]John Doe I, who participated in two lethal injections, did not ever attend a practice session. John Doe I, Deposition 7/6/07, 52-53. The only training of John Doe II, who has participated in eight lethal injections, was a (single) "dry run through" without starting an IV.  John Doe II, Deposition 5/21/07, 82-83. John Doe III, who has participated in six lethal injections, has not participated in any training sessions. John Doe III, Deposition 5/25/07, 77-78.

members state it is not their responsibility to fill out any paperwork (John Doe II, Deposition 5/21/07, 66; John Doe III, Deposition 5/25/07, 43-43); at least one is entirely unfamiliar with the contents of the supply checklist, and thus unfamiliar with the medical supplies available during a lethal injection.[16] Again, verifying a checklist is an elementary safeguard to ensure all of the necessary medical supplies are present for a lethal injection. Defendants' failure to follow this part of the protocol raises serious concerns about the risks posed by Delaware's practices.

The IV team has administered lethal injection without being shown the step-by-step directions in the lethal injection protocol. Some have been shown only the dosages and/or the supply checklist. John Doe I was not shown any written protocol or other paper before administering lethal injections. John Doe I, Deposition 7/6/07, 56. John Doe III was shown the one-page "Contents of Syringes" and the two-page Supply Checklist from the protocol, but not the sections of the protocol including "Pre-Execution Inventory and Equipment Check," "Obtaining Drugs," "**IV Set-up Procedure**," "**Injection Procedure,**" and "When the Signal to Commence Shall be

---

[16]John Doe II, Deposition 5/21/07, 92-93, testified that he was not aware whether cut-down supplies were available, although the supply checklist included topical anesthetic, a "cut-down set," two scalpels and two blades, see e.g., Supply Checklist (8/1/05 Protocol), at Documents Produced by Defendants to Plaintiffs at 451-52. (This was changed in the August 2007 protocol, which expressly bars cut-downs.)

Given by the Warden." John Doe III, Deposition 5/25/07, 94.

## IV.   THERE ARE READILY AVAILABLE ALTERNATIVES THAT WOULD SIGNIFICANTLY REDUCE THE RISK OF SERIOUS HARM.

There are "feasible [and] readily implemented" alternative procedures available to Delaware that will "significantly reduce the risk[s]" described above. Plaintiffs have not yet had an opportunity to present alternatives to the court; however, Defendants' expert, Dr. Mark Dershwitz, acknowledged during his trial testimony that a one-drug protocol, i.e. a massive overdose of a single barbiturate, would reduce the risk of an inhumane execution. Tr. 9/24/07, 29-33. Baze makes clear that it is appropriate for a court to order relief where a plaintiff has shown a substantial risk, and there is a ready alternative available to the state.

In this case, the alternatives available to Delaware are not just feasible, they are obvious. At a minimum, Defendants should institute pre-execution medical and psychiatric evaluations, establish a time limit for attempts at IV insertion; institute a consciousness check between the injection of sodium thiopental and the subsequent drugs; establish and enforce experience, training and licensure requirements for members of the execution team; and establish stabilization procedures and provide resuscitation equipment and training in case of a last-minute stay. These changes would represent a substantial improvement in Delaware's practices, and bring them

into constitutional compliance.

But while such overdue reforms would be welcome, they would be meaningless if Defendants continue to not follow their protocol. Thus, even these changes are insufficient to remedy entirely the substantial risks in Delaware's practices. Delaware's record shows past maladministrations and therefore a substantial risk of inadequate anesthetization of the condemned. The best and most feasible alternative procedure to eliminate this risk is to move to a protocol that uses only a single, massive dose of thiopental, pentobarbital, or some other barbiturate to cause death. Going to a one-drug protocol would obviate virtually every other concern and deficiency in the execution process.

The feasibility of a so-called "anesthetic-only" protocol was not definitively addressed in <u>Baze</u> because that "alternative was not proposed to the state courts below." <u>Baze</u>, at 1534. Having no findings to review on the efficacy of that reform, the Supreme Court could not have concluded in the first instance whether it was feasible or readily implementable. This court should hear and consider evidence concerning the efficacy of such a protocol. Given that there is no dispute among the parties that a sufficiently large dose of thiopental or some other barbiturate would be lethal and painless, the only remaining question is whether some legitimate, countervailing consideration makes the use of a single drug infeasible. It became a

matter of public record after the complaint was filed in this case that Defendants'

expert, Dr. Dershwitz, advised Tennessee in April 2007 to switch from its three-drug

protocol to "a one-drug protocol which provided for the administration of 5 grams of

sodium thiopental, ... and a waiting period of five minutes before the physician came

in and confirmed death." Harbison v. Little, 511 F.Supp.2d 872, 876 (M.D. Tenn.,

2007).[17]

## V.    WITNESS LIST AND AVAILABILITY.

Plaintiffs intend to call the following witnesses at trial:

Dr. Mark Heath
Dr. Steven Katz
Professor John Senders
Dr. Mark Dershwitz
Delaware DOC Commissioner Carl Danberg
Smyrna Warden Perry Phelps
Smyrna Deputy Warden Elizabeth Burris
Smyrna Deputy Warden David Pierce
Former Smyrna Warden Thomas Carroll
Anonymous Physician
Executioner John Doe #1
Executioner John Doe #2
Executioner John Doe #3
Executioner Jane Doe #1

---

[17]When questioned about his Tennessee recommendation, Dr. Dershwitz adamantly denied that the makes "recommendations," but did not dispute the viability of using a one drug procedure.  Tr. 9/24/07, 34-42.

34

Due to counsels' prior court commitments and scheduled vacations, Plaintiffs'

counsel are unavailable until September 8, 2008.

All of Plaintiffs' experts are available the weeks of September 8 and 22, 2008.

Both Dr. Heath and Professor Senders have other obligations during portions of the

week of September 15, although it is possible that they could be scheduled for that

time, if that week is more convenient for the Court.

Obviously, Plaintiffs cannot determine the availability of the anonymous

witnesses, and as to the DOC personnel, Plaintiffs request that Defendants' counsel

make their availability known.

Respectfully Submitted,

/s/ Michael Wiseman

_____

Michael Wiseman
Helen Marino
Maria K. Pulzetti
Capital Habeas Corpus Unit
Federal Community Defender Office
for the Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Dated:        Philadelphia, PA
              June 6, 2008

**Certificate of Service**

I, Michael Wiseman, hereby certify that on this 6th day of June, 2008 I served the foregoing upon the following persons by e-mail and United States Mail:

Gregory E. Smith, Esq.
Elizabeth McFarlan, Esq.
Marc P. Niedzielski, Esq.
Office of the Attorney General
820 North French Street, 6th Floor
Carvel State Building
Wilmington, Delaware 19801

/s/ Michael Wiseman
_____
Michael Wiseman

No. 07-5439

IN THE

## Supreme Court of the United States

_____

RALPH BAZE, et al,
*Petitioners,*

v.

JOHN D. REES, et al.,
*Respondents.*

_____

ON WRIT OF CERTIORARI TO THE
SUPREME COURT OF KENTUCKY

_____

JOINT APPENDIX
VOLUME IV

_____

REDACTED VERSION FOR PUBLIC RECORD

_____

Jeffrey T. Middendorf*
John C. Cummings
Justice & Public Safety
  Cabinet
Office of Legal Services
125 Holmes St
Frankfort, Kentucky 40601
502-564-3279

David M. Barron*
John Anthony Palombi
Assistant Public Advocates
Kentucky Department of Public
  Advocacy
100 Fair Oaks Lane, Suite 301
Frankfort, Kentucky 40601
502-564-3948

*Counsel of Record for*
  *Respondents*

*Counsel of Record for*
  *Petitioners*

*Counsel of Record

_____

PETITION FOR CERTIORARI FILED JULY 11, 2007
CERTIORARI GRANTED SEPTEMBER 25, 2007

970

## KENTUCKY STATE PENITENTIARY

## VISITING SCHEDULE FOR DEATH ROW INMATE

### PRE-EXECUTION (DEATH WATCH)

**ATTORNEYS/PARALEGALS**                                    REVISED 12/14/2004

DAILY                          ██████ TO ██████     CONTACT

24-HOUR ACCESS IN EVENT OF EMERGENCIES

**PERSONAL VISITORS**

DAILY BY APPOINTMENT           ██████ TO ██████     CONTACT

DAY OF SCHEDULED EXECUTION     ██████ TO ██████     CONTACT

**MINISTERS**

MONDAY THROUGH FRIDAY          ██████ TO ██████

INSTITUTIONAL CHAPLAIN         ██████ TO ██████

**NEWS MEDIA**

MONDAY THROUGH FRIDAY          ██████ TO ██████     CONTACT

BY SPECIAL ARRANGEMENTS ONLY

**VISITATION GUIDELINES**

ANY ITEM BROUGHT IN BY ATTORNEYS/PARALEGALS, MINISTERS, OR NEWS
MEDIA SUCH AS, BUT NOT LIMITED TO, CASSETTES, WIRELESS MIKES, BOOKS,
OR MAIL MUST BE APPROVED IN ADVANCE BY THE WARDEN. NO ITEMS WILL BE
ALLOWED IN BY PERSONAL VISITORS.

1.    VISITS WILL BE CONDUCTED AT A DESIGNATED LOCATION.

2.    NO MORE THAN FOUR VISITORS AT A TIME.

3.    THE WARDEN RESERVES THE RIGHT TO DENY ACCESS TO THE
      INSTITUTION, ANY VISITOR OR PERSON, HE DEEMS A RISK TO THE
      SECURITY OF THE INSTITUTION.

971

**PRE-EXECUTION MEDICAL ACTIONS CHECKLIST**

**ACTIONS TAKEN AFTER RECEIVING EXECUTION ORDER**

REVISED 12/14/2004

| ACTIONS | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|
| 1. Notify Department of Corrections ██████ and ██████ of receipt of Governor's Death Warrant (immediately). | | |
| 2. Begin a special section of condemned's medical record for all medical actions (X – 14 days). | | |
| 3. Nurse visits and checks on the condemned each shift, seven days a week, using the special medical section to record contacts and observations (X - 14 days). | | |

972

**PRE-EXECUTION MEDICAL ACTIONS CHECKLIST**
**ACTIONS TAKEN AFTER RECEIVING EXECUTION ORDER**
**PAGE 2 of 4**

REVISED 12/14/2004

| ACTIONS | | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|---|
| 4. | ▮▮▮▮ personally observes and evaluates the condemned five (5) days per week, Monday through Friday (X - 14 days). | | |
| 5. | Place the ▮▮▮▮'s documentation in the permanent record immediately after personal contact. | | |
| 6. | Department of Corrections ▮▮▮▮ or his designee reviews and initials nursing documentation in #3 daily (X - 14 days). | | |
| 7. | ▮▮▮▮ reviews nursing and doctor's documentation weekly. | | |

**PRE-EXECUTION MEDICAL ACTIONS CHECKLIST**
**ACTIONS TAKEN AFTER RECEIVING EXECUTION ORDER**
**PAGE 3 of 4**

REVISED 12/14/2004

| ACTIONS | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|
| 8. Physical examination is completed by the ▮▮▮▮▮ or his designee no later than seven (7) days prior to execution. | | |
| 9. Place the physical in the permanent medical record upon completion. | | |
| 10. ▮▮▮▮▮ evaluation is completed by ▮▮▮▮▮ no later than seven (7) days prior to execution. | | |
| 11. Place the psychiatric interview and psychiatric evaluation in the permanent medical record and send copies to the Warden. | | |

974

**PRE-EXECUTION MEDICAL ACTIONS CHECKLIST**
**ACTIONS TAKEN AFTER RECEIVING EXECUTION ORDER**
**PAGE 4 of 4**

REVISED 12/14/2004

<u>ACTIONS</u>                                                 <u>RESPONSIBILITY</u>                    <u>COMPLETED/DATE/TIME</u>

12. ▇▇▇▇▇▇▇▇▇ or his designee
personally observes and evaluates the
condemned's medical condition weekly.

13. Place the ▇▇▇▇▇ or his
designee notes in the permanent record
immediately after personal contact.

14. Notify all medical staff to immediately
notify the Warden, ▇▇▇▇▇▇▇
▇▇ or designee, and ▇▇▇▇▇
▇▇▇▇ of any change
in the inmate's medical or psychiatric
condition.



975

# THE EXECUTION
## LETHAL INJECTION

REVISED 12/14/2004

## SEQUENCE OF EVENTS

RESPONSIBILITY

COMPLETED/DATE/TIME

1. At ▮▮▮▮▮ the Warden orders the condemned escorted to the execution chamber and strapped to the gurney.

2. The IV team members will be the members of the execution team who site and insert the IV lines.

3. The team enters the chamber and runs the IV lines to the condemned inmate, site and insert one (1) primary IV line and one (1) backup IV line in a location deemed suitable by the team members.

4. The insertion site of preference shall be the following order:  arms, hands, ankles and/or feet, neck.

976

**THE EXECUTION: LETHAL INJECTION**
Page 2 of 9

REVISED 12/14/2004

## SEQUENCE OF EVENTS

RESPONSIBILITY

COMPLETED/DATE/TIME

5.  To best assure that a needle is inserted properly into a vein, the IV team members should look for the presence of blood in the valve of the sited needle.

6.  If the IV team cannot secure one (1) or more sites within one (1) hour, the Governor's Office shall be contacted by the Commissioner and a request shall be made that the execution be scheduled for a later date.

7.  The team will start a saline flow.

8.  The team will securely connect the electrodes of the cardiac monitor to the inmate and ensure the equipment is functioning.

977

**THE EXECUTION: LETHAL INJECTION**
**Page 3 of 9**

REVISED 12/14/2004

| SEQUENCE OF EVENTS | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|
| 9. The team will then move to the hallway and stand by. | | |
| 10. The team leader will recheck all restraints and determine they are secure and so advise the Warden. | | |
| 11. The Warden will confirm that all is ready. | | |
| 12. The Warden will make one final check with the attorneys stationed outside the chamber. | | |
| 13. The Deputy Warden will open the curtain and turn on the microphone. | | |

978

**THE EXECUTION: LETHAL INJECTION**
Page 4 of 9

REVISED 12/14/2004

<u>SEQUENCE OF EVENTS</u>                    RESPONSIBILITY                    COMPLETED/DATE/TIME

14.    The Warden states, "At this time
       we will carry out the legal execution
       of _____ (condemned name)."

15.    The Warden asks the condemned if he
       wants to make a final statement
       (two (2) minutes allowed).

16.    Upon the Warden's order to "proceed"
       and the microphone turned off, a designated
       team member will begin a rapid flow of lethal
       chemicals in the following order:

       1)    Sodium Thiopental (3 gm.)

       **NOTE:**  If it appears to the Warden

       That the condemned is not unconscious

THE EXECUTION: LETHAL INJECTION
Page 5 of 9

REVISED 12/14/2004

SEQUENCE OF EVENTS                    RESPONSIBILITY                    COMPLETED/DATE/TIME

within 60 seconds to his command to

"proceed", the Warden shall stop the

flow of Sodium Thiopental in the primary

site and order that the backup IV be

used with a new flow of Sodium Thiopental.

2)    Saline (25 mg.)

3)    Pancuronium Bromide (50 mg)

4)    Saline 25 (mg)

5)    Potassium Chloride (240 mcq).

17.    A designated team member will begin

a stopwatch once the lethal injections

are complete.  If the heart monitor does

980

THE EXECUTION: LETHAL INJECTION
Page 6 of 9

REVISED 12/14/2004

RESPONSIBILITY    COMPLETED/DATE/TIME

not indicate a flat line after ten (10)

minutes and if during that time the physician

and coroner are not able to pronounce death,

the Warden will order a second set of lethal

chemicals to be administered (Sodium

Thiopental, Pancuronium Bormide, and

Potassium Chloride). This process will

continue until death has occurred.

18.    A designated team member will observe

the heart monitor and advise the

physician of cessation of

electrical activity of the heart.

THE EXECUTION: LETHAL INJECTION
Page 7 of 9

REVISED 12/14/2004

## SEQUENCE OF EVENTS

| | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|
| 19. The curtains shall be drawn when the Physician and coroner enter the chamber and confirm death by checking the condemned's pulse and pupils and so advise the Warden. | | |
| 20. The curtain will then be opened. The Warden turns on the microphone and states: "At approximately ___ p.m. the execution of ___ was carried out in accordance with the laws of the Commonwealth of Kentucky". | _____ | _____ |
| 21. The microphone is turned off and the curtains will be drawn. | _____ | _____ |

982

THE EXECUTION: LETHAL INJECTION

Page 8 of 9

REVISED 12/14/2004

## SEQUENCE OF EVENTS

| | | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|---|
| 22. | The witnesses are escorted out of the witness room, first the media, inmate's witnesses, and then the victim's witnesses. | | |
| 23. | The team will prepare the body for departure. | _____ | _____ |
| 24. | Release body per prior arrangements. | _____ | _____ |
| 25. | Funeral director completes death certificate. | _____ | _____ |
| 26. | Not more than one (1) day after execution, the Warden shall return the copy of the judgment of the court pronouncing the death sentence, of the manner, time and place of its execution. | _____ | _____ |

983

THE EXECUTION: LETHAL INJECTION
Page 9 of 9

REVISED 12/14/2004

SEQUENCE OF EVENTS                    RESPONSIBILITY                    COMPLETED/DATE/TIME

27.    Close out inmate account during
       next business day.

28.    Contact individual designated to
       receive condemned's personal property
       for pick up of property the next
       business day.

29.    Compile all documents pertaining to
       Execution and place in inmate file.

## EXECUTION TEAM QUALIFICATIONS

1.  The following people with at least one year of professional experience may be on the IV team:

   a)   Certified Medical Assistant, or

   b)   Phlebotomist, or

   c)   Emergency Medical Technician, or

   d)   Paramedic, or

   e)   Military Corpsman

2.  Prior to participating in an actual execution, the member of the IV team must have participated in at least two (2) practices.

3.  Members of the IV team must remain certified in their profession and must fulfill any continuing education requirements in their profession.

4.  The execution team shall practice at least ten (10) times during the course of one (1) calendar year.

5.  Each practice shall include a complete walk through of an execution including the siting of two (2) IVs into a volunteer.

6.  Execution team members, excluding IV team members, must have participated in a minimum of two (2) practices prior to participating in an actual execution.

985

## STABALIZATION PROCEDURE AFTER THE EXECUTION HAS COMMENCED

1.    In the event that a stay is issued after the execution has commenced, the execution team will stand down and medical staff on site will attempt to stabilize the condemned with the below listed equipment and personnel.

A.    The Warden will arrange for an ambulance and staff to be present on institutional property.

B.    A medical crash cart and defibrillator shall be located in the execution building.