IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ROBERT W. JACKSON, III, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civ. No. 06-300-SLR |
| | ) | **CLASS ACTION** |
| CARL C. DANBERG, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

Michael Wiseman, Helen Marino and Maria Pulzetti, of the Federal Community Defender Office for the Eastern District of Pennsylvania, Capital Habeas Corpus Unit, Philadelphia, Pennsylvania.  Attorneys for Plaintiffs.

Elizabeth R. McFarlan, Gregory E. Smith, Loren C. Meyers and Marc P. Niedzielski, Deputy Attorneys General, Delaware Department of Justice, Wilmington, Delaware. Attorneys for Defendants.

---

**MEMORANDUM OPINION**

Dated: March  11,  2009
Wilmington, Delaware

**ROBINSON, District Judge**

## I. BACKGROUND

On May 8, 2006, Robert W. Jackson, III[1] filed a 42 U.S.C. § 1983 action seeking

preliminary and final injunctive relief and a declaratory judgment regarding defendants'[2]

procedure for carrying out his execution through lethal injection.[3]   (D.I. 2, 6)  Plaintiff

---

[1]Plaintiff is a death-sentenced prisoner in the custody of the Delaware Department of Correction ("DOC").  (D.I. 2)  His execution by lethal injection was scheduled to take place on May 19, 2006.  (D.I. 6)

[2]The complaint identifies defendants as: (1) Stanley W. Taylor, Jr., the former Commissioner of the DOC "responsible for the day-to-day management of the DOC and [ ] charged . . . with determining the specific execution protocol.";   (2) Thomas L. Carroll, the warden of the Delaware Correctional Center ("DCC") (now called the James T. Vaughn Correctional Center) "where plaintiff is incarcerated and where the execution is due to take place. He is plaintiff's custodian . . . responsible for the day-to-day management of the DOC and for the supervision of plaintiff's execution."; (3) Paul Howard, the Bureau Chief for the Bureau of Prisons, "which provides overall administrative support for Delaware's five state prisons, including the DCC. . . . [H]is predecessor was responsible for researching and drafting what plaintiff believes to be the [former] execution protocol."; and (4) "[O]ther unknown state actors, [who] are agents, employees or contractors engaged by defendants and their agents to participate in plaintiff's execution." Defendants are sued in their individual and official capacities.  (D.I. 20 ¶¶ 20-24)  During a February 8, 2007 hearing, the parties discussed working together to amend the caption to reflect personnel changes with respect to defendants and to eliminate the claims made against defendants in their personal capacity.  (D.I. 31 at 22-24)  To date, the court has made the only caption change: "The caption has been changed to reflect 'Carl C. Danberg' as Commissioner of the Delaware DOC, in place of 'Stanley W. Taylor, Jr.'  The parties are directed to advise the court if any other of the individuals should be changed to reflect the current holders of the positions represented in the caption."  (D.I. 32 at fn.1)

[3]At the time the complaint was filed, plaintiff did not have access to the specific execution protocol.  (D.I. 2 ¶¶ 7, 8)  However, by studying the procedures used in past executions, autopsy reports and past protocols, plaintiff described Delaware's lethal injection protocol as "poisoning [plaintiff] with a lethal combination of three chemical substances:  (1) sodium pentothal [also, known as sodium thiopental], a short-acting barbiturate; (2) pancuronium bromide, a paralytic agent; and (3) potassium chloride, an extremely painful chemical that causes cardiac arrest." (*Id.* at ¶ 9)

alleges that his execution[4] under the likely protocol to be used by defendants would subject him to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution.  The court has jurisdiction pursuant to 28 U.S.C. § 1331.

A telephonic status conference with the parties was held on May 9, 2006, wherein the court expressed concerns over whether it had jurisdiction to consider plaintiff's claims on the merits.  (D.I. 9)  Considering that the United States Supreme Court had recently granted certiorari to resolve that very issue, the case was stayed until a decision issued in *Hill v. McDonough*,[5] 05-8794, *certiorari granted*, 126 S. Ct. 1189 (Jan. 25, 2006).  As part of that order, defendants were enjoined from carrying out plaintiff's execution until further order of the court.  (D.I. 9)

On June 12, 2006, the Supreme Court ruled that plaintiff Hill's claim was cognizable under 42 U.S.C. § 1983 and was not subject to dismissal as a second or successive habeas corpus petition.  *Hill*, 547 U.S. 573 (2006).  With jurisdiction evident,

---

[4]11 Del. C. § 4209(f) provides, in part, for execution of condemned prisoners by lethal injection.

[5]The United States Supreme Court granted certiorari to resolve the following questions:  (1) whether a complaint brought under 42 U.S.C. § 1983 by a death-sentenced state prisoner, who seeks to stay his execution in order to pursue a challenge to the chemicals utilized for carrying out the execution, is properly recharacterized as a habeas corpus petition under 28 U.S.C. § 2254; and (2) whether, under [the Supreme Court's] decision in *Nelson v. Campbell*, 541 U.S. 637 (2004), a challenge to a particular protocol the State plans to use during the execution process constitutes a cognizable claim under 42 U.S.C. § 1983.

the court conducted a second teleconference,[6] lifted the stay and ordered defendants

to respond to the complaint. The parties agreed to an informal exchange of discovery

materials as part of an effort to resolve the claims without litigation.[7] (D.I. 12, 14 - 19)

On October 6, 2006, a scheduling order was imposed pursuant to Fed. R. Civ. P.

16, setting discovery to conclude on June 30, 2007 and a bench trial to commence on

September 10, 2007. (D.I. 20) The case was also referred to United States Magistrate

Judge Mary Pat Thynge for the purpose of alternative dispute resolution. (D.I. 20, 21)

On December 1, 2006, plaintiff filed an opposed motion for class certification to

include all current and future inmates sentenced to death by a state court in the State of

Delaware. (D.I. 26, 27, 28, 29) Following briefing and oral argument, the court granted

the motion to certify the class pursuant to Fed. R. Civ. P. 23(b)(1) & (2).[8] (D.I. 30, 31

33)

A mediation teleconference was held on May 15, 2007. On May 24, 2007,

defendants moved for a protective order. (D.I. 38) Plaintiffs opposed the protective

order and moved to amend the discovery deadline. (D.I. 39) The court held a third

---

[6]Although the transcript of this teleconference was sealed, most of the transcripts of the other teleconferences are not sealed and are available to the public. (D.I. 13)

[7]As part of that order, a bench trial was scheduled to commence on September 10, 2007. (D.I. 22)

[8]Since the court is unaware of any class members opting out, the members of the class are: (1) Robert W. Jackson, III; (2) Luis G. Cabrera; (3) James E. Cooke, Jr.; (4) Robert A. Gattis; (5) Shannon M. Johnson; (6) Michael R. Manley; (7) Adam W. Norcross; (8) Lamont L. Norman; (9) Juan J. Ortiz; (10) Gary W. Ploof; (11) Luis E. Reyes; (12) Steven W. Shelton; (13) Chauncy S. Starling; (14) David D. Stevenson; (15) Ralph E. Swan; (16) Ambrose L. Sykes; (17) Milton E. Taylor; (18) Jermaine M. Wright and (19) Craig A. Zebroski. (D.I. 122 at fn.2)

3

telephonic conference on June 8, 2007, wherein the parties discussed, *inter alia*, problems involving discovery. (D.I. 46) As a result, the scheduling order was amended, extending discovery through October 1, 2007 and re-scheduling the bench trial to commence on October 9, 2007. (D.I. 43)

For about the next two months, the parties exchanged discovery, noticed depositions of fact and expert witnesses and toured the lethal injection facility (Building 26, Bate stamp no. 01871) at the DCC.[9] (D.I. 47-58, 61-73; D.I. 102) On August 15, 2007, plaintiffs moved for leave to amend the complaint to add claims under Delaware's Administrative Procedures Act; the motion was withdrawn on August 26, 2007. (D.I. 55, 56, 60)

On September 26, 2007, the court conducted a fourth telephonic status conference to discuss the effect of the decision of the United States Supreme Court in granting the petition for certiorari in *Baze v. Rees*, __ S.Ct. __, 2007 WL 2075334 (Sept. 25, 2007).[10] (D.I. 80) While plaintiffs wanted to proceed with discovery in order

---

[9]In September 2007, the court accompanied counsel and an expert retained by plaintiffs on one such tour of Building 26 at DCC. (D.I. 71)

[10]The petition for writ of certiorari presented broad questions for the Supreme Court: (1) does the Eighth Amendment to the United States Constitution prohibit means for carrying out a method of execution that create and unnecessary risk of pain and suffering as opposed to only a substantial risk of the wanton infliction of pain?; (2) do the means for carrying out an execution cause an unnecessary risk of pain and suffering in violation of the Eighth Amendment upon a showing that readily available alternatives that pose less risk of pain and suffering could be used?; (3) does the continued use of sodium thiopental, pancuronium bromide, and potassium chloride, individually or together, violate the cruel and unusual punishment clause of the Eighth Amendment because lethal injections can be carried out by using other chemicals that pose less risk of pain and suffering?; and (4) when it is known that the effects of the chemicals could be reversed if the proper actions are taken, does substantive due process require a state to be prepared to maintain life in case a stay of execution is

to keep the case moving while the Supreme Court decided the petition, defendants argued the entire case should be stayed and discovery halted until a decision issued. (D.I. 84) Because defendants resisted the court's suggestion to continue with discovery, the parties were warned that resolution of the case might be further delayed by resuming discovery after the Supreme Court's decision; the trial was also postponed. (D.I. 84 at 6-8)

On April 16, 2008, the Supreme Court held that the risk of improper administration of the initial drug did not render Kentucky's three-drug protocol cruel and unusual and found that Kentucky's failure to adopt proposed alternatives to the three-drug protocol did not constitute cruel and unusual punishment. *Baze v. Rees*, 128 S.Ct. 1520 (2008). On April 17, 2008, the court scheduled an in-person status conference and ordered the parties to be prepared to "address the specific procedures that have been employed by the DOC for death by lethal injection in light of the Supreme Court's opinion in *Baze v. Rees* . . . . " (D.I. 83) During this conference, the court noted that "the only issue before us is whether the State of Delaware has a protocol that is either the same as Kentucky's or substantially similar." (D.I. 88 at 2-3)

At the June 23, 2008 pretrial conference, it was evident that Delaware had not embraced Kentucky's protocol. (D.I. 93 at 3-4) The court concluded that an evidentiary hearing would have to be conducted in order to determine, through expert testimony, whether the differences between the two protocols were significant. The evidentiary hearing was scheduled for September 10, 2008. (D.I. 95)

---

granted after the lethal injection chemicals are injected? *Baze v. Rees*, 2007 WL 2781088 (2007).

5

Defendants filed a revised lethal injection protocol on August 29, 2008. (D.I.
108) . Following a September 5, 2008 telephone conference, the case was referred to
mediation for the purpose of negotiating the final version of Delaware's lethal injection
protocol. (D.I. 109, 128) The evidentiary hearing scheduled for September 10 was
cancelled. Magistrate Judge Thynge conducted a mediation conference on October 26,
without success. (D.I. 111, 114)

On October 30, 2008, the court ordered plaintiffs to specifically identify the
portions of Delaware's protocol that are substantially different from that approved by the
Supreme Court in *Baze*.[11] (D.I. 116) Defendants filed a motion for summary judgment
on December 19, 2008, which plaintiffs opposed. (D.I. 121-126) Oral argument was
conducted on January 29, 2009. (D.I. 127)

## II.   STANDARD OF REVIEW

A court shall grant summary judgment only if the pleadings, depositions, answers
to interrogatories, and admissions on file, together with the affidavits, if any, show that
there is no genuine issue as to any material fact and that the moving party is entitled to
judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the burden
of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus.
Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). When determining whether
a genuine issue of material fact exists, the court must view the evidence in the light
most favorable to the nonmoving party and draw all reasonable inferences in that
party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Facts that could

---

[11]Plaintiffs now concede that, as written, there are no substantive differences
between the Kentucky and Delaware protocols. (D.I. 121)

6

alter the outcome are material, and disputes are genuine if evidence exists from which

a rational person could conclude that the position of the person with the burden of proof

on the disputed issue is correct. *Horowitz v. Federal Kemper Life Assurance Co.*, 57

F.3d 300, 302 n.1 (3d Cir.1995) (internal citations omitted).

If the moving party has demonstrated an absence of material fact, the

nonmoving party then must come forward with "specific facts showing that there is a

genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at

587 (quoting Fed.R.Civ.P. 56(e)). However, a party opposing summary judgment must

present more than just bare assertions, conclusory allegations or suspicions' to show

the existence of a genuine issue. *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d

Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). To survive a

motion for summary judgment, plaintiff cannot rely merely on the unsupported

allegations of the complaint, and must present more than the mere existence of a

scintilla of evidence in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U .S. 242, 252

(1986). If the nonmoving party fails to make a sufficient showing on an essential

element of its case with respect to which it has the burden of proof, the moving party is

entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).

## III.    THE OLD LETHAL INJECTION PROTOCOL

In 1992, Delaware carried out its first execution by lethal injection using a

7

three-drug protocol ("the old protocol"):[12]  (1) sodium pentothal, also known as sodium thiopental; (2) pancuronium bromide, also known as pavulon; and (3) potassium chloride. (D.I. 122)  This three-drug combination has been used in the lethal injection executions of 13 prisoners.[13]  The team responsible for inserting the intravenous lines ("IV") into each inmate sentenced to the death penalty ("ISDP") and administering or "pushing" the drugs through the IV has consisted of four members, John Doe 1, Jane Doe 1, John Doe 2 and John Doe 3 ("the IV team").[14]  (Depositions 7/6/07, 6/5/07, 5/21/07, 5/25/07).  The IV team is distinguishable from the "execution team," as the latter consists of DOC employees responsible for the security, safety and tie-down of the ISDP.  (Carroll Deposition, 3/27/07 at 16)  The same medical doctor has been present at each execution and responsible for "determin[ing] whether the patient is still

---

[12]There have been several revisions to the old protocol.  (*See e.g.,* Bate stamp no. 00001-00129 (3/11/92), Bate stamp no. 00130-00204 (2/26/93), Bate stamp no. 00205-00278 (9/29/95), Bate stamp no. 00279-00344 (3/1/99), Bate stamp no. 00345-00407 (10/11/00), Bate stamp no. 00408-00467 (8/1/05); Bate stamp no. 2444-2528 (8/31/07)

[13]Steven B. Pennell (3/14/92), James Allen Red Dog (3/3/93), Kenneth W. DeShields (8/31/93), Andre S. Deputy (6/23/94), Nelson W. Shelton (3/17/95), William H. Flamer (1/30/96), James B. Clark, Jr. (4/19/96), David J. Lawrie (4/23/99), Willie G. Sullivan (9/24/99), Dwayne L. Weeks (11/17/00), David F. Dawson (4/26/01), Abdullah Tanzil Hameen, formerly Cornelius Ferguson (5/25/01), and Brian D. Steckel (11/4/05). httpl://doc.delaware.gov/information/deathrow_executions February 11, 2009).

[14]John Doe 1 and Jane Doe 1 were the IV team for the Pennell and Red Dog executions.  Jane Doe 1 was also part of the IV team for:  DeShields, Deputy, Shelton, Flamer and Clark.  John Doe 2 was part of the IV team for the following executions:  DeShields, Deputy, Shelton, Flamer, Clark, Lawrie, Sullivan, Weeks, Dawson, Hameen and Steckel.  John Doe 3 was part of the IV team for:  Lawrie, Sullivan, Weeks, Dawson, Hameen and Steckel.

8

living or if he's dead." (Physician Deposition, 5/23/07 at 79-80; Taylor Deposition, 5/24/07 at 48)

According to the old protocol, for each execution, the IV team would arrive at the prison and be escorted to the execution building for a briefing with a security officer and/or the warden or deputy warden. The IV team would check the medications and dosages needed against the supplies on hand. The IV team would also review a previously prepared evaluation of the potential IV sites on the ISDP. Next, the IV team would begin preparing the medications and saline solution and drawing them into syringes. Once the ISDP was secured and strapped onto a gurney, the IV team would start intravenous lines in the ISDP's left and right arms. After the ISDP made a final statement, the warden would signal for the IV team to commence administration of the medications into the IV lines. First, sodium thiopental would be administered, followed by a normal saline flush; next, pavulon, followed by a normal saline flush; and third, potassium chloride would be administered, followed by a normal saline flush. (John Doe 2 Deposition, 5/21/07 at 14-16, 82-83; John Doe 3 Deposition, 5/25/07 at 18-10)

The record reflects noncompliance with the old protocol (whichever version was in effect at the time) in each of the thirteen executions. Some ISDP were administered incorrect dosages of the three drug combinations. Specifically, although the old protocol called for the administration of 100 mEq. of potassium chloride, several ISDP were given larger dosages: Clark was administered 200 mEq of potassium chloride (Bate stamp no. 1711); Red Dog was given 240 mEq of potassium chloride (Bate stamp no. 1152); Lawrie was given 200 mEq of potassium chloride (Bate stamp nos. 1729, 1733); Weeks was given 200 mEq of potassium chloride (Bate stamp nos. 1775, 1778);

9

and Steckel was given 200 mEq of potassium chloride (Bate stamp nos. 1849, 1870). (*See* Jane Doe 1, Deposition 6/5/07 at 78)

Written records of the drugs or the amounts administered were not kept; instead, the IV team made "mental notes." (John Doe 2 Deposition, 5/21/07 at 121-123, 66; John Doe 3 Deposition, 5/25/07 at 43) A log was not kept in the IV room. (Danberg Deposition, 5/27/07 at 48-49) With the exception of training sessions conducted before the Pennell execution and the start of John Doe 2 on the IV team, regular training sessions were not conducted. (John Doe 1 Deposition 7/6/07 at 52-53; John Doe 3 Deposition, 5/25/07 at 77-78; Jane Doe 1 Deposition, 6/5/07, at 52-56 (session geared toward security not IV team responsibilities); Watson Deposition, 8/10/07 at 44; John Doe 2 Deposition, 5/21/07 at 82-83 (training did not include starting an IV line)

Some members of the IV team also failed to follow the old protocol with respect to: (1) checking the equipment and materials pre-execution; (2) reviewing step-by-step instructions in the protocol; and (3) conducting executions without seeing any paperwork at all. (John Doe 1 Deposition, 7/6/07 at 56; John Doe 2 Deposition, 5/21/07 at 92-93; Carroll Deposition, 3/27/07 at 98)

The most notable execution of record was that of Brian Steckel, which occurred on November 3, 2005. At 12:08 a.m., immediately after Steckel finished making his final statement, Warden Carroll signaled the IV team to commence the execution, i.e., inject "syringe 1" containing the first drug, sodium thiopental, into the IV line.[15] (Bate stamp no. 00771; Carroll Deposition, 3/27/07 at 82-84) The primary line ran well at

---

[15]Two catheters were placed in Steckel's arms, the "primary line" in his left arm and the "secondary line" in his right arm. (Carroll Deposition, 3/27/07 at 30)

first but, for an unknown reason, became infiltrated.[16] (John Doe 2 Deposition, 5/21/07 at 117-118, 139-14-, 142; John Doe 3 Deposition, 5/25/07 at 109)

While the IV team tried to fix the problem, Steckel started talking, an indication that he was not yet anesthetized. (Carroll Deposition, 3/27/07 at 81, 84)  Because the IV team's efforts at troubleshooting the syringe 1 problem were unsuccessful, they decided to abort the first IV line and, instead, inject "syringe 2" containing sodium thiopental into the second IV line located in Steckel's right arm. (John Doe 2 Deposition, 5/21/07 at 117-118, 139)  While syringe 2 was running through the IV, the IV team prepared a replacement syringe ("syringe 3") of sodium thiopental and injected syringe 3 into the IV after syringe 2 was administered. (John Doe Deposition, 5/21/07 at 120)  Although the record is inconclusive on the total amount of sodium thiopental that Steckel ultimately received, the record reflects that at least two syringes (the required dose) were administered. (John Doe 2 Deposition, 5/21/07 at 124; Bates no. 1849, 1870)  Following the administration of syringes 2 and 3, the IV team administered pancuronium bromide and potassium chloride, as well as the corresponding saline flushes. (John Doe 2 Deposition, 5/21/07 at 141)  Steckel's time of death was announced at 12:22 a.m., some 14 minutes having elapsed since the IV team began its work. (Bate stamp no. 1848; Danberg Deposition 5/27/07 at 57, "Steckel's execution took a period of time that some of the witnesses considered to be an excessive length

---

[16]Infiltration can occur when the catheter nicks but does not enter the vein, causing the fluid to enter the skin or tissue. (John Doe 2 Deposition, 5/21/07 at 43)  If an IV line is infiltrated, there is back pressure or resistance felt on the syringe and the plunger of the syringe. (John Doe 2 Deposition, 5/21/07 at 45 46)

11

of time"; Burris Deposition, 3/28/07 at 69)  Other executions were completed in a far

shorter time period.[17]

## IV.    THE NEW LETHAL INJECTION PROTOCOL

On August 29, 2008, the DOC issued a revised execution policy, procedure and

protocol ("the new protocol") to be used to perform the court-ordered executions by

lethal injection of ISDP.  (D.I. 113)  The new protocol includes the same three-drug

combination with one significant difference, the amount of the first drug (sodium

thiopental) was increased.[18]  Specifically, the execution[19] begins with the injection of 3

---

[17]Dewayne Weeks:  warden signaled for procedure to begin at 12:12 a.m. and warden announced time of death as 12:16 a.m., Bate stamp no. 00738; David Lawrie: warden signaled for procedure to begin at 12:14 a.m. and warden announced time of death as 12:17 a.m., Bate no. 00712; Andre Deputy:  Warden signaled procedure to begin at 12:31 a.m. and physician pronounced death at 12:35 a.m., Bate stamp nos. 00532-00534.

[18]Defendant's expert, Mark Dershwitz, M.D., Ph.D., opined as to the significance of the increase:

> [T]he dose of thiopental sodium used by Delaware would render most people unconscious within 60 seconds from the time of the start of the administration. By the time the entire 3,000 mg dose of thiopental sodium solution is injected, it is my further opinion, to a reasonable degree of medical certainty, that over 99.99999999 % of the population would be unconscious.  Furthermore, this dose of thiopental sodium will cause virtually all persons to stop breathing within a minute or two of drug administration. . . . Thus, even in the absence of the administration of pancuronium bromide and potassium chloride, the administration of 3,000 mg of thiopental sodium by itself would be lethal in almost everyone.

(Bates no. 2509; see Dershwitz Deposition, 9/24/07 at 9-10, 13-14)

[19]The new protocol explicitly sets forth:  how the execution team is to be selected; required training and practice for the execution team; the procurement, storage, accountability and transfer of chemicals; the lethal injection chemical set-up and preparation; the manner for insertion of a catheter and connected IV lines; and chemical administration and IV monitoring.  (D.I. 123 at App-1)  As noted, the Delaware

grams of sodium thiopental at 2.5 % concentration. (*Id.* at 4, ¶4) The syringes

containing the sodium thiopental are labeled[20] for "Sodium Thiopental #1a" and

"Sodium Thiopental #1b" for identification. (*Id.* at 7) The IV line is then flushed with 50

mL of saline solution from the IV bag into a syringe labeled "Saline #2." After the

delivery of the Saline #2, the IV team must wait two minutes to allow for a

"consciousness check." (*Id.*) The consciousness check shall be performed as follows:

> a. The curtain between the execution chamber and the witness room
> shall be closed.
> b. Once the curtain is closed, the Warden will call the ISDP's name in
> a loud voice and observe the ISDP for a reaction.
> c. A member of the IV team will assess the consciousness of
> the ISDP by tactile stimulation of the ISDP. This tactile stimulation
> shall include touching the ISDP, shaking the ISDP's shoulder, and
> brushing the eyelashes of the ISDP.
> During the consciousness check, the Warden and IV team shall
> closely monitor the ISDP to assess consciousness.
> The curtain between the execution chamber and the witness room
> shall be reopened.
> If it appears that the ISDP is unconscious, the Warden shall signal
> to proceed with the remaining syringes, starting with Pancuronium
> Bromide in sequence.

(*Id.* at 7) After the IV team administers 50 mg of pancuronium bromide, labeled

"Pancuronium Bromide #3," the IV line is flushed with "Saline #4". (*Id.* at 4) Syringes

labeled "Potassium Chloride #5a, #5b and #5c," containing a total dose of 240mEq. of

Potassium Chloride, are next administered. "Saline #6," containing 50 mL of saline

and Kentucky protocols contain no substantive differences; in fact, Delaware's new
protocol includes additional safeguards not found in the Kentucky protocol, e.g., a two
minute consciousness test and the installation of a pan-tilt-zoom camera to allow IV
team members to monitor the ISDP during the execution.

[20]The primary set of syringes are to be color-coded red. (*Id.*)

13

solution, is next drawn from the IV bag into a syringe. (Id.) This process is repeated to create a second, back-up set of syringes color-coded blue.

## V.  ANALYSIS

The court begins its analysis by noting three fundamental facts. First, capital punishment is constitutional, and the Supreme Court "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." Baze v. Rees, 128 S. Ct. at 1530. Second, the Supreme Court has recognized that "[s]ome risk of pain is inherent in any method of execution - no matter how humane - if only from the prospect of error in following the required procedure. It is clear, then, that the Constitution does not demand the avoidance of all risk of pain in carrying out executions." Id. at 1529. Finally, the Supreme Court in Baze concluded that the risk of pain associated with administering Kentucky's three-drug protocol was constitutionally acceptable. Consequently, in order to demonstrate that Delaware's lethal injection protocol is "cruelly inhumane," plaintiffs shoulder a "heavy burden." Id. at 1533.

The question before the Supreme Court in Baze was whether Kentucky's lethal injection protocol was unconstitutional under the Eighth Amendment's ban on "cruel and unusual punishments," because of the risk that the protocol's terms might not be properly followed, resulting in significant pain. The petitioners in Baze proposed an alternative protocol (the "one-drug" protocol), despite their concession that said protocol has not been adopted by any State and has never been tried. The Supreme Court, upon review of the record, concluded that petitioners had failed to carry their burden of

14

showing "that the risk of pain from maladministration of a concededly humane lethal injection protocol, and the failure to adopt untried and untested alternatives, constitute cruel and unusual punishment." *Id.* at 1526.

Plaintiffs in the case at bar pursue the same relief (administration of a one-drug protocol) under the same theory (the risk of significant pain from maladministration of the three-drug protocol) as had the petitioners in *Baze*. It is undisputed in this case that Delaware has revised its lethal injection protocol to conform[21] to that sanctioned by the Supreme Court in *Baze*. And, for purposes of this proceeding, the court acknowledges that Delaware's IV team[22] has a history of committing errors[23] in carrying out the old protocol. Based on this record, there are two issues that remain for the court's review. First, have plaintiffs demonstrated that future IV teams will likely fail to follow the new protocol, consistent with the historic failures of administration? If so, the second issue for review is whether plaintiffs have demonstrated that the kind of administrative errors of record, projected into the future, present such an "objectively intolerable risk of harm" as to constitute cruel and unusual punishment?

With respect to the first issue, plaintiffs have demonstrated that executions by lethal injection had been carried out in Delaware with a casualness in procedure that cannot be tolerated in the future. As recognized by the Supreme Court, however, as

---

[21]As noted by defendants, the new protocol includes more safeguards than that provided by the protocol reviewed in *Baze*.

[22]As noted, the IV team was responsible for inserting the IV lines into each ISDP and for administering the drugs through the IV. The execution team was responsible for security, safety and tie-down of the ISDP. *See infra* pp. 8-9.

[23]*See infra* pp. 9-12.

15

societal norms have changed, so have the expectations relating to how executions should be carried out within the scope of the Eighth Amendment. In this regard, the Supreme Court in *Baze* raised the procedural bar by requiring various safeguards to accompany what is presently considered the most humane method of execution, that is, execution by lethal injection. It is evident from the Supreme Court's decision that Kentucky, like Delaware, revised its protocol as a result of litigation. *Id.* at 1528. Therefore, the fact that expectations have been raised (i.e., societal norms have changed yet again) should not be counted against defendants.

Plaintiffs argue in response that an improved protocol is of no moment if it is not carried out correctly. They assert that Delaware's past performance in administering its lethal injection protocol has been so deficient that, on this basis alone, the court should assume that Delaware's future performance likewise will be deficient. To put the point differently, plaintiffs ask the court to assume that future conduct by different personnel under a new lethal injection protocol in a different legal environment will reflect past conduct by former personnel under a now rejected protocol. To embrace plaintiffs' logic, the court would have to find either that the new protocol is simply too complicated for a State to carry out - an argument rejected in *Baze* - or that Delaware's personnel will intentionally ignore the requirements of the new protocol in order to intentionally cause undue pain and suffering. The record does not support either of those propositions.[24]

---

[24]Although not dispositive, several States whose lethal injection protocol have been reviewed and approved under *Baze* had a similar history of errors in administration. *Clemons v. Crawford*, 2008 WL 2783233 (W.D. Mo. 2008); *Nooner v. Norris*, 2008 WL 3211290 (E.D. Ark. 2008); *Raby v. Johnson*, 2008 WL 4763677 (S.D.

16

Even if the court were to assume that the record supported plaintiffs' arguments

in this regard, the question remains whether the risks of harm posed by such

hypothetical errors are of constitutional dimension. The Supreme Court acknowledged

in *Baze* that

> subjecting individuals to a risk of future harm - not simply actually
> inflicting pain - can qualify as cruel and unusual punishment. To
> establish that such exposure violates the Eight Amendment, however,
> the conditions presenting the risk must be **"sure or very likely"** to
> cause serious illness and needless suffering," and give rise to
> sufficiently **imminent** dangers." . . . We have explained that to
> prevail on such a claim there must be a "substantial risk of serious
> harm," an "objectively intolerable risk of harm" that prevents prison
> officials from pleading that they were "subjectively blameless for
> purposes of the Eighth Amendment."

*Id.* at 1530-31 (emphasis in original) (citations omitted).

Of course, in the context at bar, the "harm" referred to above is not death, since

that is the goal of lethal injection. The "harm" is the risk of "needless" suffering or pain.

In this case, as in *Baze*, the focus of plaintiffs' concerns is the improper administration

of the first drug, sodium thiopental, of the three-drug protocol.[25] According to the

Supreme Court in *Baze*, "[i]t is uncontested that, failing a proper dose of sodium

thiopental that would render the prisoner unconscious, there is a substantial,

constitutionally unacceptable risk of suffocation from the administration of pancuronium

bromide and pain from the injection of potassium chloride." *Id.* at 1533. The risks

---

Tex. 2008).

   [25]The court notes that plaintiffs' other concern, the absence of any guidance in
the new protocol for the IV team if they are unsuccessful in finding peripheral access is
no longer at issue. Counsel for defendants represented in open court that the absence
of any such procedures simply means that the execution cannot proceed. (D.I. 127 at
40-41)

identified by plaintiffs, then, is that too little sodium thiopental is administered and/or that not enough time elapses following the administration of this first drug to cause unconsciousness before the administration of the final two drugs.

Aside from administrative errors, the only evidence arguably relevant to plaintiffs' claims is that concerning the Steckel execution.[26] Although the court concedes that the IV team did not document the steps of the execution, nevertheless, the record adequately demonstrates that the proper dose of sodium thiopental (at least 2 syringes' worth) was administered. The court is not prepared to find, on this record, that Steckel was likely exposed to needless suffering because the dose of sodium thiopental delivered to him took longer to take effect in his case than in other cases. Moreover, the court notes that the new protocol addresses the very concerns raised in this regard, by having a standard "consciousness check" before the delivery of the final two drugs. The court finds that plaintiffs have not shown that there is a substantial risk of an inadequate dose of sodium thiopental under the new protocol. Consequently, plaintiffs have not demonstrated that any maladministration of the new protocol is "very likely" to pose an "objectively intolerable risk of harm."[27] *Id.* at 1531.

## VI.    CONCLUSION

Under the now settled standard of review and for the reasons stated, the court concludes that plaintiffs have not carried their heavy burden to prove that the risks

---

[26]The court does not understand the risk of over-dosing to be of constitutional concern.

[27]The court notes in this regard that the phrase "unnecessary risk of pain" is one coined by petitioners in *Baze*, not by the Supreme Court. *See id.* at 1529. This court purposefully did **not** embrace the phrase in evaluating the issues at bar.

18

associated with maladministering Delaware's new lethal injection protocol are not only "sure" or "very likely," but are "objectively intolerable risks of harm" as well. Therefore, the court finds that there are no genuine issues of fact and that defendants are entitled to judgment as a matter of law. Defendants' motion for summary judgment (D.I. 121) is granted. An order shall follow.

19